Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Víctor A. Trinidad Hernández y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>María del C. Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br>José A. De Jesús Vera y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos | Certificación<br><br>2013 TSPR 73<br><br>188 DPR ____ |

Número del Caso: CT-2013-8
                 CT-2013-9
                 CT-2013-10


Fecha: 24 de junio de 2013

**CT-2013-8**

Abogado de la Parte Peticionaria:

Lcdo. Iván Crespo Arroyo

Oficina de la Procurador General:

Lcda. Margarita Mercado Echegaray

**CT-2013-9**

Abogadas de la Parte Peticionaria:

Lcda. Judith Berkan
Lcda. Mary Jo Meléndez

Abogada de la Parte Recurrida:

Lcda. Beatriz Annexy Guevara

**CT-2013-10**

Abogados de la Parte Peticionaria:

Lcdo. Raúl Santiago Meléndez
Lcdo. Edgar R. Vega Pabón

Abogadas de la Parte Recurrida:

Lcda. Judith Berkan
Lcda. Mary Jo. Meléndez

Materia: *Per Curiam* con Opinión de Conformidad y Opiniones Disidentes

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Víctor A. Trinidad Hernández y otros<br><br>    Peticionarios<br><br>       v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>María del C. Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>       v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>José A. De Jesús Vera y otros<br><br>    Peticionarios<br><br>       v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos | CT-2013-0008<br><br>CT-2013-0009<br><br>CT-2013-0010 | Certificación |

*PER CURIAM*

En San Juan, Puerto Rico, a 24 de junio de 2013.

Nos encontramos ante la delicada situación de atender el reclamo de cientos de empleados públicos para evaluar la constitucionalidad de la Ley Núm. 3-2013, la cual reforma el Sistema de Retiro de los Empleados del Gobierno de Puerto Rico

y sus Instrumentalidades (en adelante, Reforma del Sistema de Retiro).

Al suscribir esta decisión, somos conscientes del efecto de esta reforma sobre los planes de retiro de las partes demandantes y otros empleados públicos. Todos los que estamos en el servicio público tenemos familiares, compañeros y compañeras y amigos y amigas cercanos que se afectarán por esta legislación. Por otro lado, sabemos la importancia que tiene la resolución de estos casos sobre la situación económica del país, particularmente, sobre la deuda del Estado que le permite acceso a fondos para el desarrollo y mantenimiento de infraestructura y de otros programas de singular importancia para todos los que vivimos en Puerto Rico. Esta Curia tiene la obligación de adjudicar los casos ante nos y de hacer ese delicado balance entre unos intereses en conflicto de extrema importancia en nuestra vida como pueblo.

Ante este dilema, examinados cuidadosamente los recursos presentados a la luz de nuestro ordenamiento constitucional y de la jurisprudencia, procede que sostengamos la validez de las medidas adoptadas por los poderes ejecutivo y legislativo para resolver la insolvencia actuarial del Sistema de Retiro. Por los fundamentos que exponemos a continuación, se acogen y consolidan los recursos de certificación intrajurisdiccional presentados por Trinidad Hernández y otros, Alvarado Pacheco y otros, así como por De Jesús Vera y otros, y se confirma la sentencia desestimatoria decretada por el Tribunal de Primera Instancia.

I.

En síntesis, en los casos que tenemos ante nuestra consideración, las partes demandantes solicitaron al Tribunal de Primera Instancia que declarara inconstitucional la Reforma del Sistema de Retiro y que concediera un *injunction* preliminar y permanente para detener su implementación. En esencia, la reforma consiste en: 1) la congelación de la acumulación de beneficios de los empleados públicos activos bajo los planes de beneficio definido establecidos en la Ley 447 y la Ley 1, al eliminar la adquisición de nuevos beneficios bajo el sistema actual pero respetando toda acumulación ganada por dichos empleados públicos hasta el presente; 2) el incremento en la edad de retiro, el cual se implantará de manera escalonada para aquellos empleados públicos que se encuentran hoy cerca de cumplir con la edad de retiro requerida bajo las leyes vigentes; 3) el incremento de la aportación de los empleados públicos al sistema; 4) mover los empleados públicos activos al amparo de la Ley 447 y la Ley 1 a un plan de contribución definida similar a la Reforma 2000; y 5) la modificación de los beneficios otorgados por las leyes especiales, utilizando todo el ahorro en las aportaciones patronales que esto produzca para allegarle más fondos al sistema de retiro de empleados públicos y así asegurar el pago de los beneficios de los jubilados y de aquellos empleados públicos activos con beneficios acumulados al amparo de la Ley 447 y la Ley 1.

Estando el trámite pendiente ante el Tribunal de Primera Instancia, las partes demandantes acudieron al Tribunal

Supremo solicitando la certificación de los casos. Mediante Resolución emitida el 11 de junio de 2013, denegamos las solicitudes y señalamos, entre otras cosas, que el foro primario debía atender con premura las mociones dispositivas que tenía ante sí y que celebrara una vista evidenciaria no más tarde del 18 de junio de 2013. Alvarado Pacheco y otros v. E.L.A. y otros, 2013 T.S.P.R. 64, 188 D.P.R. __ (2013).

El 17 de junio de 2013, el foro primario emitió una sentencia y sentencia parcial mediante la cual resolvió las mociones de desestimación presentadas por los demandados y desestimó todas las reclamaciones al amparo de la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V. Por eso, dejó sin efecto la vista señalada para el día siguiente.

Oportunamente, las partes demandantes, Trinidad Hernández y otros, Alvarado Pacheco y otros y De Jesús Vera y otros acudieron ante este Tribunal mediante las peticiones de certificación intrajurisdiccional.[1] Por su parte, las partes recurridas presentaron sus respectivas oposiciones a que se

---

[1] La parte peticionaria compuesta por Alvarado Pacheco y otros, CT-2013-0009, presentó un recurso de apelación ante el Tribunal de Apelaciones el 18 de junio de 2013 pero no incluyó copia de este en el apéndice incumpliendo con la Regla 20 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-B. Por otro lado, no surge del expediente del grupo de peticionarios De Jesús Vera y otros, CT-2013-0010, que haya presentado una moción de reconsideración ante el foro primario o una apelación ante el foro apelativo intermedio, por lo que no podemos corroborar si existe asunto pendiente ante alguno de los foros de inferior jerarquía. De hecho, este último tiene serias deficiencias que incluyen la falta de índice del apéndice y enumeración de las páginas. No obstante, como el recurso de Trinidad Hernández y otros, CT-2013-0008, cumple con todos los requisitos para ejercer nuestra jurisdicción, consolidamos los recursos y resolvemos en virtud de la Regla 50 del Reglamento del Tribunal Supremo, supra.

certificara los casos. Resuelto los casos por el Tribunal de Primera Instancia, y toda vez que este "asunto es de tal importancia que exige una pronta atención" ante la vigencia inminente de la Reforma del Sistema de Retiro, certificamos y resolvemos estos recursos sin más trámite. U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 272-273 (2010).

## II.

Una parte puede presentar como defensa una moción de desestimación bien fundamentada cuando la reclamación en su contra no justifica la concesión de remedio alguno. 32 L.P.R.A. Ap. V, R. 10.2 (5); Asoc. Fotoperiodistas v. Rivera Schatz, 180 D.P.R. 920 (2011). Para disponer de una moción de desestimación bajo este fundamento

> el tribunal tomará como ciertos todos los hechos bien alegados en la demanda, que hayan sido aseverados de manera clara y concluyente, y que de su faz no den margen a dudas. Ante una moción de desestimación, las alegaciones hechas en la demanda hay que interpretarlas de forma conjunta, liberal y lo más favorable posible para la parte demandante. La demanda no deberá desestimarse a menos que se demuestre que el demandante no tiene derecho a remedio alguno bajo cualesquiera hechos que pueda probar. Colón v. Lotería, 167 D.P.R. 625 (2006).

Por otra parte, tanto la Constitución de Puerto Rico como la federal disponen que no se aprobarán leyes que menoscaben las obligaciones contractuales. Art. II., Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; Art. 1, Sec. 10, Const. E.E. U.U., L.P.R.A., Tomo 1. Ambas cláusulas buscan asegurar la estabilidad de las relaciones contractuales. Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 81 (2010), certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S. Ct. 152, 562 U.S. __ (2010); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 395 (1973).

No obstante, la protección de las obligaciones contractuales no es absoluta, pues debe ser armonizada con el poder de reglamentación del Estado en beneficio del interés público. United States Trust Co. v. New Jersey, 431 U.S. 1, 21 (1977); Warner Lambert Co. v. Tribunal Superior, *supra*, pág. 394. Por tal razón, es norma reiterada que no todo menoscabo contractual es inconstitucional. Bayrón Toro v. Serra, 119 D.P.R. 605, 619 (1987); United States Trust Co. v. New Jersey, *supra*, pág. 16.

Para analizar la validez constitucional de un estatuto bajo la cláusula de menoscabo de obligaciones contractuales, el criterio aplicable es el de razonabilidad. Bayrón Toro v. Serra, *supra*, pág. 620. Así, al evaluar la interferencia del Estado con la contratación privada, primero se debe auscultar si existe una relación contractual y si la modificación constituye un menoscabo sustancial o severo. Domínguez Castro *et al.* v. E.L.A. I, *supra*, pág. 80; Warner Lambert Co. v. Tribunal Superior, *supra*, pág. 395. De existir un menoscabo sustancial o severo, se evalúa si la interferencia gubernamental responde a un interés legítimo y si está racionalmente relacionada con la consecución de dicho objetivo. Domínguez Castro *et al.* v. E.L.A. I, *supra*; Warner Lambert Co. v. Tribunal Superior, *supra*.

Cuando se modifica una obligación del Gobierno, el escrutinio debe ser más cuidadoso en aras de asegurar que la actuación del Estado no sea en beneficio propio. Domínguez Castro *et al.* v. E.L.A. I, *supra*. Por ello, la modificación contractual, además de ser razonable, debe ser necesaria para

adelantar un propósito gubernamental importante. Bayrón Toro v. Serra, *supra*, pág. 619; United States Trust Co. v. New Jersey, *supra*, pág. 29. En fin, si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público, se sostendrá su validez. Íd. Al respecto, en Domínguez Castro *et al.* v. E.L.A. I, *supra*, pág. 85, establecimos que debemos dar deferencia a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad de la medida.

En 1987, este Tribunal tuvo la oportunidad de expresarse sobre una reforma al sistema de retiro de los empleados públicos de la Universidad de Puerto Rico (U.P.R.). Bayrón Toro v. Serra, *supra*. En esencia, se fijó en cincuenta y cinco (55) años la edad mínima para que un participante pudiera ser elegible para recibir una anualidad, se redujo el importe de la pensión que recibirían los participantes que se jubilaran antes de cumplir los cincuenta y ocho (58) años y se aumentó la aportación de los participantes al fondo del sistema.

En ese contexto, reconocimos que "un participante en un plan de retiro tiene un interés propietario de naturaleza contractual protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales". Íd., págs. 607-608. No obstante, entendimos prudente "armonizar, por un lado, el interés de proteger los derechos de los participantes y, por el otro, el de permitirle al Estado la libertad de adoptar cambios que garanticen la estabilidad y solvencia del sistema". Íd., pág. 618. Cónsono con lo anterior, establecimos que el Estado puede, antes de que un empleado se jubile,

enmendar los términos del sistema de retiro siempre y cuando las enmiendas sean razonables y adelanten la solvencia actuarial del mismo. Íd.

III.

En los casos que nos ocupan, enfrentamos una legislación de naturaleza económica que reforma el Sistema de Retiro de los empleados públicos. Las partes demandantes alegan que ello constituye un menoscabo de las obligaciones contractuales del Estado. Ciertamente, la Reforma del Sistema de Retiro menoscaba sustancialmente las obligaciones del Estado, pues afecta adversamente las expectativas de los empleados públicos respecto a su retiro.

Determinado lo anterior, debemos examinar si la modificación persigue un interés importante en beneficio del bienestar general y si esta es necesaria y razonable para adelantar dicho interés. Al tratarse del Sistema de Retiro, según Bayrón Toro v. Serra, *supra*, esta reforma será válida si es razonable y necesaria para asegurar la solvencia actuarial del mismo. Recordemos que aunque no debemos dar deferencia absoluta a la determinación de la Asamblea Legislativa respecto a la razonabilidad y necesidad del estatuto, sí debemos darle alguna deferencia. Domínguez Castro *et al.* v. E.L.A. I, *supra*, pág. 85.

Surge de la Exposición de Motivos de la Reforma del Sistema de Retiro que el legislador entendió necesario y razonable adoptar las medidas fiscales en controversia para evitar que dicho sistema colapse y que el crédito de Puerto Rico sea

degradado a "chatarra" por las agencias clasificadoras. En particular, la Asamblea Legislativa especificó que

> para el año fiscal 2013-2014, los activos netos del sistema serán negativos, ya que la deuda del Sistema evidenciada por bonos de obligaciones de pensión excederá los activos del Sistema y, para el año fiscal 2018-2019, el Sistema se quedará sin fondos suficientes para cubrir el pago de sus obligaciones, entre las que se encuentra el pago de pensiones a los propios pensionados, ya que sus activos totales se agotarán. Inclusive, es probable que, de no hacer esos cambios, ahora el agotamiento de los activos del Sistema ocurrirá antes.

> Actualmente, y conforme a los informes provistos por los actuarios al 30 de junio de 2011, el Sistema de Empleados Públicos, junto con el Sistema de Retiro para Maestros […] cargan con un déficit actuarial combinado de $35,260 millones, siendo el déficit del Sistema de Empleados aproximadamente $25,491 millones. Se anticipa que este déficit actuarial habrá crecido sustancialmente para el 30 de junio de 2013. La magnitud del déficit actuarial de ambos Sistemas de Retiro es tal, que equivale a más de cuatro veces el ingreso anual del Fondo General y a más de la mitad del Producto Nacional Bruto de Puerto Rico, ambos para el año 2011.

Al respecto, el legislador enfatizó que las múltiples medidas aprobadas a través de los años no han logrado atajar la crisis financiera del Sistema de Retiro.

Indudablemente, de la Exposición de Motivos de la Reforma del Sistema de Retiro se desprende que las medidas adoptadas son necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema. Ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños y puertorriqueñas.

Ciertamente, no se sostendrá el menoscabo de una obligación contractual si la parte demandante demuestra que existen alternativas menos drásticas o severas que las que el legislador escogió para lograr su objetivo. Domínguez Castro *et al.* v. E.L.A. I, *supra*, pág. 84; United States Trust Co. v. New Jersey, *supra*, págs. 29-31. Ahora bien, amerita mencionar que las partes demandantes alegaron de forma generalizada que existían alternativas menos onerosas, sin detallar cómo estas se llevarían a cabo y cómo asegurarían la solvencia actuarial del Sistema de Retiro. Se limitan a señalar que el Estado puede aumentar sus recaudos con otras medidas, como aumentar la captación del Impuesto sobre Ventas y Uso (I.V.U.) o las contribuciones. Sin embargo, no demostraron que tienen evidencia para convencer al tribunal en un juicio que estas alternativas son viables y menos onerosas. Véase Regla 110 (a) de Evidencia, 32 L.P.R.A. Ap. VI; United Automobile v. Fortuño, 633 F. 3d 37, 42-44 (1er Cir. 2011); Buffalo Teachers Federation v. Tobe, 464 F. 3d 362, 365 (2do Cir. 2006) citado con aprobación en Domínguez Castro *et al.* v. E.L.A. I, *supra*, pág. 85.

No obstante, es norma establecida que no corresponde a los tribunales hacer una determinación *de novo* sobre la existencia de otras alternativas para solucionar el problema. Domínguez Castro *et al.* v. E.L.A. I, *supra*, pág. 89. La determinación de la Asamblea Legislativa en torno a las medidas aprobadas constituye un ejercicio de política pública que merece nuestra deferencia en este sistema de separación de poderes. Íd., pág. 45. En nuestro sistema republicano de gobierno, las tres ramas

deben mantener un balance que respete los límites de las funciones de cada una. Véase Art. 1, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. Recordemos que "[d]ebido a que las Ramas Legislativa y Ejecutiva son las llamadas a establecer e implantar la política pública del Estado, el examen judicial no se puede convertir en una evaluación independiente de la sabiduría o corrección de la legislación o actuación impugnada". San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405, 431 (1993). Véase además Clases A, B, C v. P.R.T.C., 183 D.P.R. 666, 681 (2011).

Incluso, de la propia Exposición de Motivos surge que la Asamblea Legislativa consideró otros tipos de medidas para resolver el problema apremiante de solvencia que tiene el Sistema de Retiro pero concluyó que "no son factibles y, en todo caso, tampoco pudieran resolver por sí solas la crisis actuarial vigente […] Por el contrario, se requieren soluciones integradas y abarcadoras en las cuales todos los constituyentes del Sistema y todos los contribuyentes aporten a la salvación del mismo".

Por otro lado, del estatuto se desprende que la Reforma del Sistema de Retiro es de aplicación prospectiva y que no afecta la pensión de los ya jubilados.[2] Igualmente, asegura a las

---

[2] En cuanto a las alegaciones de las partes demandantes ya pensionadas, basta señalar que los beneficios otorgados mediante las leyes especiales que la Reforma del Sistema de Retiro elimina no forman parte de su pensión. Por el contrario, son gracias legislativas que se nutren del presupuesto general del Estado y no con fondos del fideicomiso del Sistema de Retiro. Se trata, más bien, de beneficios adicionales otorgados por la Legislatura. Su pensión queda inalterada. Véanse Domínguez Castro et al. v.

partes demandantes y al resto de los participantes del sistema que como resultado de dichas medidas podrán disfrutar de una pensión al momento de cumplir los requisitos para retirarse. La Exposición de Motivos detalló que ello no sería una posibilidad sin esta Reforma que busca evitar la insolvencia y debacle de este sistema y la degradación del crédito de Puerto Rico con sus consecuencias nefastas sobre la economía.

Por todo lo anterior, concluimos que la Reforma del Sistema de Retiro es constitucional porque, a pesar de que existe un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin.

Consiguientemente, al amparo de la Regla 50 del Reglamento de este Tribunal, *supra*, y sin ulterior procedimiento, se confirma la Sentencia dictada por el Tribunal de Primera Instancia que desestimó las acciones incoadas por las partes demandantes y aquí peticionarias.

Se dictará la Sentencia correspondiente.

---

E.L.A. I, *supra*, págs. 67-70; Asoc. Maestros v. Dpto. Educación, 171 D.P.R. 640, 665-666 (2007); Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101, 109 (2006).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Víctor A. Trinidad Hernández y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>María del C. Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos<br>_____<br><br>José A. De Jesús Vera y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br><br>    Recurridos | CT-2013-0008<br><br>CT-2013-0009<br><br>CT-2013-0010 | Certificación |

Sentencia

En San Juan, Puerto Rico, a 24 de junio de 2013.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, la cual se hace formar parte integrante de la presente Sentencia, se acogen y consolidan los recursos CT-2013-0008, CT-2013-0009, CT-2013-0010, y se confirma la Sentencia del Tribunal de Primera Instancia.

Lo acordó y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Feliberti Cintrón emitió una Opinión de Conformidad a la cual se une el Juez Asociado señor Martínez Torres. La Jueza Asociada señora Pabón Charneco y los Jueces Asociados señores Kolthoff Caraballo, Rivera García y Estrella Martínez emitieron Opiniones Disidentes.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| VÍCTOR A. TRINIDAD HERNÁNDEZ Y OTROS<br><br>MARÍA DEL CARMEN ALVARADO PACHECO Y OTROS<br><br>JOSÉ ALEJANDRO DE JESÚS VERA Y OTROS<br><br>Peticionarios<br><br>v.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO Y OTROS<br><br>Recurridos | **CT-2013-008**<br><br>**CT-2013-009**<br><br>**CT-2013-010** | *Certificación* |

Opinión de Conformidad emitida por el Juez Asociado señor FELIBERTI CINTRÓN a la que se une el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 24 de junio de 2013.

> *"La realidad es que corresponde al Estado velar por el bienestar económico colectivo, a expensas del bienestar individual."*[1]

Por **PUERTO RICO** y por ser lo correcto en Derecho, estoy conforme con la Opinión *Per Curiam* emitida hoy por este Tribunal. No por chantajes, presiones o comentarios públicos injustos, insultantes y lamentables por miembros de las otras dos ramas de gobierno que han sido electos para servir como líderes y ser ejemplo para nuestros jóvenes, y que tratan de anticipar e influenciar

---

[1]     Domínguez Castro *et al*. v. E.L.A. I, 178 D.P.R. 1, 15, *cert. denied sub nom.* Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010).

indebidamente las determinaciones de los componentes de la Rama Judicial.

Aunque siento el dolor y la angustia de aquellos empleados públicos que con su trabajo y esfuerzo han laborado arduamente por años con miras a alcanzar un retiro digno, para bien o para mal, las necesidades y el bienestar colectivo de los aproximadamente tres millones y medio de habitantes en Puerto Rico se imponen y prevalecen sobre los intereses individuales de los miles de empleados públicos afectados por la Ley Núm. 3-2013. Véase Domínguez Castro *et al.* v. E.L.A. I, 178 D.P.R. 1, 15, *cert. denied sub nom.* Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010).

Debido a la precaria condición de los Sistemas de Retiro de los Empleados Públicos del Gobierno de Puerto Rico,[2] así como a la incertidumbre y las posibles

---

[2]    Según indicado en la Exposición de Motivos de la Ley Núm. 3-2013, aprobada el 4 de abril de 2013, y concediéndole a la Asamblea Legislativa la deferencia y el respeto que siempre nos ha merecido, ésta es necesaria para estabilizar las finanzas de los Sistemas de Retiro de los Empleados Públicos del Gobierno de Puerto Rico dada la crisis financiera existente. Los Sistemas de Retiro confrontan una deficiencia de recursos que amenaza con agravar catastróficamente la crisis económica que atraviesa actualmente la Isla, cargando con un déficit actuarial combinado de $35,260 millones según informes actuariales al 30 de junio de 2011 (se anticipa que dicho déficit actuarial habrá crecido sustancialmente para el 30 de junio de 2013). La magnitud del déficit actuarial de dichos Sistemas de Retiro es tal que equivale a más de cuatro veces el ingreso anual del Fondo General. Se proyecta que para cumplir con las obligaciones a los pensionados **por los próximos 26 años,** el Gobierno de Puerto Rico (gobierno central, corporaciones públicas y municipios) tendrá que inyectarle cerca de **$2,850 millones anuales** a los Sistemas de Retiro. La razón de la Ley Núm. 3-2013 es evitar la erosión total de los activos del Sistema de Retiro de Empleados Públicos y con ello una catástrofe económica sin precedentes para la Isla, al igual que proteger los beneficios de retiro para los miles de servidores públicos activos y retirados.

*Continúa…*

consecuencias adversas a la ya maltrecha economía e inestable capacidad crediticia del país que una determinación distinta a la tomada hoy por esta Curia podría ocasionar, opino humildemente y con gran respeto a los compañeros disidentes, que actuar de otra manera sería, aun con la mejor de las intenciones, contrario a nuestros precedentes constitucionales, al bien común y al futuro de nuestros hijos y de nuestra querida Isla.

**Quienes presumieron la existencia de una agenda escondida por parte de miembros de este Tribunal, quedan hoy desmentidos.**

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

---

Dado que el crédito de la Isla se encuentra en una situación sumamente frágil, habiendo sido degradada la deuda pública del Gobierno Central a un punto anterior al llamado "nivel de chatarra", y ante la grave situación de estrechez fiscal en la que se encuentra todo el aparato gubernamental, el gobierno no cuenta con fondos suficientes para inyectar el dinero necesario y atenuar el déficit actuarial en los Sistemas de Retiro.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Víctor A. Trinidad Hernández y otros<br>      Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br>      Recurridos<br>_____<br><br>María del C. Alvarado Pacheco y otros<br>      Peticionarios<br><br>        v.<br><br>Estado Libre Asociado y otros<br>      Recurridos<br>_____<br><br>José A. De Jesús Vera y otros<br>      Peticionarios<br>        v.<br><br>Estado Libre Asociado y otros<br>      Recurridos | CT-2013-0008<br><br>CT-2013-0009<br><br>CT-2013-0010 | *Certificación* |

Opinión disidente emitida por la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico, a 24 de junio de 2013.

*Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved.*[1]

---

[1] *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934).

Ante la Opinión que antecede, no queda otra alternativa que disentir del resultado anunciado. A través de solo doce (12) páginas, una mayoría de este Tribunal se aferra a una aplicación equivocada de *Domínguez Castro v. E.L.A. I*, 178 D.P.R. 1 (2010), *cert.* denegado, *Castro v. Puerto Rico*, 131 S.Ct. 152 (2010). Con una escueta opinión Per Curiam –huérfana de autor específico- se le da una trastada final a miles de servidores públicos utilizando una metodología adjudicativa que raya en la constitucionalización de un "sello de goma". No puedo prestar mi voto a ese proceder, por lo que debo emitir estas breves expresiones.

**I**

De acuerdo a la doctrina de *Domínguez Castro v. E.L.A. I,* supra, los tribunales deben limitarse a analizar la razonabilidad de las medidas legislativas que tengan el efecto de menoscabar relaciones contractuales. Sin embargo, el producto final del *ratio decidendi* de la Opinión Per Curiam que hoy se emite nos invita a concluir que la Ley Núm. 3-2013 es razonable porque...pues porque el Gobierno lo dice. Soy de la opinión que ese no es el análisis constitucional que requiere *Domínguez Castro v. E.L.A. I*, supra, y *United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977).

Al igual que discute el hermano Juez Asociado señor Rivera García en su Opinión disidente, considero que para

que el Estado cumpla con el estándar de razonabilidad al momento de alterar las pensiones de los empleados públicos, este debe proveer algún beneficio al empleado que aminore el impacto de los cambios negativos en la relación contractual. Por eso, ante la eminencia de los intereses involucrados, soy del criterio que para llevar a cabo el análisis de razonabilidad los tribunales deben utilizar el estándar siguiente:

> To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, **and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.** *Allen v. City of Long Beach*, 287 P.2d 765, 767 (1955)(Énfasis suplido).

Ese es el estándar que sabiamente han utilizado varios tribunales que han analizado legislaciones como la involucrada en los casos de autos. Véase *Calabro v. City of Omaha*, 531 N.W.2d. 541 (Neb. 1995); *Singer v. City of Topeka*, 607 P.2d 467 (Kan. 1980); *Betts v. Board of Administration*, 21 Cal.3d 859 (1978). Un proceder contrario convertiría la actuación del Estado en un mero ejercicio de poder deslegitimado. Lamento que este Tribunal avale tal utilización del poder.

Nótese que el estatuto que analizamos en *Domínguez Castro v. E.L.A. I*, supra, cumplía con ese estándar de razonabilidad. La Ley Núm. 7-2009, 3 L.P.R.A sec. 8791 *et seq.,* compensaba el efecto negativo del menoscabo

contractual por ser una medida **temporera**, que afectaba un número **limitado** de empleados públicos y que colocaba a disposición de los cesanteados una serie de **ayudas económicas** que amortizaban el efecto patrimonial a estos. Ese proceder cumplía adecuadamente con el estándar de razonabilidad que propongo. Ello a diferencia de la Ley Núm. 3, *supra*, que contiene menoscabo tras menoscabo, con efectos presentes y futuros, en el patrimonio de los trabajadores. Por esta razón, y por lo profundamente discutido en las Opiniones disidentes de los compañeros Jueces Asociados señores Kolthoff Caraballo, Rivera García y Estrella Martínez, la Ley Núm. 3, *supra*, debería ser declarada inconstitucional.

## II

Por otro lado, si bien es cierto que el crédito de Puerto Rico está en riesgo y se ha alegado que declarar inconstitucional la Ley Núm. 3, *supra*, causaría finalmente su degradación, este no es el Foro para pasar juicio sobre ello. Sencillamente, esa es una consideración exógena al Derecho que no debe guiar la decisión de los casos de autos. Si el principio de independencia judicial significa algo es que ese tipo de amenaza no puede empañar la labor constitucional de los tribunales en Puerto Rico.

Lamentablemente, con la Opinión que hoy se emite el crédito que sí ha quedado degradado es el de la

credibilidad del Estado como patrono. Con solo doce (12) páginas este Tribunal dio la bendición final para que en apenas unos cuantos días miles de puertorriqueños vean sus vidas alteradas ante el cambio inminente e ineludible de su futuro económico. En unos días tendrán que aportar más a un sistema de retiro que nuevamente se les ha prometido, pero con el conocimiento de que, tras años de labor incansable al servicio de su Isla, la pensión original a la cual eran acreedores sencillamente se esfumó. En doce (12) páginas de análisis judicial pasajero, se selló ese nuevo futuro de los empleados públicos en Puerto Rico. El sacrificio de largos años de estos servidores públicos merecía mucho más que eso.

Finalmente, tres (3) miembros de este Tribunal que conforman la Mayoría en este caso han dado su anuencia a este lamentable proceder. Ello a pesar de haber disentido enérgicamente de lo resuelto en *Domínguez Castro v. E.L.A. I*, supra. Este es tan solo el segundo capítulo de una saga en la cual aparentemente presenciaremos una "virazón" en la metodología adjudicativa de estos tres (3) compañeros. Véase *Alvarado Pacheco y otros v. E.L.A.*, 2013 T.S.P.R. 64, 188 D.P.R. ___ (2013), res. el 11 de junio de 2013. Parecería que ahora estamos ante un "nuevo" Tribunal Supremo. La inconsistencia de estos tres (3) compañeros en las últimas semanas "es evidente e irrefutable. Nada, que esta falta de constancia sólo se puede entender —tal vez—

cuando, desde la orilla, observamos el flujo y reflujo de la marea". (Op. Disidente de RODRÍGUEZ RODRÍGUEZ, J.) *Domínguez Castro v. E.L.A. I,* supra pág. 161.

## III

Por todo lo anterior, declararía la Ley Núm. 3, *supra*, inconstitucional.  Por ende, revocaría la Sentencia emitida por el Tribunal de Primera Instancia.


Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Víctor A. Trinidad Hernández y otros<br>    Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>    Recurridos<br>_____<br>María del C. Alvarado Pacheco y otros<br>    Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br>    Recurridos<br>_____<br>José A. De Jesús Vera y otros<br>    Peticionarios<br><br>v.<br><br>Estado Libre Asociado de Puerto Rico  y otros<br>    Recurridos | CT-2013-8<br><br>CT-2013-9<br><br>CT-2013-10 | Certificación |

Opinión Disidente emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 24 de junio de 2013.

> *Salary and pensions are not synonymous.*[1]

Si usted tuviera 30 años de edad y le anunciaran que a los 40 indefectiblemente va a morir, ¿invertiría sus últimos 10 años de vida aportando a un **plan de retiro**? ¡Claro que no! ¿Para qué?, si usted jamás

_____

[1] Oregon State Police Officers' Ass'n v. State, 323 Or. 356, 374 (1996).

alcanzará la edad de retiro. Pues algo parecido es lo que el Estado ha provocado con la aprobación de la Ley Núm. 3-2013. Un análisis profundo y a conciencia me lleva irremediablemente a concluir que, en lo que respecta a la dramática reducción de las anualidades que impone, esta ley ha convertido al Sistema de Retiro de los Empleados del Gobierno de Puerto Rico en un particular oxímoron: **obliga al empleado público a aportar a un plan de retiro con el cual jamás podrá retirarse**. Es una contradicción de términos porque los "planes de retiro" son precisamente para poder "retirarse".

Cuando a un empleado que ha aportado a su plan de retiro por espacio de 20, 23, 25, 30 o más años de honroso servicio público, se le anuncia que cuando finalmente alcance su edad de retiro recibirá, en lugar de una pensión acordada equivalente al 75% o 65% de su salario, una pensión de apenas 40%, 35% o hasta el 30%, ese empleado sabe que realmente **no se podrá retirar**. De manera que, además de que tendrá que aportar por más tiempo y en mayor cantidad a su "plan de retiro", al final esta persona tendrá que continuar trabajando, ya sea en la posición que ocupa en el servicio público o buscar otro empleo a tiempo completo en la empresa privada.[2] **Tal grado de menoscabo contractual hace necesaria una intervención de esta**

---

[2] Para los policías, solo estaría disponible la segunda opción porque estos están obligados a retirarse a los 58 años de edad.

**Curia, que no puede relegarse en aras de la autolimitación o no intervención con los poderes de las otras dos ramas de gobierno.**

Ciertamente, este Tribunal está impedido de dictaminar **la forma y manera** en que las ramas hermanas de gobierno deben resolver un problema de política pública. Eso, claramente constituiría una intromisión indebida en sus poderes, pues al Tribunal Supremo no le corresponde legislar o establecer cuál ha de ser la política pública del País. No nos corresponde gobernar.

Sin embargo, en circunstancias como las de los casos de autos, estamos obligados a **impedir o al menos mitigar** cualquier acción de las ramas políticas dirigida a menoscabar **sustancial y permanentemente** los derechos adquiridos de los ciudadanos. **Sobre todo, cuando tal menoscabo es tan sustancial y de tal naturaleza que no cumple con el grado de razonabilidad que exige el escrutinio racional que en el pasado hemos utilizado en estatutos socioeconómicos.** Los casos de autos son claramente distinguibles de Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010), cert. denegado, Castro v. Puerto Rico, 131 S.Ct. 152 (2010). En esta ocasión, el interés propietario de los empleados públicos así como la violación de sus derechos adquiridos son sustancialmente distintos en gravedad y naturaleza.

Soy consciente –como debemos serlo todos- de que el gobierno se encuentra en una extremadamente difícil situación financiera. Sin embargo, pienso que si el barco está haciendo agua y existe la amenaza real de un naufragio, se lanzan por la borda primeramente las bagatelas. Luego, si es necesario las cosas importantes y finalmente las cosas más valiosas. **Para cualquier persona trabajadora la pensión por la cual ha trabajado toda su vida constituye su seguridad y posesión más valiosa.** Por eso, y aunque estoy impedido de identificarlas, veo claramente muchas "bagatelas fiscales" y múltiples "cosas importantes" que precisarían ser arrojadas por la borda, antes que las valiosas pensiones de decenas de miles de nuestros empleados públicos.

I

*La sentencia del tribunal de primera instancia en el contexto de la Regla 10.2 de Procedimiento Civil*

En los casos de autos no procedía la desestimación de las causas presentadas por los demandantes, pues no se cumplió con la jurisprudencia interpretativa de la Regla 10.2 de Procedimiento Civil.[3] **Contrario a lo resuelto por el tribunal de primera instancia, las alegaciones de las demandas no dejaban de exponer una reclamación que justificara la concesión de un remedio.** Me explico.

---

[3] 32 L.P.R.A. Ap. V.

Sabido es que la Regla 10.2 de Procedimiento Civil, *supra*, concede el que un demandado presente una moción de desestimación contra cualquier alegación hecha en el cuerpo de una demanda. Sin embargo, tal desestimación procederá solo si **"es evidente** de las alegaciones de la demanda que algunas de las defensas afirmativas prosperará". (Énfasis suplido.)[4] Del mismo modo, en diversas ocasiones hemos expresado que ante una moción de desestimación las alegaciones hechas en la demanda tienen que ser interpretadas en conjunto, liberalmente y de la manera más favorable posible para la parte demandante.[5] Además, al resolver una moción de desestimación fundamentada en la Regla 10.2 de Procedimiento Civil, *supra*, el tribunal tiene la obligación de dar por ciertos y buenos **todos** las hechos bien alegados por el demandante.[6] Por último, y específicamente al evaluar la defensa de si la demanda deja de exponer una reclamación que justifique la concesión de un remedio, el tribunal deberá "determinar si a base de éstos [hechos] la demanda establece una reclamación plausible que justifique que el demandante tiene derecho a un remedio, guiado en su análisis por la experiencia y el sentido común".[7]

---

[4] Trans-Oceanic Life Ins. Oracle Corp., 184 D.P.R. 689, 701 (2012).

[5] Colón v. Lotería, 167 D.P.R. 625, 649 (2006).

[6] Íd.

[7] R. Hernández Colón, Derecho Procesal Civil, 5ta ed., San Juan, LexisNexis, 2010, pág. 268.

En los casos de autos, los demandantes expusieron claramente en sus alegaciones no sólo un menoscabo sustancial y permanente en sus pensiones, sino que especificaron y detallaron el grado de ese menoscabo, sobre todo con relación a la cantidad en que se verían reducidas sus anualidades futuras. Sin embargo, y sin explicación aparente, el tribunal de primera instancia obvió tales alegaciones. Conforme lo requiere la Regla 10.2 de Procedimiento Civil, *supra*, el foro de primera instancia debió -y podía con razonable facilidad- determinar que con la aprobación de la Ley Núm. 3-2013 todos los demandantes sufrirán al momento de su retiro una reducción promedio en sus pensiones de entre 30% a 45%. De esta forma, y guiado por un análisis racional y objetivo, el tribunal de primera instancia hubiera tenido que concluir que tal reducción en las anualidades de los demandantes constituye un menoscabo no sólo sustancial y permanente, **sino demasiado drástico en comparación con la pensión que el Estado acordó les honraría, a cambio de sus constantes aportaciones.** United Auto., Aerospace, Agr. Implement Workers of America Intern. Union v. Fortuño, 633 F.3d 37, 45-46 (1st. Cir, 2011). De manera, que los demandantes alegaron claramente la forma, extensión y severidad en las que la Ley Núm. 3-2013 socavaba sus expectativas contractuales. Íd.

Por otro lado, de las alegaciones de los demandantes también surgía claramente que estos

expusieron alternativas no contempladas en la Exposición de Motivos ni en el resto del cuerpo de la Ley Núm. 3-2013, que constituían opciones más moderadas y que, al menos de su faz, parecerían viables para sustituir y así cuando menos mitigar el menoscabo a sus pensiones.[8] Como surge del texto de la propia Ley Núm. 3-2013, las enmiendas que esta establece tienen el propósito de "en conjunto...**reducir**...el déficit actuarial del Sistema [de Retiro y] el déficit de caja"[9], y no de solventar el déficit total de la agencia. (Énfasis suplido.) Por lo tanto, las distintas alternativas propuestas por los demandantes no debían evaluarse como un remedio total o una cornucopia a los problemas de la agencia, sino como un paliativo que podría sustituir parte de los ingresos que el gobierno busca al menoscabar las pensiones de los demandantes. En síntesis, no es esencial el que se implanten todas las enmiendas aprobadas por la Ley Núm. 3-2013. Es posible identificar aquellas más drásticas al menoscabo de las pensiones de los servidores públicos y sustituirlas por alguna de las alternativas propuestas por los propios demandantes. Véase U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 29-30 (1977) (*"The determination of necessity can be considered on two*

---

[8] Véanse alegaciones 4.58 y 4.59 de la Petición presentada ante el Tribunal de Primera Instancia.

[9] Véase Exposición de Motivos de la Ley Núm. 3-2013.

*levels. First, it cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations on the use of Port Authority revenues and reserves to subsidize commuter railroads").*

Por otro lado, en casos en que se cuestiona la constitucionalidad de una ley por el menoscabo de obligaciones contractuales, el primer paso es determinar si la ley en cuestión ha provocado un menoscabo substancial del contrato entre las partes. De determinarse la existencia de un menoscabo substancial, entonces procede en segundo término determinar si tal menoscabo es razonable y necesario para conseguir un propósito importante para el Estado.[10] Ahora bien, cuando el Estado es una de las partes en tal contratación, nuestro escrutinio debe ser más riguroso, otorgándole menos deferencia a la acción legislativa en el análisis de razonabilidad y necesidad. Véase <u>U.S. Trust Co. of New York v. New Jersey</u>, *supra*, págs. 25-26 ("*complete deference to a legislative assessment of reasonable and necessity is not appropriate because the State's self-interest is at stake*").

En la evaluación de una moción de desestimación en virtud de la Regla 10.2 de Procedimiento Civil,

---

[10] <u>U.S. Trust Co. of New York v. New Jersey</u>, 431 U.S. 1 (1977).

*supra*, fundamentada en que la parte demandante dejó de exponer una causa de acción que amerite la concesión de un remedio, ninguna de las partes tiene que presentar prueba. Sin embargo, y como señalamos, lo que sí es necesario determinar es si los hechos alegados en la demanda establecen de su faz una reclamación que sea plausible y que, como tal, justifique que el demandante tiene derecho al remedio que busca **o, al menos, a parte del mismo**. Si se determina que los hechos alegados "no cumple[n] con el estándar de plausibilidad, el tribunal debe desestimar la demanda".[11]  Lo que se busca con el análisis de plausibilidad es el "no permitir que una demanda insuficiente proceda bajo el pretexto de que con el descubrimiento de prueba pueden probarse las alegaciones conclusorias".[12]

Me parece evidente que en los casos de autos, las alegaciones de los demandantes eran claras y suficientes en el aspecto del drástico menoscabo producido por la Ley Núm. 3-2013, sobre todo en lo concerniente al Art. 5-103(6)(iii-iv) de la ley, que establece la dramática reducción de sus anualidades futuras. Asimismo, me parece que las alegaciones son plausibles en el aspecto de la viabilidad de opciones más moderadas para sustituir y cuando menos mitigar el

---

[11] Hernández Colón, op. cit., pág. 268. Véase, además, Ashcroft v. Iqbal, 556 U.S. 662 (2009).

[12] Íd.

menoscabo a las pensiones de los demandantes. Además, en sus alegaciones los demandantes enumeraron distintas alternativas que se le presentaron a la Asamblea Legislativa, de las cuales no surge de la Exposición de Motivos de la ley que alguna fuera considerada. U.S. Trust Co. of New York v. New Jersey, *supra*, págs. 30-31. ("*[A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives*".)

Por todo lo anterior, me parece que -al analizar las alegaciones de las demandas- el tribunal de primera instancia no podía concluir que era evidente que los demandantes no tenían una reclamación que justificara la concesión de un remedio. En este contexto y en casos como los de autos, son lapidarias las expresiones del Dr. José A. Cuevas Segarra:

> En aquellos casos en los que esté **involucrado un alto interés público,** no debe desestimarse ninguna acción bajo la Regla 10.2 de Procedimiento Civil, por insuficiencia de las alegaciones, **salvo en aquellas ocasiones en que no quepa duda que bajo ninguna situación de hechos que surja lógicamente en la demanda, es posible conceder un remedio adecuado, cualquiera que este sea.** (Énfasis suplido).[13]

## II

***Las diferencias entre los casos de autos y el caso de la notoria Ley Núm. 7-2009***

Ciertamente erró el foro de instancia al implicar que los casos de autos son similares al caso Domínguez

---

[13] J.A. Cuevas Segarra, Tratado de derecho civil, 2da ed., San Juan, Pubs. J.T.S., 2011, Tomo II, pág. 529.

Castro et al. v. E.L.A. I, *supra*, que interpretó la Ley Núm. 7-2009, *Ley especial declarando estado de emergencia fiscal y estableciendo plan integral de estabilización fiscal para salvar el crédito de Puerto Rico*. Como adelanté, en esta ocasión el interés propietario de los empleados públicos así como la violación de sus derechos adquiridos son sustancialmente distintos en gravedad y naturaleza.

Primeramente, la controversia en el caso Domínguez Castro et al. v. E.L.A. I, *supra*, se circunscribía básicamente al despido de empleados públicos y principalmente al reclamo de que tales despidos constituían una violación a la cláusula constitucional del debido proceso de ley, en su aspecto sustantivo y procesal.[14] Mientras *Domínguez Castro* requería meramente un análisis según un escrutinio racional que justificara la acción del Estado, en los casos de autos se trata de un reclamo de una violación a la cláusula de no menoscabo de obligaciones contractuales en el que el propio Estado es el violador del contrato entre las partes, según ya lo determinó el foro de instancia. Como señalamos, tal realidad obliga a un escrutinio más riguroso, otorgándole menos deferencia a la acción legislativa en el análisis de razonabilidad y necesidad.

---

[14] Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 38-48 (2010).

Además, es claro que si constituye una gran contrariedad la pérdida o disminución de nuestros salarios –como fue el caso de *Domínguez Castro*- mucho peor es la virtual pérdida de una pensión de retiro, sobre todo cuando se ha trabajado y aportado a la misma por décadas. Y es que, la pérdida de un salario y la pérdida de una pensión no son sinónimos.[15] Mientras –como detallamos más adelante- un empleado público no ostenta un derecho adquirido en la permanencia de su empleo, sí lo tiene en cuanto a su pensión. Pero, además y en el aspecto real o pragmático, la persona que pierde un empleo -sobre todo en los años en que todavía puede ser más productivo- siempre tiene la expectativa de poder conseguir otro. En el ínterin, esa persona descansa en la seguridad de que llegada su vejez, lo que ha aportado a su pensión permanezca inalterado y le sirva para su retiro. Sin embargo, el que conserva su empleo pero le alteran sustancialmente la anualidad que ha de recibir en el momento de su retiro, no le queda ni opción ni esperanza. Máxime, cuando, como ocurrirá con la mayoría de los empleados públicos a consecuencia de la ley aquí en controversia, si alguno decidiera renunciar y buscar un "nuevo horizonte" con mejores

---

[15] <u>Oregon State Police Officers' Ass'n v. State</u>, 323 Or. 356, 374 (1996).

beneficios futuros, no podrá llevarse consigo las aportaciones realizadas a su plan de retiro.[16]

En segundo lugar, en *Domínguez Castro*, ante el reclamo de los empleados públicos sobre la ilegalidad de sus despidos por la retroactividad de la Ley Núm. 7, no les reconocimos un derecho adquirido pues no existe ley alguna que expresa o implícitamente le reconozca a un empleado público un derecho irrestricto a no ser despedido, sino todo lo contrario.[17] En ese sentido, señalamos que "no cabe hablar de un derecho adquirido a la retención o a no ser cesanteado de un empleo en el servicio público, pues se encuentra ausente el elemento del amparo de una ley anterior [del Art. 3 del Código Civil] que hubiese concedido tal derecho".[18] Sin embargo, es claro que los demandantes de los casos de autos sí tienen en sus respectivos contratos de pensiones, no solo un derecho o interés propietario, sino un derecho adquirido mediante la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, la Ley Núm. 1 de 16 de febrero de 1990, según enmendada, y la Ley Núm. 305 de 24 de septiembre de 1999, según enmendada. Como señalamos en *Domínguez Castro*, "no todo derecho o interés propietario es a su vez un derecho adquirido".[19] Pero los demandantes de

---

[16] Véase Art. 5-110 de la Ley Núm. 3-2013.

[17] Domínguez Castro et al. v. E.L.A. I, *supra*, págs. 67-70.

[18] Íd., pág. 69.

[19] Íd., pág. 68.

los casos de autos, al juramentar como empleados públicos lo hicieron bajo unas condiciones contractuales definidas claramente por la ley vigente al momento de su juramentación, lo que constituye claramente un derecho adquirido. Así, recientemente, en Pagán Santiago v. ASR, 185 D.P.R. 341, 354 (2012), señalamos que "la Asamblea Legislativa no tiene facultad para menoscabar ese derecho adquirido de naturaleza contractual, o que ha sido "comprado", por ese participante mediante aportaciones compulsorias provenientes de su salario".

Por otro lado, en Domínguez Castro et al. v. E.L.A. I, *supra*, el reclamo de menoscabo contractual que se hizo fue en función, no de las pensiones de retiro de los empleados públicos, sino del incumplimiento temporero de los convenios colectivos de aquellos servidores públicos unionados por virtud de la Ley Núm. 45 de 25 de febrero de 1998.[20] Específicamente, indicamos que era "meritorio señalar que la legislación impugnada es producto de una situación de emergencia y la suspensión de las disposiciones de los convenios que no sean conformes a la referida Ley Núm. 7 **es temporera**". (Énfasis suplido).[21] Como ya expresamos, el contrato que se menoscaba en los casos de autos es la seguridad de las

---

[20] 3 L.P.R.A. sec. 1451 *et seq*.

[21] Domínguez Castro et al. v. E.L.A. I, *supra*, pág. 68.

pensiones de retiro de los demandantes y la vigencia de tal menoscabo no es temporera sino **permanente**.

Es claro entonces, que la naturaleza de la causa de acción y el reclamo constitucional en el caso de la Ley Núm. 7 y los casos de autos son muy distintos. *Domínguez Castro* era un caso de despidos, alegada violación de debido proceso de ley y menoscabo temporero (en aquellos empleados unionados) de sus convenios colectivos. En los casos de autos nos enfrentamos al reclamo de un menoscabo sustancial y permanente de un contrato entre el Gobierno de Puerto Rico y los empleados públicos,[22] muchos de los cuales han laborado por décadas en el servicio público, haciendo sus aportaciones bajo una expectativa muy distinta a lo que ahora la Ley Núm. 3-2013 les anuncia.

Ciertamente y como ya señalamos, los beneficios provenientes de planes de pensión claramente pueden ser más importantes que el salario de un empleado.[23] De hecho, como implicamos en el normativo Bayrón Toro v. Serra, 119 D.P.R. 605 (1987), la persona que se convierte en empleado de gobierno con la expectativa de hacer una carrera en el servicio público, no lo hace necesariamente por el salario que recibirá. Ya "[a]nteriomente hemos reconocido los sacrificios

---

[22] Pagán Santiago et al. v. ASR, 185 D.P.R. 341 (2012).

[23] Oregon State Police Officers' Ass'n v. State, *supra*; Rose City Transit v. City of Portland, 271 Or. 588 (1975).

económicos que conlleva la dedicación al servicio público".[24] Así, señalamos que "[s]ólo si se ofrecen beneficios marginales tales como un atractivo plan de retiro, puede el Gobierno atraer personal competente, que de otra forma ofrecería sus servicios a la empresa privada".[25] Además, en *Bayrón Toro* señalamos que "[e]s indiscutible que cuando alguien acepta una oferta de empleo toma en consideración y descansa en la seguridad que le brinda el sistema de retiro que le ofrece dicho empleo".[26] Ciertamente, estos casos **no son Domínguez Castro et al. v. E.L.A. I.**

### III

El Sistema de Retiro de los Empleados del Gobierno de Puerto Rico ha confrontado un déficit actuarial desde sus mismos inicios. Basta con citar la propia Exposición de Motivos de la Ley Núm. 3-2013, al describir la primera de las causas principales de la crisis:

> **Desde sus comienzos**, el Sistema no contó con las aportaciones adecuadas para mantener un nivel saludable de solvencia. El Sistema fue **diseñado** como un sistema de beneficio definido cuyas pensiones estaban fijadas por ley y no dependían del monto de las aportaciones que hicieran los patronos o los empleados. La ley que creó el Sistema estableció un nivel de aportación que no estaba ligado a los beneficios que tenía que pagar el Sistema y tampoco se ajustaba a los cambios económicos o actuariales que

---

[24] Bayrón Toro v. Serra, 119 D.P.R. 605, 616 (1987).

[25] Íd.

[26] Íd.

afectaban el nivel de beneficios. (Énfasis suplido).[27]

Como vemos, el fundamento de la crisis del Sistema de Retiro estriba en un problema de diseño: la ley que creó el Sistema estableció un nivel de aportación que no estaba ligado a los beneficios que este tenía que pagar y tampoco se ajustaba a los cambios económicos o actuariales que afectaban el nivel de beneficios.

A este problema base, se sumó el incumplimiento por parte de las distintas agencias con las portaciones suplementarias requeridas; la aprobación de varias leyes entre el 1960 y el presente que aumentaron los beneficios, pero que no contaron con aportaciones adicionales; y el hecho de que el gobierno nunca realizó la aportación patronal recomendada por los actuarios para poder cubrir los beneficios de retiro.[28] De manera que al cuestionarnos: ¿cuándo ha estado bien financieramente nuestro Sistema de Retiro? La contestación es: nunca. O, expuesto de otra forma: ¿desde cuándo ha existido el déficit del Sistema de Retiro? La contestación, por la admisión que hace la propia Ley Núm. 3-2013, es: **siempre**. La conclusión entonces es que el problema deficitario siempre ha existido; siempre ha sido el mismo, excepto

---

[27] Exposición de Motivos de la Ley Núm. 3-2013, pág. 5.

[28] Íd.

que se ha ido agravando por las propias acciones incorrectas del gobierno.

Con relación a lo anterior, me parece justo lo implicado por el Tribunal Supremo federal al final de la opinión en U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 32, y que ha sido adoptado en otras jurisdicciones. Y es que, de determinarse que el problema que el Estado busca resolver con la implantación del estatuto que menoscaba el contrato en cuestión existía al momento en que se incurrió en la obligación, tal menoscabo no puede determinarse como uno razonable y necesario. Massachusetts Community College Council v. Commonwealth, 420 Mass. 126; 649 N.E. 2d 708 (1995). ("*An impairment is not a reasonable one if the problem sought to be resolved by an impairment of a contract existed at the time the contractual obligation was incurred*"). Incluso, si los cambios ocurridos a través de los años hasta el momento en que se propone la medida que menoscaba el contrato obedecen a un incremento de lo que en esencia es el mismo problema habido cuando se contrató originalmente, el menoscabo es irrazonable e innecesario. Carlstrom v. State, 103 Wash.2d 391, 397; 694 P.2d 1 (1985) *("The United States Supreme Court has observed that if the state is aware of problems when it enters into a contract, the state cannot impair those contracts on the basis of problems that have only changed in degree rather than in kind*"). No

me cabe la menor duda de que esta es la situación en los casos de autos.

**IV**

En *Bayrón Toro* señalamos que "[l]a solución más adecuada es aquella que nos permita armonizar, por un lado, el interés de proteger los derechos de los participantes y, por el otro, el de permitirle al Estado la libertad de adoptar cambios que garanticen la estabilidad y solvencia del sistema".[29] Ante un claro menoscabo no solo sustancial sino drástico de los beneficios de los demandantes, específicamente por la reducción de sus anualidades futuras, se imponía que el foro de instancia encontrara ese balance entre las necesidades reales del Sistema de Retiro y los derechos de los empleados. Entiendo que al final, tal balance hubiera requerido que el foro primario preservara la constitucionalidad de la inmensa mayoría de las enmiendas establecidas por la Ley Núm. 3-2013. Sin embargo, creo que la reducción en las anualidades futuras de los empleados públicos, en el grado que fue impuesta, no pasa el cedazo constitucional por constituir una medida demasiado drástica, ante la existencia de posibles opciones más moderadas que sirven el mismo fin.

Advierto en la decisión que hoy toma la Mayoría de esta Curia lo que me sospecho es una actuación

---

[29] Bayrón Toro v. Serra, *supra*, pág. 618.

cuidadosa, recelosa, suspicaz ante la amenaza de una degradación del crédito del País. Sin embargo, con nuestra decisión permitimos que a nuestros servidores públicos, víctimas inocentes de los errores del Estado, se les quite tanto sin que se les conceda nada.

Por todo lo anterior, respetuosamente disiento.


Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Víctor A. Trinidad Hernández,
        *et al.*

María del Carmen Alvarado
    Pacheco, *et al.*

José A. De Jesús Vera, *et al.*

        Peticionarios

            v.

Estado Libre Asociado de Puerto
        Rico et al.

        Recurridos

CT-2013-08
    cons.
CT-2013-09
    cons.
CT-2013-10

Opinión disidente emitida por el Juez Asociado señor Rivera García.

En San Juan, Puerto Rico, a 24 de junio de 2013.

> "El sustento de miles de servidores públicos merecía un Tribunal que examinara a cabalidad sus planteamientos de acuerdo con la prueba que en su momento se presentara, y no que se atendieran sus reclamos mediante una decisión que valida, cual sello de goma, los argumentos del Estado".[1]

El pasado 11 de junio de 2013 una mayoría de este Tribunal emitió una Resolución en la cual le ordenó al Tribunal de Primera Instancia (T.P.I.) que con suma diligencia y premura celebrara una

_____

[1] Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez, Domínguez Castro et al v. E.L.A. I, 178 D.P.R. 1, 158 (2010)

vista evidenciaria en los casos de epígrafe y además, emitiera los remedios provisionales necesarios para que se pudieran atender a tiempo las reclamaciones de los peticionarios. El foro primario atendió el caso y desestimó las causas de los demandantes. Hoy, una mayoría de este Tribunal avala este endeble rumbo decisorio.

En la nefasta Opinión que hoy se certifica, una mayoría ha optado por navegar un curso de acción apresurado, sin que se haya presentado en los tribunales la prueba necesaria para establecer que las modificaciones al Sistema de Retiro constituyen la alternativa menos onerosa a la luz de la situación fiscal de Puerto Rico. Peor aún, so pretexto de atender una crisis, a fin de cuentas el resultado nos lleva inevitablemente hacia una hecatombe mayor. Con esta decisión, se conduce al servidor público a un estado de indefensión y se le condena a conmemorar el fin de su carrera a que viva en el ocaso de su existencia al borde de la pobreza. Sin duda alguna, el Estado, haciendo uso de su poder, ha echado a un lado al empleado público que por años dedicó su vida al servicio del pueblo. Ante la postura pusilánime asumida por 5 miembros de este Tribunal, no me queda más que disentir.

I

En vista de que se ordenó que se consolidaran los casos y que las controversias de estos están estrechamente entrelazadas, exponemos los hechos por separado para facilitar su comprensión.

CT-2013-08
CT-2013-09
CT-2013-10

**CT-2013-08**

En el presente caso tenemos ante nuestra consideración una demanda presentada el 21 de mayo de 2013 por Víctor A. Trinidad Hernández y otros 45 miembros de la Policía de Puerto Rico (en adelante, los peticionarios) en contra del Gobierno de Puerto Rico y de la Administración de los Sistemas de Retiro de los empleados del Gobierno y la Judicatura de Puerto Rico (en adelante Sistema de Retiro). Estos impugnan la constitucionalidad de la Ley Núm. 3-2013 (Ley 3) por menoscabar su relación contractual con el Gobierno y tener una aplicación arbitraria e irrazonable al alterar los beneficios de retiro que tenían la expectativa de recibir. Además, solicitan que se emita un *injunction* preliminar y permanente para detener su implantación.

En síntesis, los peticionarios alegan que están cobijados por la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. sec. 761, *et seq.*, (Ley 447) y la Ley Núm. 1 de 16 de febrero de 1990, que aplica a aquellos empleados que entraron al Sistema de Retiro después del 1 de abril de 1990. La sección 3 de la Ley Núm. 1, establece una pensión idéntica a la pensión por mérito de la Ley 447, dirigida únicamente a los miembros de la Policía. Plantean además, que las enmiendas realizadas por la Ley 3, *supra*, son inconstitucionales, toda vez que constituyen un menoscabo sustancial de su relación contractual con el Estado.

Esto, pues con la aprobación de la Ley 3, se enfrentan a un panorama de retiro totalmente distinto al que planificaron. Aducen que tienen derecho a retirarse con una anualidad equivalente a 75% de su salario promedio si cuentan con 30 años de servicio y con al menos 55 años de edad al momento de su retiro, o 65% de su salario promedio si cuentan con 30 años de servicio y menos de 55 años de edad.

Con la aprobación de la Ley 3, *supra*, se enmendó la Ley Núm. 447 y con ello el compromiso y la garantía que tenían los peticionarios de recibir una pensión correspondiente al 75% o 65% de su salario promedio. Establece esta ley además, que aquellos que se retiren antes del 30 de junio de 2013, podrán continuar recibiendo las aportaciones gubernamentales al plan médico así como el bono de medicamentos y el bono de navidad. Por el contrario, aquellas personas que se retiren del 1 de julio de 2013 en adelante no recibirán estas aportaciones. Asimismo, cuestionan la eliminación de la pensión por incapacidad y la imposición de un seguro por incapacidad compulsorio.

Por otro lado, como agravante los peticionarios expresan que son servidores públicos de alto riesgo y que no pueden aportar al Seguro Social, por lo que no recibirán pensión alguna por ese concepto cuando se retiren. Así pues, luego de varios incidentes procesales acaecidos en el Tribunal de Primera Instancia, el señor

CT-2013-08
CT-2013-09
CT-2013-10

Trinidad Hernández y otros presentaron el 5 de junio de 2013 un recurso de certificación ante esta Curia. Examinada la petición, emitimos una Resolución en la que, entre otros asuntos, se ordenó al Tribunal de Primera Instancia a que celebrase una vista evidenciaria no más tarde del 18 de junio de 2013, en la que las partes presentaran prueba sobre las edades de los demandantes y los años cotizados en el servicio público.

Conforme a ese mandato, el foro primario emitió una Orden en la que citó a las partes a una vista evidenciaria a celebrarse el 18 de junio de 2013, a las 8:30 a.m. No obstante, el 17 de junio de 2013 desestimó la presente demanda mediante Sentencia Declaratoria e Injunction. De esta determinación, se presentó ante el Tribunal de Apelaciones un recurso de apelación. Sin embargo, ante la inminencia de la entrada en vigor de la Ley 3, *supra*, los peticionarios acuden ante nos mediante una petición de certificación. En esencia, nos solicitan que ante el poco tiempo que falta para que entre en vigor la Ley 3, actuemos con celeridad y expidamos el auto de certificación.

**CT-2013-09**

Los peticionarios en este caso consisten en sesenta y ocho (68) empleados de la Oficina del Contralor de Puerto Rico que entraron en el servicio público hace más de 23 años. Entre estos, figuran el Sub Contralor de Puerto Rico, la Directora de Auditoría de los Sistemas de Retiro

CT-2013-08
CT-2013-09
CT-2013-10

y Asuntos Financieros de la Oficina del Contralor, la Directora Ejecutiva de la Oficina de Asuntos Legales, Investigaciones y Litigios, el Director Ejecutivo de la Oficina de Prevención y Anticorrupción, el Director de la División de Análisis de Datos Forense Digital y Desarrollo Tecnológico, la Directora de Auditoría Interna, la Directora Ejecutiva de la Oficina de Asuntos de Auditorías, el Director de la División de Auditorías de Departamentos y Agencias, y la Directora de la División de Auditorías de Municipios, además de varios Sub-directores de divisiones, Gerentes, Auditores y Ayudantes Ejecutivos.

Todos estos empleados han aportado al Sistema de Retiro vigente de forma compulsoria. Por formar parte del servicio público antes del 1 de abril de 1990, cada uno está protegido por la estructura de beneficios que adquirieron cuando comenzaron sus labores. Cada uno es participante en un plan de pensión de tipo "beneficio definido" basado en la Ley 447, *supra*, estatuto que estableció la llamada "pensión por mérito". Por décadas, se les ha garantizado que al día de su retiro, disfrutarán de una anualidad equivalente a 75% de su salario promedio si cuentan con 30 años de servicio y con al menos 55 años de edad al momento de retirarse, o 65% de su salario promedio si no cuentan con 55 años de edad. Los peticionarios tienen entre 44 y 57 años de edad y todos han cotizado para su plan de retiro por más de veinte años al amparo de la Ley 447. Empero, al día de hoy ninguno ha

alcanzado los 55 años de edad ni los 30 años de servicio que los cualifica para recibir la pensión por mérito.

Actualmente, los demandantes se enfrentan a tener que optar entre dos alternativas: (1) retirarse en o antes del 30 de junio de 2013 para acogerse al sistema antiguo de retiro o; (2) continuar trabajando en el Gobierno por un espacio de entre 1.6 a 17 años adicionales a lo contemplado en la ley anterior para, eventualmente, jubilarse con una anualidad significativamente menor a la que les fue prometida cuando ingresaron al sistema y quedar desprovistos de un plan médico, beneficio que también tendrían al amparo de la Ley 447, *supra*.

Por esta razón, el 8 de mayo de 2013 los peticionarios presentaron una petición ante el T.P.I. en solicitud de sentencia declaratoria e interdicto preliminar y permanente para impugnar la constitucionalidad de ciertas disposiciones de la recién aprobada Ley 3, *supra*, que menoscaban su derecho a retirarse bajo el plan por el cual contrataron con el Gobierno de Puerto Rico.

Luego de varias incidencias procesales, y al igual que en el caso anterior, la Sra. María del Carmen Alvarado y otros presentaron el 5 de junio de 2013 un recurso de certificación ante este Tribunal. Posteriormente, ordenamos al Tribunal de Primera Instancia que celebrara una vista evidenciaria antes del 18 de junio de 2013. Sin

embargo, el foro primario desestimó la demanda de autos el día antes de celebrar la vista.

Inconformes con ese proceder, los peticionarios presentaron ante el Tribunal de Apelaciones un recurso de apelación. No obstante, ante la proximidad de que cobren vigencia las disposiciones de la Ley 3, *supra*, acuden ante nos mediante una petición de certificación. En esencia, nos solicitan que expidamos el auto y que declaremos inconstitucional las condiciones de la Ley Núm. 3 que tienen el efecto de menoscabar las relaciones contractuales del Gobierno con los empleados.

**CT-2013-10**

El presente recurso es instado por cincuenta (50) empleados de la Autoridad de Acueductos y Alcantarillados, cuatro (4) empleados del Departamento de la Vivienda, tres (3) del Municipio de Bayamón, uno (1) del Departamento de Transportación y Obras Públicas, uno (1) del Departamento de Asuntos del Consumidor, y dos (2) del Departamento de la Familia. Estos plantean que la Ley 3, *supra*, menoscaba retroactivamente los derechos adquiridos por los peticionarios al amparo de la Ley 447, *supra*, y a la luz de la indubitada relación contractual existente entre estos y la Administración del Sistema de Retiro. Alegan, además, que esa relación contractual les fue impuesta por parte del recurrido como requisito compulsorio e irrevocable cuando fueron reclutados en sus respectivos empleos.

CT-2013-08
CT-2013-09
CT-2013-10

Cónsono con lo anterior, los peticionarios arguyen que confiados en la certidumbre de sus derechos y las obligaciones del gobierno, planificaron su futuro económico con la expectativa de acogerse al retiro con los beneficios y en las fechas que las leyes correspondientes establecían. Fundamentan su posición en que realizaron préstamos, los cuales están pagando, para que le acreditaran tiempo no cotizado y así completar los años requeridos. De igual forma, alegan tenían planes de saldar sus deudas con la liquidación a la que tienen derecho para luego costear sus gastos con lo que recibirían de pensión. Arguyen además, que rechazaron ofertas de empleo más lucrativas en el sector privado por no poner en riesgo su retiro.

Al igual que los casos anteriores, los peticionarios confrontan una situación espinosa: optar por una pensión sustancialmente menor a la pactada o continuar trabajando un gran número de años adicionales para finalmente recibir una pensión menguada y sin los beneficios de plan médico, bonos y bajo unas condiciones totalmente diferentes.

En atención a ello, el Sr. José A. De Jesús Vera y otros presentaron el 6 de junio de 2013 una petición de sentencia declaratoria e interdicto provisional y permanente ante el T.P.I. Este recurso fue consolidado a nivel de instancia con los casos mencionados anteriormente y, al igual que estos, sus reclamaciones fueron

desestimadas por el foro primario el pasado 17 de junio de 2013.

Ante el factor inminente de que cobren vigencia los postulados de la Ley 3, *supra*, los peticionarios presentaron un recurso de certificación ante este tribunal. En este, nos solicitan que con carácter de urgencia expidamos el auto solicitado y declaremos la inconstitucionalidad de la Ley Núm. 3, ordenemos la celebración de una vista ante un Comisionado Especial a los fines de determinar la edad de los demandantes y los años cotizados al Sistema de Retiro. Además, nos imploran a que emitamos una orden de interdicto preliminar contra la Administración de Retiro prohibiéndole realizar gestión o trámite alguno sobre el retiro de los peticionarios hasta la adjudicación del presente recurso.

II

A

Antes de entrar a discutir el marco doctrinal que aplica a los reclamos de los demandantes, debemos expresarnos respecto a la procedencia de la petición de *injunction* preliminar que presentaron ante el TPI.

Cuando emitimos nuestra resolución del 11 de junio de este mes, fuimos enfáticos en que "de no proveerse un remedio interlocutorio oportuno, los peticionarios se ver[í]an obligados a tomar decisiones drásticas que podrían ir desde renunciar a sus empleos y acogerse a un plan de pensión menor del esperado o continuar trabajando

CT-2013-08
CT-2013-09
CT-2013-10

por años y acogerse a la nueva estructura de retiro provista por esa ley".[2] Ciertamente, el Tribunal de Primera Instancia posee discreción para otorgar este tipo de remedios. 32 L.P.R.A. sec. 3522. Sin embargo, ante la situación particular que presentan estos casos, era procedente que se emitiera un interdicto preliminar para paralizar los efectos de la Ley 3, *supra*, en lo que se dilucidaba esta controversia. Elaboremos.

Como regla general, un interdicto para suspender los efectos de una ley es improcedente. Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3524. No obstante, el citado precepto en su inciso (3) dispone que:

> [U]n tribunal podrá dictar orden de entredicho provisional, *injunction* preliminar o permanente sujeto a los términos de la Regla 57 de Procedimiento Civil:
>
> (a) En aquellos casos en que ello sea indispensable para hacer efectiva su jurisdicción y previa una determinación de que la orden es indispensable para evitar un daño irreparable a la parte peticionaria.
>
> (b) Cuando en la petición se alegue que alguna persona, bajo la autoridad de alguna ley, ordenanza, o reglamento del Estado Libre Asociado de Puerto Rico, esté privando o sea el causante de que alguien esté privando al peticionario de algún derecho, privilegio o inmunidad protegido por la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o por la Constitución o leyes de los Estados Unidos de América que sean aplicables a las personas bajo la jurisdicción del Estado Libre Asociado de Puerto Rico.
>
> **Disponiéndose, además, que al dictar dicha orden el tribunal debe considerar el interés público envuelto y concluir que la parte peticionaria**

---

[2] María del C. Alvarado Pacheco, *et al.* v. E.L.A. CT-2013-05/06/07, pág. 25.

CT-2013-08
CT-2013-09
CT-2013-10

**tiene una posibilidad real de prevalecer en los méritos de su petición. Dicha orden sólo tendrá vigor en el caso específico ante el tribunal y entre las partes.**
(Énfasis nuestro)

El caso que pende ante nuestra consideración involucra asuntos complejos que requieren una seria y ponderada dilucidación. Precisamente, por esa razón es que se le ordenó al foro primario que celebrara una vista evidenciaria. Así también, ante la postura del T.P.I. de no celebrarla ni emitir remedio provisional alguno, se hacía necesario que hoy emitiéramos un interdicto preliminar paralizando la vigencia de la Ley 3, *supra*, para que este pleito se pudiera atender correctamente. Y es que no existía otra forma de evaluar responsablemente los reclamos de los demandantes en este caso. Sin ánimos de ser repetitivos, nos remitimos a todas las razones que para ello esbozamos en nuestra resolución del pasado 11 de junio. Como bien expresó el Juez Presidente hace pocos años, **"no haberles provisto a las partes una oportunidad adecuada de probar sus puntos de vista y disponer del caso sin el rigor que nos exige una controversia como la de autos, es a todas luces contraria al principio de igualdad procesal que debe regir todo proceso judicial** (…) priva a los empleados públicos afectados de sus derechos

CT-2013-08
CT-2013-09
CT-2013-10

adquiridos sin tan siquiera haberles provisto un proceso judicial completo y transparente …".[3] (Énfasis nuestro)

Concluido este primer asunto, somos del criterio que los hechos de este caso presentan una fuerte presunción de que los artículos de la Ley 3 que afectan los derechos adquiridos de los participantes del Sistema de Retiro bajo la Ley 447, *supra*, son inconstitucionales, y por ende, se hacía imperativo acceder a la petición de interdicto preliminar de los peticionarios. Pasemos ahora a exponer el derecho aplicable a los planteamientos constitucionales de los demandantes que a nuestro juicio operan con mayor fuerza en detrimento de la constitucionalidad de esas disposiciones.

B

Toda comunidad políticamente organizada tiene lo que se conoce como "police power" o poder público del Estado, que opera en función de salvaguardar la seguridad, la salud y el bienestar de sus habitantes. Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 36 (2010). Ese poder es amplio y responde a las circunstancias de cada caso. Así por ejemplo, la precariedad económica es "una realidad que

---

[3] Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 110. Opinión disidente del Juez Presidente señor Hernández Denton. En esa misma línea opina el Profesor Paul Secunda, quien al respecto nos dice:

> Because of the lack of legal uniformity in public pension regulation from one state to the nest, the only possible way to determine whether state curtailment of public employee pension rights will be constitutional is by undertaking an **in-depth** legal analysis of the applicable pension laws, regulations, ordinances, court opinions and prior settlements. (Énfasis y subrayado nuestro) P. M. Secunda, Constitutional Contract Clause Challenges in Public Pension Litigation, 28 Hofstra Lab. & Em. L.J. 263, 300, (2011).

CT-2013-08
CT-2013-09
CT-2013-10

necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado". *Id.*, pág. 37. Ahora bien, ello no implica que ese poder se pueda ejercer de manera omnímoda en ausencia de parámetros.

En Puerto Rico, la protección de las relaciones contractuales encuentra apoyo en el Art. II, sec. 7 de nuestra Constitución, que prohíbe que se promulguen leyes que menoscaben las obligaciones contractuales. Esa disposición es análoga al Art. I, sec. 10 de la Constitución federal, por lo que al interpretar la nuestra, debemos mirar cómo el Tribunal Supremo federal ha evaluado esa cláusula. Tales decisiones constituyen las protecciones mínimas que nos vemos precisados a proveer en nuestro ordenamiento. Domínguez Castro et al. v. E.L.A. I, *supra*, pág. 80; Bayrón Toro v. Serra, 119 D.P.R 605 (1987). Cabe señalar que mediante la misma se protegen las obligaciones entre partes privadas como las contraídas por el Estado.

Es conocido que la cláusula contractual no constituye una prohibición absoluta, pues como ya mencionamos, el Estado tiene la facultad de reglamentar en favor del bienestar del pueblo. Bayrón Toro v. Serra, 119 D.P.R. 605, 619 (1987). En otras palabras, no prohíbe que se promulgue ninguna legislación que tenga el efecto colateral de menoscabar una obligación contractual pública o privada. U.S. Trust Co. v. New Jersey, 431 U.S. 1, 20-

21 (1977). Lo que hay que observar es si el menoscabo sobrevive el escrutinio constitucional. *Id.*

Para evaluar las situaciones en que el Estado modifica sus propias obligaciones, el escrutinio que se emplea es más cuidadoso que el que se utiliza cuando el Gobierno interfiere en relaciones contractuales privadas. Es decir, es más severo. Véase <u>Dominguez Castro et al. v. E.L.A., I</u> *supra*, pág. 81; <u>Bayrón Toro v. Serra</u>, *supra*; <u>Warner Lambert Co. v. Tribunal Superior</u>, 101 D.P.R. 378 (1973). La función del foro judicial es evaluar la validez de la legislación estableciendo un balance entre el poder del Estado para salvaguardar el bienestar ciudadano y el interés de proteger las relaciones contractuales. *Id.*

Como cuestión de umbral, al analizar reclamaciones bajo esta doctrina es preciso auscultar si existe una relación contractual sobre la cual se reclama protección. <u>Domínguez Castro et al. v. E.L.A. I.</u> *supra*, págs. 81-84; <u>U.S. Trust v. New Jersey</u>, *supra*. En ese ejercicio, procede examinar si la actuación estatal ha menoscabado sustancialmente esa relación. *Id.* Por último, el hecho de que eso haya ocurrido no implica que la actuación gubernamental se convierta *ipso facto* en inconstitucional. *Id.* La medida del Estado podría prevalecer si a pesar de menoscabar la relación contractual, es necesaria y razonable y persigue adelantar un propósito gubernamental importante. *Id.*

CT-2013-08
CT-2013-09
CT-2013-10

Expuesto este marco general, pasemos a discutir la doctrina más detalladamente.

1. **Relación contractual entre el Estado y los servidores públicos demandantes**

En el caso de autos la relación contractual que pretenden vindicar los demandantes deriva de la Ley 447, *supra*, que creó el Sistema de Retiro. Ese estatuto, ¿puede considerarse como un acuerdo contractual entre el Estado y el empleado? Veamos.

Para propósitos de determinar que una legislación es inconstitucional en el contexto de que el Estado se obligó contractualmente con el demandante mediante cierta legislación, es necesario que de la medida en controversia se deriven derechos contractuales. National Railroad v. Atchinson, 470 U.S. 451, 466-467 (1985). Pues como regla general, las medidas legislativas no crean automáticamente una relación contractual con las personas beneficiadas por el estatuto de que se trate. *Id.*

No obstante, varios tribunales estatales han resuelto que los estatutos referentes a los sistemas de retiro dan

CT-2013-08
CT-2013-09
CT-2013-10

génesis a una relación contractual.[4] Nuestra norma jurisprudencial nos lleva a la misma conclusión. De hecho, desde Bayrón Toro v. Serra, *supra*, rechazamos la teoría arcaica de que las pensiones de los empleados públicos retirados eran una mera dádiva del gobierno e hicimos hincapié en que estas constituían una obligación del Estado cimentada en bases de moral. Dijimos también allí que "los participantes de un sistema de retiro tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema, independientemente de que la participación sea voluntaria o compulsoria". Bayrón Toro v. Serra, *supra*, pág. 618. Esta norma derrota cualquier alegación que pretenda convencernos de que no existen derechos adquiridos sobre la pensión antes de que el empleado se retire. Si fuera así, ¿Por qué Bayrón Toro nos enfatiza que ese derecho adquirido de naturaleza contractual surge con el ingreso del empleado al sistema?

Tan recientemente como el año pasado en Pagán Santiago et al. v. ASR, 185 D.P.R. 341, 352 (2012)

---

[4] Muchos estados siguen la teoría contractual. Bajo este alcance, existe una relación contractual entre el Estado, como el patrono, y el empleado público en cuanto a los beneficios que se le han garantizado mediante la ley. En algunos estados los beneficios adquieren la categoría de derechos adquiridos dependiendo la etapa laboral en que se encuentre el empleado, por ejemplo: cuando comenzó a trabajar e ingresó al sistema de retiro; luego de cada día de servicio rendido en el empleo; cuando el empleado satisface los requisitos de elegibilidad o, cuando el empleado se retira y comienza a devengar su pensión. En otros estados los empleados obtienen derechos adquiridos absolutos en el plan de pensión una vez entran al sistema. Otros, tienen una visión más restrictiva. Para una discusión general sobre este asunto véase Eric M. Madiar, Public Pension Benefits under siege: does state law facilitate or block recent efforts to cut the pension benefits of public servants? 27 ABA J. Lab. & Emp. L. 179 (2012). Véase también, J. M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 40 (2013).

CT-2013-08
CT-2013-09
CT-2013-10

reiteramos lo que habíamos colegido en <u>Bayrón Toro</u> respecto a que

> [e]l derecho a pensión de retiro por años de servicio del empleado público tiene un respetable contenido ético y moral y constituye un seguro de dignidad para el hombre o la mujer que habiendo dedicado al servicio público sus años fecundos, no debe encontrarse en la etapa final de su vida en el desamparo, o convertido en carga de parientes o del Estado."[5] <u>Pagán Santiago *et al* v. ASR</u>, *supra*, pág. 353.

Finalmente, acotamos que entre el Estado y el empleado existe un acuerdo de voluntades que produce un efecto jurídico vinculante para ambas partes, lo que hacía que el plan de retiro al amparo de la Ley 447, *supra*, fuera parte de ese contrato. *Id.*, pág. 353. Sostuvimos entonces que por esa razón "la Asamblea Legislativa no tiene facultad para menoscabar ese derecho adquirido de naturaleza contractual, o que ha sido 'comprado', por ese participante mediante aportaciones compulsorias provenientes de su salario."[6] *Id.*, 354.

Nótese la connotación que se le da a la pensión de los empleados impartiéndole características de un derecho adquirido fundamentado en una relación contractual. Esta es la norma establecida por este Tribunal hace años y que hasta hoy no ha sido revocada. Y aún en caso de que no existiera ese precedente, para evaluar el reclamo contractual procedería estudiar el lenguaje de la ley para

---

[5] Citando a <u>Rosa Resto v. Rodríguez Solís</u>, 111 D.P.R. 89, 92 (1981).
[6] Citando a <u>Calderón v. Adm. Sistemas de Retiro</u>, *supra*, págs. 1041-1042. Claro está, esa limitación a menoscabar la relación contractual se encuentra supeditada al poder de razón del Estado que discutimos previamente.

CT-2013-08
CT-2013-09
CT-2013-10

ver si del mismo se desprende un intento legislativo de crear derechos de ese tipo. Véase, National Railroad v. Atchison, *supra*.

En ese sentido, podemos mencionar como ejemplo la Ley Núm. 35-2007, que enmendó la Ley 447, *supra*, en varios aspectos. Entre las enmiendas se aumentó un 3% a las pensiones que allí se mencionaron. Esos aumentos se concedieron por que el legislador reconoció que "con el paso del tiempo, el aumento en el costo de vida conlleva una disminución relativa de las anualidades de los pensionados". Asimismo, añadió que de esa manera "… el Gobierno enfrenta la obligación moral de ayudar a mejorar la condición de vida de los pensionados, personas que dieron lo mejor de su vida en el servicio al Pueblo de Puerto Rico". Véase Exposición de Motivos de la Ley Núm. 35-2007.

Aprovechamos la coyuntura para plasmar la ironía de "la obligación moral" que existió para aumentarle un 3% a las pensiones de retiro en aquel entonces pero que hoy no existe para garantizarles un retiro digno a los demandantes. Fíjese que **a costa de esa y otras medidas poco analizadas es que esa "obligación moral" para con los retirados se desvanece entre las páginas de la Exposición de Motivos de la Ley 3, *supra*.**

Así pues, quedando meridianamente claro que el precedente jurídico y las expresiones legislativas avalan la existencia de una relación contractual en cuanto a las

pensiones de retiro, pasemos al siguiente asunto ante nuestra consideración.

## 2. **Menoscabo sustancial de los acuerdos contractuales entre los servidores públicos y el Estado**

Como regla general, la cláusula constitucional contra el menoscabo de las obligaciones contractuales se activa cuando la modificación afecta de manera adversa los términos esenciales que se tuvieron en cuenta al momento de contratar, de modo que se afecten las expectativas razonables de las partes. Domínguez Castro et al. V. E.L.A. I, supra, pág. 83. Véase también, Baltimore Teachers Union, v. Mayor, 6 F.3d 1012 (4th Cir. 1993).

Cuando resolvimos Bayrón Toro v. Serra, supra, dictaminamos que ciertas enmiendas al Sistema de Retiro de los empleados de la Universidad de Puerto Rico no eran irrazonables. Se estableció los 55 años como la edad mínima de retiro, se redujo el importe de la pensión a los participantes que se jubilaran antes de los 58 años de edad y se aumentó la aportación de los participantes al fondo del sistema. En ese caso, antes de la enmienda todo participante aportaba mensualmente 4% de los primeros $350 de su sueldo, más, el 6.5% del sueldo restante. Luego de la enmienda, la aportación mensual de un 4% se aumentó a un 5% del sueldo mensual hasta la cantidad máxima cotizable al seguro social y en lugar de un 6.5 % se aportaría el 7% de la porción del sueldo en exceso de esa cantidad. Estos hechos, en nada se asimilan a la situación

de los hoy demandantes, quienes verán sus beneficios reducidos dramáticamente.

En ese mismo caso, dijimos que cuando un empleado se ha retirado y cumple con todas las condiciones para el retiro, su pensión no está sujeta a menoscabo. Empero, antes de que ese empleado se acogiera al retiro, los términos del sistema podían enmendarse si las modificaciones eran **razonables** y con el fin de adelantar la solvencia del sistema. Y es que no debe ser de otra forma. La cláusula constitucional no le prohíbe al Estado poner en vigor medidas que tengan el efecto colateral de menoscabar una obligación contractual. Ahora bien, esto debe hacerse dentro de los parámetros de **necesidad y razonabilidad**.

## 3. Criterios de necesidad y razonabilidad

Un menoscabo contractual sustancial no es razonable si el problema que se intenta resolver mediante la medida impugnada existía al momento en que el Estado entró en la obligación contractual que se intenta proteger. Si ese problema previsible se agravó con el tiempo, pero se agravó solo en cuanto al grado o magnitud, el menoscabo no es razonable. Véase, US Trust v. New Jersey, supra, pág. 31 (1977); Massachusetts v. Community College, 649 N.E. 2d 708 (1955). Así se resolvió en Carlstrom v. State, 103 Wash. 2d 391 (1985) cuando le correspondió al Tribunal Supremo de Washington dilucidar si por el hecho de haber declarado una emergencia fiscal, el Gobierno podía negarse

CT-2013-08
CT-2013-09
CT-2013-10

a honrar sus acuerdos contractuales con la parte demandante. El Tribunal señaló que, aunque la situación financiera había empeorado, lo que ocurrió fue un cambio en el grado del problema y no en la clase o tipo de problema. También se concluyó que como las medidas impugnadas eran irrazonables no necesitaba abordar el cuestionamiento en cuanto a si eran necesarias.[7]

Por otra parte, en Singer v. City of Topeka, 607 P 2d 467 (1980) el Tribunal Supremo de Kansas señaló que las modificaciones a los planes de pensión eran razonables si tenían una relación material con la esencia del sistema de retiro y si propendían a la administración exitosa del mismo. No obstante, cambios que resultaran en desventajas para los empleados debían venir acompañados con nuevas ventajas. Véase también Calabro v. City of Omaha, 247 Neb. 955 (1995). Ese análisis comparativo de desventajas y nuevas ventajas compensatorias debe enfocarse en el empleado que tiene el derecho a la pensión. Betts v. Board of Administration, 582 P2d 614 (1978).

Existe cierta controversia en los Tribunales apelativos del circuito federal en cuanto a cuál de las partes tiene la carga probatoria para demostrar la

---

[7] Since the State was fully aware of its financial problems while negotiating and prior to signing the Agreement, it cannot now be permitted to avoid the agreement based on those same economic circumstances. Although the financial situation worsened, it was a change **in degree, not in kind.** We therefore find as a matter of law that because the State's acts were not reasonable in view of the circumstances existing when it entered into a contract, ... Finding the State's acts unreasonable, **we need not reach the question of necessity.** Carlstrom v. State, 103 Wash. 2d 391, 397 (1985) (Énfasis nuestro)

CT-2013-08
CT-2013-09
CT-2013-10

ausencia o presencia de la necesidad y razonabilidad de la medida impugnada.[8] Varias interpretaciones han surgido a partir del caso normativo U.S. Trust v. New Jersey, *supra*. Allí el máximo foro federal hizo la siguiente expresión: "…the State has failed to demonstrate that repeal of the 1962 covenant was similarly necessary". *Id.*, pág. 30.

En el 2007 la Corte de Apelaciones de los Estados Unidos para Cuarto Circuito resolvió que el demandante es quien debe demostrar que hubo un menoscabo contractual y que el Estado no ejerció legítimamente su poder de reglamentación. Catawha Indian Tribe v. City of Rock, 501 F. 3d 368, 371 (4th Cir. 2007). Poco después, en Fraternal Order v. Prince George County, 645 F. Supp 2d 492 (4th Cir. 2009), ese tribunal señaló:

> To pass constitutional muster, however, a State, or as in the present case, a County, when exercising this power, by enacting legislation that constitutes a substantial impairment of its own contracts, must demonstrate that the legislation is "reasonable and necessary to serve an important public purpose".

Sin embargo, hace poco en United Auto Aerospace v. Fortuño, 633 F. 3d 37, 45-47 (1st Cir. 2011) el Primer Circuito le impuso la carga de la prueba a la parte que reclama que el menoscabo a la obligación contractual no era razonable ni necesario. Pero, tan reciente como el año pasado, el cuarto circuito en Cherry et al. v. Mayor and City Councy of Baltimore,[9] expresó:

---

[8] Véase, Paul Secunda, *supra*, pág. 283.
[9] 2012 WL431446.

CT-2013-08
CT-2013-09
CT-2013-10

> However, the Fortuño court addressed the matter in the initial pleading context, holding that generalized allegations of illegitimate purpose and the existence of other alternatives are insufficient to allege a plausible claim that challenged legislation was not reasonable and necessary to serve an important public purpose. In sum, the Court finds the burden of proof issue unresolved, at least for courts outside the First Circuit.
>
> In any event, the Court will assume that Plaintiffs have the burden of proving that the impairment of their contract rights by the Ordinance was not "reasonable and necessary to serve an important public purpose." As discussed herein, Plaintiffs have carried that burden, if they had it.

Si bien el Tribunal concluyó que los demandantes habían cumplido con su carga probatoria, si alguna, dejó constar lo siguiente:

> If required to predict the burden of proof allocation that would be adopted by the appellate courts, the Court would find a useful analogy in the *McDonnell Douglas* burden of proof scheme. *Mc Donnel Douglas Corp v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973). Therefore, consistent with the First Circuit decision in Fortuño, the Court would impose a threshold burden on a plaintiff to plead (and ultimately to prove) facts sufficient to create a *prima facie* case that an impairment was not "reasonable and necessary to serve an important public purpose". Then, the ultimate burden would be on the plaintiff to disprove the government unit's asserted basis for contending that the impairment was "reasonable and necessary to serve an important public purpose". Id, N. 15.

Así mismo lo concluyó el Juez Presidente señor Hernández Denton hace poco más de tres años al interpretar <u>U.S. Trust v. New Jersey</u>, *supra*, expresó lo siguiente:

> [e]n cuanto a la valoración de los elementos de razonabilidad y necesidad de una medida impugnada en casos como el de autos, el máximo foro federal resolvió que no procede otorgarle

CT-2013-08
CT-2013-09
CT-2013-10

deferencia absoluta al juicio legislativo cuando el propio interés del Estado está en juego. Lo contrario, razonó el Tribunal Supremo federal, implicaría que la cláusula constitucional contra el menoscabo de las obligaciones contractuales no proveería protección alguna y, en esencia, sería letra muerta. **Por lo tanto, el Estado debe probar en los tribunales que la medida es razonable y necesaria.** Domínguez Castro et al. v. E.L.A., I *supra*, pág. 104. Opinión disidente del Juez Presidente señor Hernández Denton. (Énfasis suprimido y énfasis suplido)

En ese proceder de evaluar la razonabilidad y necesidad de una medida que menoscaba una obligación contractual –aunque con un alcance algo indefinido– el Estado disfruta de una limitada deferencia que se le debe al criterio de la Legislatura en relación a si la obligación contractual debe perjudicarse. U.S. Trust v. New Jersey, *supra*, pág. 26. Cuando se alega que el Estado menoscabó un contrato público del cual es parte, la determinación de razonabilidad y necesidad de la Asamblea Legislativa merece menos deferencia. *Id.* **Una deferencia completa en estos casos no es apropiada porque es el propio interés del Estado el que está en juego.** *Id.* Aporta a la determinación final de razonabilidad de la medida el hecho de que la legislación impugnada se promulgue debido a una situación de emergencia y que su aplicación sea temporal o transitoria. Domínguez Castro et al. v. E.L.A, I, *supra*, pág. 85. No obstante, la existencia de un interés público importante no es suficiente para prevalecer en cuanto a la limitación constitucional. U.S. Trust v. New Jersey, *supra*, pág. 21. No se sostendrá el menoscabo de una obligación contractual si para alcanzar

CT-2013-08
CT-2013-09
CT-2013-10

el objetivo perseguido por el Estado existen otras medidas alternas menos severas. *Id.*, pág. 27 (1977).

Ante este marco normativo discutamos por qué entendemos que las secciones de la Ley 3 que afectan los derechos adquiridos de los participantes del Sistema de Retiro bajo la Ley 447, presentan una fuerte presunción de inconstitucionalidad.

III

**A. La Ley 3 menoscaba sustancialmente la relación contractual entre los demandantes y el Gobierno de Puerto Rico**

Comencemos explicando a rasgos generales cómo opera el sistema de retiro de los demandantes.

La Ley 447, *supra*, creó el Sistema de Retiro de los empleados del Gobierno de Puerto Rico en 1951 bajo un programa de retiro de beneficios definidos.[10] Este tuvo el propósito de garantizarles a sus participantes un ingreso sustentable una vez concluida su carrera en el servicio público. El Sistema se nutre de las contribuciones individuales de cada uno de los participantes y se considera un fideicomiso, ya que los fondos deben utilizarse "en provecho de los miembros participantes de su matrícula, sus dependientes y beneficiarios, para el pago de anualidades por retiro y por incapacidad, anualidades y beneficios por defunción y otros

---

[10] Es importante señalar las características generales de un sistema de pensiones de beneficios definidos. En este tipo de plan el patrono tiene la carga de aportar fondos al sistema de pensión en bases actuariales de modo que existan suficientes fondos para pagarle al empleado cuando se retire. Para una explicación más detallada véase, P. Secunda, *supra*, Parte I.

CT-2013-08
CT-2013-09
CT-2013-10

beneficios…". 3 L.P.R.A. sec. 761. Véanse, <u>Pagán Santiago</u> <u>*et al.* v. ASR</u>, 185 D.P.R. 341, 352 (2012); <u>Aquino González</u> <u>v. A.E.E.L.A.</u>, 182 D.P.R. 1 (2011).

El Sistema tiene tres estructuras de beneficios: (1) el plan de retiro bajo la Ley 447 para los participantes que entraron al Sistema antes del 1 de abril de 1990 y al cual pertenecen los peticionarios; (2) la estructura bajo la Ley Núm. 1 del 16 de febrero de 1990 y; (3) el plan de retiro conocido como Reforma 2000 para aquellos participantes que entraron al Sistema a partir del 1 de enero de 2000.

Ahora bien, con la aprobación de la Ley 3, *supra*, se crea un nuevo sistema de retiro a base de un "Programa Híbrido de Contribuciones Definidas". El sistema nuevo elimina por completo el criterio de mérito por años de servicio y también aumenta la edad de retiro a 61 años para los empleados cobijados por la Ley 447. Ciertamente, esta es la primera vez que el Gobierno aplica cambios sustanciales de forma retroactiva a los planes de retiro de sus servidores públicos. A pesar de que en el 1990 ese principio de mérito fue eliminado para los nuevos empleados, los peticionarios continuaron bajo el sistema pactado al momento de su reclutamiento. Es decir, los cambios anteriores se han realizado de forma prospectiva sin menoscabar los intereses de los que ya eran participantes y sus derechos adquiridos a través de los años.

Contrario a lo que ha sido la práctica en el pasado, las enmiendas aprobadas bajo la Ley 3, *supra*, implican un aumento drástico en la cantidad de tiempo que tendrán que trabajar los empleados para cualificar y poder retirarse. Aun así, después de esos años adicionales de servicio, sólo tendrán derecho a una pensión considerablemente menor a la pactada al momento que ingresaron al Sistema de Retiro. **Todo ello constituye un menoscabo sustancial y severo a su relación contractual con el Estado.**

B.  **El fin público que se intenta alcanzar con la Ley Núm. 3 y la razonabilidad de esa medida.**

Ciertamente, alcanzar la estabilidad del Sistema de Retiro es un fin público de gran envergadura y es sumamente apremiante atender esa crisis. Ahora bien, las medidas que aquí se impugnan, ¿son razonables y necesarias?

Cuando el T.P.I. analizó el reclamo de los demandantes sobre si la Asamblea Legislativa consideró alternativas menos onerosas para atender el problema fiscal del Sistema, este foro concluyó que "la determinación del Legislador en cuanto a la serie de medidas escogidas constituye un ejercicio de política pública, que merece deferencia… por lo que no corresponde realizar una determinación *de novo* sobre la misma". Tiene razón el foro primario en que el criterio de razonabilidad y necesidad del legislador merece deferencia. <u>Domínguez Castro et al. v. E.L.A. I</u>, pág. 85. Pero como ya explicamos, cuando se trata de casos en que el Estado es

CT-2013-08
CT-2013-09
CT-2013-10

parte de la obligación contractual, ese análisis es más cuidadoso. Lo mínimo que eso implica es que se debe ponderar adecuadamente si lo que el legislador impregnó en la ley es razonable y necesario para alcanzar el fin público que se busca. No se puede dar deferencia al criterio legislativo meramente por que el legislador opina que la medida es razonable. Hay que evaluar si existían alternativas menos onerosas, si el problema que se intenta remediar era conocido o desconocido, si se compensan los daños causados, entre otras cosas. Lo contrario equivaldría a obviar toda la norma jurisprudencial que hemos discutido que señala que el foro judicial debe justipreciar esos criterios lo que sería muy conveniente para el Estado.

Para que esto se lograra se hacía necesario emitir un *injunction* preliminar y ponderar la prueba pertinente.[11] Por ello somos del criterio que ante el menoscabo sustancial que evidentemente han sufrido los demandantes le correspondía al Estado presentar prueba de que las medidas impugnadas eran necesarias y razonables como bien lo puntualizó el Juez Presidente en su Opinión disidente de Domínguez Castro. En cuanto a esto encontramos muy acertadas las expresiones que se hicieron en Cherry v. Mayor, *supra*, disponiendo que una vez los demandantes

---

[11] Al tener ante nuestra consideración un asunto tan importante, teníamos a nuestra disposición la Regla 51 del Reglamento del Tribunal Supremo de 2011 que establece que este Tribunal puede a iniciativa propia ordenar que se celebre una vista evidenciaria ante un comisionado especial.

CT-2013-08
CT-2013-09
CT-2013-10

demostraran que sufrieron un menoscabo sustancial, la carga probatoria pasa al Estado. Así pues, le correspondía al Estado probar en este caso que era necesario y razonable afectar tan dramáticamente las pensiones de los empleados que ya estaban a punto de retirarse. También debía demostrar que era razonable y necesario obligarlos a trabajar un sin número de años adicionales para al final recibir menos beneficios.

Cónsono con lo anterior, una razón por la cual entendemos que las secciones de la Ley 3 que afectan los derechos adquiridos de los participantes del Sistema de Retiro bajo la Ley 447 son irrazonables es debido a que los problemas que intenta remediar no eran desconocidos para el Estado al momento en que entró en una obligación contractual con sus empleados mediante la Ley 447. Esto requiere que dediquemos algunas líneas para explicar con detalle a lo que nos referimos.

El Sistema de Retiro ha carecido de una buena planificación así como de un sistema de contribución eficiente desde sus inicios en 1951. Surge del estudio intitulado *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, que la estructura del sistema ha estado arruinada por años.[12] No obstante, se señala qué acciones que se realizaron en el periodo de 2004 a 2008 han exacerbado el deteriorado

---

[12] Véase también la Exposición de Motivos de la Ley 116-2011.

CT-2013-08
CT-2013-09
CT-2013-10

estado fiscal del sistema.[13]  Entre estas, la emisión de los bonos de obligaciones de pensión o *Pension Obligation Bond Transactions* (POB por sus siglas en inglés), los programas o ventanas de retiro temprano[14], el incremento en la cuantía permitida de préstamos personales, procedimientos inadecuados y las leyes especiales de concesión de beneficios para retirados, a saber, bonos de verano, bonos para medicamentos, aguinaldo de Navidad, ajustes por costo de vida, entre otros.[15]

Específicamente, el citado estudio critica severamente el aumento en la cantidad permitida por préstamo personal contra los fondos de retiro, de $5,000 a

---

[13] Véase Apéndice I del CT-2013-06. Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico, Conway MacKenzie, Inc. Octubre 2010.

[14] Es preocupante que recientemente se haya aprobado la Ley 27-2013 que creó una ventana de retiro tempano a los empleados de la Autoridad de Puertos de Puerto Rico que tuvieran al menos 20 años de servicio.  Más aún, la ley tiene vigencia inmediata a partir de su aprobación el pasado el 17 de junio de 2013. Esa ley en su Artículo 1 señala que se promulga en estricto cumplimiento con las leyes laborales y **los derechos adquiridos de los servidores públicos. Además, se les proveerá una bonificación mínima de $900 por cada año de servicio, hasta un máximo de $27,000 de bonificación.**  Señaló la legislatura que para ello se separaron $50 millones provenientes de la transacción del arrendamiento del aeropuerto Luis Muñoz Marín.  Tal medida es contradictoria a lo enunciado en la Exposición de Motivos de la Ley 3.

[15] Véase la propia Exposición de Motivos de la Ley Núm. 3, supra; Ley Núm. 524-2004, Ley Núm. 144-2005, Ley Núm. 35-2007.

CT-2013-08
CT-2013-09
CT-2013-10

$15,000.[16] Esto, porque ello tuvo un efecto nefasto sobre la liquidez del sistema. De las entrevistas realizadas por los investigadores a varios empleados clave, se llegó a la conclusión de que al permitir ese cambio en el 2007, no se ejerció el debido cuidado por la administración y la Junta de Directores.[17] No constaban en archivos análisis documentados ni información que indicara que incrementar la cuantía de préstamos personales era un paso fundamentado, hecho con el debido análisis que revelara el impacto que ello tendría sobre la salud financiera del sistema. Esa documentación nunca apareció, y es que, según los propios empleados del sistema, esos análisis nunca se realizaron.[18]

De otra parte, en el 2008 los POB se aprobaron para resolver el problema de liquidez del Retiro. Al emitir los bonos se incrementarían los activos del sistema y, por ende, el coeficiente de financiación, el cual se esperaba aumentara en un 70% según se estimó. Sin embargo, ese efecto nunca se alcanzó. Surge que los cálculos realizados para verificar el resultado de esa emisión sobre el

---

[16] The potential impact of increasing the capo n personal loans from $5,000 to $15,000 on the System's liquidity profile and investment portfolio should have been thoroughly vetted before the ERS [(Sistema de Retiro de Empleados) decided to amend the regulations pertaining to personal loans. Based on our review of the relevant documentation that was provided to us, including the 2007 ERS Board of Trustee minutes, and interviews with various key employees of the ERS, it appears that such due care was not used by the System Administrator in supporting this change or by the Board of Trustees in approving this change. …Approving such a decision without supporting analyses demonstrates lack of fiduciary responsibility by ERS management and the Board of Trustees. Íd. Pág. 17.
[17] Íd., pág. 10.
[18] Íd.

CT-2013-08
CT-2013-09
CT-2013-10

coeficiente de financiación fueron erróneos, pues ignoraron la deuda en la que consistió la emisión. Realmente, el incremento sería en un 9.7%, un porcentaje drásticamente menor al estimado por el Sistema de Retiro durante el proceso de emisión. Esta crasa falta llevó a los autores del estudio a cuestionar cómo a aquellos individuos responsables en la toma de decisiones entraron en este tipo de transacción y se les escapó un paso tan fundamental en el método de cómputo del coeficiente de financiación.[19] Según establece el estudio, los riesgos de esa decisión no se midieron o no se entendían, **lo que indica que tanto la gerencia como la Junta de Síndicos del Sistema de Retiro y la Junta de Directores del Banco Gubernamental de Fomento fueron negligentes.** El arreglo de la liquidez del sistema a corto plazo realmente provocó un problema mayor que ha resultado en grandes costos que se pagarán en décadas por venir.[20] Precisamente, en consideración a ello, se recomendó en el informe que se realizaran más investigaciones sobre la toma de decisiones que permeó el proceso dela emisión de bonos en el 2008

---

[19] Concretamente el estudio expresa lo siguiente:
  Given the dramatic increase in the funding ratio presented to them, ERS [(el Sistema de Retiro)] management, the Board of Trustees and GDB [(Banco Gubernamental de Fomento)] Board of Directors had a responsibility to fully understand if the increase was reasonable and calculated consistently with prior period calculations. This lack of understanding falls short of what is expected from a director or a fiscal agent that is exercising prudence or acting within the general standards of reasonability. Íd. Pág. 12.
[20] Íd., pág. 15.

CT-2013-08
CT-2013-09
CT-2013-10

por las autoridades correspondientes.[21]  Hasta ahora, lo único que sabemos es que la factura se le pasó a quien **no tuvo la culpa: los servidores públicos que hicieron sus aportaciones y confiaron a un sistema mal manejado el fruto de su trabajo.**

Entre otros errores administrativos que ahora paga el pueblo, cabe resaltar que varias leyes especiales que otorgaban beneficios se aprobaron ignorando las metas de reforzar el sistema de manera que este contara con fuentes suficientes de fondo a largo plazo.  Entre ellas, algunas fueron la Ley Núm. 524-2004, la Ley Núm. 144 de 2005 y la Ley Núm. 35 de 2007. De esta forma, los beneficios especiales, los cuales no son un componente explícito del Sistema de Retiro han sido cubiertos con los activos del mismo.  Esto, pues, **el Fondo General, las corporaciones públicas y municipios han faltado a su responsabilidad de pagar los beneficios concedidos por estas leyes especiales.**[22]  Tanto así que para junio de 2009, los

---

[21] Íd., pág. 16.  The POB transaction has negatively impacted the ERS and the Government, in general. Rather than addressing the System's long-term funding problems, the POB transaction merely provided a short-term temporary measure to address the System's liquidity needs. This short-term measure is pricey and its cost may be realized for decades to come.  In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS.  We also believe that certain actions and omissions of the Board of Trustees, GDB Board of Directors and ERS management during the POB decision making process were not reasonable and potentially flawed.  As such, Conway MacKenzie recommends that further investigation into the POB decision-making process should be pursued by the appropriate authorities.

[22] Nótese que el Estado evade una responsabilidad previamente contraída con la Administración de los Sistemas de Retiro. Y así, a raíz de esa negligencia intenta remediar el problema menoscabando los derechos adquiridos de los futuros pensionados. Véase, U.S. Trust v. New Jersey, supra.

CT-2013-08
CT-2013-09
CT-2013-10

beneficios provistos por las leyes especiales ocupaban $2.3 billones de $19 billones en deudas actuariales del sistema.

Como vemos, es más que obvio que la crisis por la que atraviesa la Administración del Sistema de Retiro le era conocida al Estado al momento en que contrató con los demandantes. Es cierto que la estabilización del Sistema de Retiro no deja de ser un "propósito público importante" por el hecho de que era previsible la severa crisis que se intenta remediar mediante la Ley 3, *supra*. Sin embargo, las enmiendas impugnadas no son razonables al analizarlas desde esta perspectiva. El hecho de que exista un deseo genuino de aminorar ese problema no implica que automáticamente la Ley 3, *supra*, sea razonable en toda su extensión. Véase U.S. Trust v. New Jersey, *supra*.

Así también, si analizamos las medidas impugnadas de la Ley 3, *supra*, bajo el examen de ventajas y desventajas es más que predecible el resultado. La desventaja que se legisla no viene acompañada de ningún beneficio, como se ha resuelto en algunas jurisdicciones estatales. Todo lo contrario, quedan desamparados con la ínfima pensión que recibirán.

Por otra parte, en cuanto a los criterios de razonabilidad y necesidad el Estado alega que este caso es similar a Domínguez et al. Castro v. E.L.A. I, *supra*, donde se evaluó la constitucionalidad de la Ley 7. En ese caso es que se ampara una mayoría de este Tribunal para

darle la espalda a los servidores públicos puertorriqueños. Veamos cómo un examen de las dos medidas legislativas nos lleva a concluir que la pauta allí establecida no es óbice para que atendamos los reclamos de los demandantes.

**C. *Domínguez Castro v. E.L.A.* es distinguible del caso de autos**

Hoy, una mayoría de este Tribunal fundamenta su decisión en un análisis equivocado del caso Domínguez Castro et al. v. E.L.A. I, *supra*. Ese caso trataba sobre el "Plan Integrado de Estabilización" que incluía despidos de empleados públicos al amparo de la Ley Núm. 7 de 9 de marzo de 2009, según enmendada, denominada como la Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico.

Contrario a lo que concluye la mayoría, los hechos en Domínguez Castro no representan la misma situación que en el caso de autos. La Opinión del Tribunal se recuesta de los fundamentos de ese precedente, pero se equivoca al ignorar las diferencias fundamentales entre ambos estatutos. Veamos.

En Domínguez Castro esta Curia estableció que la ley era razonable y necesaria y que la razón principal para su aprobación era la crisis fiscal que existía y que le impedía al Gobierno incluso pagar la nómina gubernamental en ese momento. Allí la Asamblea Legislativa realizó un análisis de otras medidas que fueron presentadas y

CT-2013-08
CT-2013-09
CT-2013-10

evaluadas conjuntamente con las medidas propuestas en dicha ley. Sobre este particular el tribunal resolvió haciendo alusión a la Exposición de Motivos de la Ley 7 que:

> …[t]odas las alternativas típicamente usadas como pasos previos a la reducción de personal [o sea] traslados, reubicaciones, readiestramientos, licencias sin sueldo y reducción de jornada, entre otros no son viables dentro del contexto de la magnitud del déficit estructural del Gobierno y la precariedad de la situación. Es necesario reducir dramáticamente y de forma expedita, el gasto gubernamental. **En vista del tamaño de la nómina y del tamaño del déficit, ninguna de las demás alternativas es compatible con este objetivo o no son viables ante su impacto sobre la operación del Gobierno.** Los traslados, las reubicaciones y los readiestramientos meramente transfieren el empleado y, por consiguiente, el gasto de un lado a otro. **La reducción general de jornada y mucho menos las licencias sin sueldos, no son alternativas viables pues tendrían que ser de tal magnitud y duración que impactarían gravemente la gobernabilidad de la Rama Ejecutiva.**
>
> Por otro lado, y como bien se explica en la Exposición de Motivos de la ley, el establecer medidas impositivas únicamente, tampoco es una alternativa viable. De manera que, la Asamblea Legislativa, como funcionarios electos y legítimos representantes del Pueblo de Puerto Rico, determinaron que la imposición al contribuyente de los recaudos necesarios para cerrar una brecha de $3,200 millones en el déficit ahogarían a la ciudadanía y hundirían a Puerto Rico en una depresión catastrófica.
>
> _Domínguez Castro et al. v. E.L.A., I_, _supra_, págs. 61-62.

Como puede observarse, en aquella ocasión validamos la razonabilidad y necesidad de la Ley 7 debido a que esta se aprobó **luego de evaluar otras alternativas y determinar que las mismas no podrían resolver la crisis fiscal de**

CT-2013-08
CT-2013-09
CT-2013-10

**aquel momento.** En otras palabras, las medidas impuestas al amparo de la Ley Núm. 7 eran las menos onerosas dentro de las alternativas disponibles para lograr el fin propuesto.[23]

Ahora bien, a diferencia de la Ley 7 en esta ley Núm. 3-2013 no surge de la Exposición de Motivos cuales fueron las gestiones hechas durante el proceso legislativo para evaluar otras alternativas menos onerosas que pudiesen resolver la crisis que afecta al Sistemas de Retiro. Lo que sí surge de la Exposición de Motivos es que, distinto al panorama de insolvencia económica que imperaba en momentos que se aprobaba la Ley 7 el Gobierno no tendía la solvencia económica para pagar la nómina gubernamental en ese momento, el sistema de Retiro tiene fondos suficientes para cubrir sus gastos hasta el 2018. Por tal razón, era imperativo que se estudiara esta situación con más detenimiento y se evaluaran otras alternativas previo a la aprobación de la ley.

No obstante, a pesar de presentar una variedad de razones que llevaron a los problemas fiscales que atraviesa el Sistema de Retiro, la ley se limita,

---

[23] Cabe señalar que la propia Exposición de Motivos de la Ley Núm. 7 establece que el Gobernador de Puerto Rico había tomado medidas para atender esta grave situación y que mediante las Órdenes Ejecutivas OE-2009-001 y OE-2009-004, había establecido medidas inmediatas de control de gastos incluyendo: la congelación de puestos vacantes; la prohibición a la creación de nuevos puestos; la eliminación de un 30% de los puestos de confianza en las agencias; la reducción de gastos operacionales equivalente al 10% de la mitad de los gastos operacionales presupuestados para el año fiscal 2008-2009; la prohibición del uso de tarjetas de crédito; la limitación al uso de vehículos oficiales; y la prohibición del uso de fondos públicos para sufragar gastos relacionados al uso de celulares, entre otras medidas.

exclusivamente, a disminuir los beneficios de los empleados. No se menciona en toda la Ley 3 una sola alternativa que haya sido considerada y que las aprobadas finalmente fueran las menos onerosas. Todo ello, en clara distinción a la Ley 7.

Por otro lado, la Ley 7 establecía tres fases que ofrecían diversas opciones en beneficio de los empleados que voluntariamente se acogieran a las mismas. Así pues, en la Fase 1 de implementación el empleado o empleada tenía la opción de: (1) acogerse a una reducción permanente de jornada si contaba con más de (20) años de servicio, de hacerlo, recibiría un incentivo económico; (2) renunciar voluntariamente, recibiendo ayudas incluyendo que el gobierno subsidiaría el primer año de su sueldo en el sector privado o en alguna organización sin fines de lucro, además de brindar incentivos económicos de acuerdo al tiempo que llevaba trabajando; (3) vales educativos para que finalizaran sus estudios; (4) vales de adiestramiento para que aprendieran las herramientas necesarias que les permitiera reintegrarse a la fuerza laboral; (5) recibir subsidio económico de plan médico hasta por un año; (6) el pago de gastos de relocalización si el cambio requería una mudanza y; (7) vales para establecer un negocio propio.

La Fase II, por su parte, comenzaría con despidos de empleados irregulares o transitorios, pasando luego a los regulares, de ser necesario, y siguiendo el principio de

antigüedad. Los empleados afectados bajo esta fase recibirían el pago del plan médico por seis meses y podían participar en del Programa de Alternativas al Empleado, además de ser incluidos en un registro de elegibles por el cual tendrían prioridad sobre otros candidatos para ser contratado en una agencia en la que se desempeñaran labores similares. Es decir, la Ley Núm. 7-2009 creó un registro de reingreso al gobierno con prioridad para aquellas personas cesanteadas.

Finalmente la Fase III incorporaba dos medidas adicionales: (1) la congelación de aumentos, beneficios marginales o compensación adicional y; (2) la suspensión de ascensos, traslados y movimiento de personal.

Distinto a la Ley, la Ley 7 era de carácter temporero y su vigencia fue de dos años. Por el contrario, las enmiendas aprobadas al Sistema de Retiro condenan a miles de servidores públicos a un nuevo estado de pobreza y de marginación social. No existe un periodo de orientación o de espera suficiente para que el empleado pueda tomar una decisión ponderada que le permita lidiar con un cambio tan súbito en sus planes de vida, tanto emocional como financieramente.

Por otro lado, diferente a la Ley 7, los empleados no tienen otra alternativa, más allá de retirarse para no perder beneficios pactados previamente como el pago de plan médico y el bono de navidad. Tampoco existen medidas para compensar de alguna manera el menoscabo de las

relaciones contractuales de los empleados por parte de la aprobación de esta ley. No hay vales, ni posibilidades de readiestramiento, ni incentivos, ni subsidios para empresas del sector privado que puedan contratarle. No existe compensación alguna que aminore los severos daños que sufrirán los demandantes a causa del menoscabo de sus expectativas contractuales con el Gobierno. Estos daños cobran más fuerza en el caso de los miembros de la fuerza policiaca, quienes no cotizan para el Seguro Social y que por mandato de ley deben retirarse a los 58 años de edad. La medida impugnada no contiene disposición alguna que intente aminorar los vejámenes y vicisitudes que tendrán que enfrentar los peticionarios.

Cabe señalar además que un importante pronunciamiento en Domínguez Castro *et al.* v. E.L.A. I, *supra*, fue la inaplicabilidad del Artículo 3 del Código Civil, 31 L.P.R.A. sec. 3, que dispone que "[e]n ningún caso podrá el efecto retroactivo de una ley perjudicar los derechos adquiridos al amparo de una legislación anterior". Entonces resolvimos que un empleado despedido por virtud de la Ley 7 no podía "hablar de un derecho adquirido a la retención o a no ser cesanteado de un empleo en el servicio público, **pues se encuentra ausente el elemento del amparo de una ley anterior que hubiese concedido tal derecho**". (Énfasis nuestro) Domínguez Castro *et al.* v. E.L.A. I, *supra*, págs. 69-70. Es decir, en ausencia de una

ley que los protegiera, el Art. 3 del Código Civil no los cobijaba.[24]

La situación de los peticionarios y sus derechos al amparo de la Ley 447 es ampliamente distinta. Estos claramente tienen sus derechos garantizados por una ley anterior. Si bien podría argumentarse que ese derecho se activa una vez el empleado se retira y comienza a devengar su pensión, ciertos pronunciamientos de Bayrón Toro v. Serra, *supra*, nos motivan a rechazar ese planteamiento.

En ese caso señalamos que "los participantes del Sistema de Retiro tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema, independientemente de que la participación sea voluntaria o compulsoria". Bayrón Toro v. Serra, *supra*, pág. 618. La naturaleza contractual y el tratamiento que se le ha impartido a la relación que existe entre los empleados públicos y el Gobierno varían en las distintas jurisdicciones estatales. Pero aquí en Bayrón Toro concluimos que los participantes de un sistema de retiro tienen un derecho de naturaleza contractual desde que ingresan al Sistema, eso quiere decir, desde que comenzaron a cotizar para el mismo. De esta forma, todo menoscabo a ese derecho debe pasar el crisol de la razonabilidad y necesidad.

---

[24] Sobre este particular expresamos que "…ninguna ley al momento le reconoce al empleado público un derecho sin limitaciones a la retención, o un derecho a no ser cesanteado2. Domínguez Castro *et al.* v. E.L.A. I, 178 D.P.R. 1, 69 (2010).

CT-2013-08
CT-2013-09
CT-2013-10

Igualmente, es preciso recordar que la Quinta Enmienda de la Constitución de Estado Unidos establece que: [N]or shall private property be taken for public use, without just compensation". Asimismo, nuestra Carta Magna dispone en su Art. II, Sec. 9 que: "No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley".

En casos sobre controversias de legislaciones que afectan los sistemas de pensiones de empleados públicos es común que se hagan planteamientos sobre incautación en conjunto a reclamaciones bajo el menoscabo de relaciones contractuales. En ese contexto, el interés del empleado en las promesas contractuales puede constituir un derecho propietario cuando estas estén protegidas por la cláusula del menoscabo de las relaciones contractuales o la doctrina estatal sobre el sistema público de pensiones.[25] Jack M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 63-64 (2013). El Tribunal Supremo de Estados Unidos ha señalado que los intereses propietarios se extienden más allá de las formas tradicionales de propiedad, tales como el dinero, inmuebles, entre otros

_____

[25] Sin embargo, es posible que una acción estatal que no viola la cláusula contra el menoscabo de las relaciones contractuales –ya que esta acción estatal es razonable y necesaria para servir un interés público- viole la cláusula contra la expropiación sin justa compensación o *taking.* Esto así, ya que cuando el Estado toma propiedad privada, es irrelevante si lo hace con un fin importante, por ende, cuando expropia este debe pagar una justa compensación. Jack M. Beermann, The Public Pension Crisis, 70 Wash. & Lee L. Rev. 3, 63-64 (2013).

CT-2013-08
CT-2013-09
CT-2013-10

bienes. <u>Regents v. Roth</u>, 408 U.S. 564, 577 (1972). A esos efectos la Corte Suprema ha expresado que:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead have a legitimate claim of entitlement to it.

Asimismo, hemos expresado que son factores que determinan la existencia de un interés propietario el hecho de que un interés esté protegido por ley o que las circunstancias creen una expectativa de continuidad. <u>Domínguez Castro et al. v. E.L.A. I</u>, *supra*. De esa forma, al considerar la constitucionalidad de las enmiendas legislativas a los planes de pensiones la determinación sobre los derechos adquiridos de un empleado yace en si este tiene suficientes años de servicio en el sistema y si ha descansado o confiado sustancialmente en el recibo de tales beneficios contratados. Véase, <u>Booth v. Sims</u>, 456 S.E.2d 167, 181 (W. Va. 1995); Jack M. Beermann, <u>The Public Pension Crisis</u>, 70 Wash. & Lee L. Rev. 3, 40 (2013).

Los demandantes ciertamente tienen un derecho propietario sobre su pensión según acordada y sobre las aportaciones hechas al sistema. Véase, <u>Bayrón Toro v. Serra</u>, 119 D.P.R. 605, 612 (1987). Pero el reclamo de los empleados cobijados bajo la Ley 447, *supra*, descansa en que con el pasar del tiempo confiaron en que a través de su esfuerzo laboral y sus aportaciones obtendrían los beneficios acordados contractualmente al alcanzar las

CT-2013-08
CT-2013-09
CT-2013-10

edades dispuestas en la citada disposición. Después de todo, su seguridad económica y su calidad de vida están de por medio y ello tendrá un efecto social que de una forma u otra padeceremos todos.[26] Estas enmiendas despojan a los participantes de sus derechos adquiridos a recibir una pensión completa y su expectativa sobre la fecha para acogerse al plan de retiro.

En fin, surge con meridiana claridad que el análisis de la constitucionalidad de la Ley tiene que realizarse distinguiéndolo considerablemente del examen elaborado en Domínguez Castro y la evaluación de razonabilidad y necesidad de la Ley 7. Hacer lo contrario denota una equívoca metodología adjudicativa sin precedentes. Para dar la atención meritoria a estos asuntos tan sensitivos y de vital importancia para la estabilidad social y económica de estas personas, era necesario auscultar responsablemente los reclamos de los peticionarios.

La Opinión de la mayoría señala que "[a]nte este dilema, examina[ron] cuidadosamente los recursos presentados a la luz de nuestro ordenamiento constitucional". Respetuosamente dudamos de esa

---

[26] Nótese que en la Exposición de Motivos de la Ley 3, *supra*, el legislador plasmó que "[e]l bienestar de todos los que vivimos en Puerto Rico se vería seriamente afectado si más recursos del Fondo General se compromete para pagar las pensiones de los pensionados". También indicó que "[m]ás fondos para los Sistemas de Retiro implican menos fondos para educar a nuestros niños, proteger nuestros hogares, cuidar nuestra salud y mejorar la infraestructura que utilizamos todos los días". El impacto económico que sufrirán los empleados retirados no tiene precedente. Las expresiones que acabamos de transcribir no contiene ápice de razonabilidad alguna y no ha sido objeto de prueba para ser aquilatado por un tribunal.

CT-2013-08
CT-2013-09
CT-2013-10

aseveración pues "…para determinar los hechos relevantes, la opinión mayoritaria se sustenta exclusivamente en la Exposición de Motivos y acepta, sin prueba, ….que no existe otra opción para corregir el déficit…".[27] "*En otras palabras, la mayoría de este Tribunal no tomó en consideración posiciones distintas a la adoptada por la Legislatura, porque no hubo oportunidad para recibir y dirimir prueba en un Foro de Primera Instancia o administrativo*".[28] (Énfasis en el original). Esto, pues "… lo único que hay en los expedientes de los casos es la demanda, el recurso de certificación y las mociones interlocutorias…";[29] y de esta forma la mayoría quiere "…apresurarse a resolver el asunto constitucional".[30] "Un análisis somero de los expedientes de los recursos consolidados nos permite percibir que las controversias que se presentan no tan sólo son complejas, sino múltiples y diversas".[31]

> Cada uno de estos asuntos pudo requerir la intervención del foro administrativo o del Tribunal de Primera Instancia para dirimir la prueba y crear un expediente que permitiera la labor efectiva de los foros apelativos, incluyendo la de este Tribunal Supremo. Es axiomático que el derecho no se aplica en el vacío, requiere de hechos que sirvan de base para aplicar las normas.[32]

---

[27] Domínguez Castro et al. v. E.L.A. I, *supra*, pág. 117. Opinión disidente de la Jueza Fiol Matta.
[28] *Id.*
[29] *Id.*
[30] *Id.*, pág. 111.
[31] *Id.*, pág. 115.
[32] *Id.*, pág. 114.

CT-2013-08
CT-2013-09
CT-2013-10

Tal como dijimos en nuestra resolución del pasado 11 de junio "…**los intereses públicos involucrados en estos casos son excepcionales. Los peticionarios han hecho unos planteamientos que merecen una consideración seria y pronta**". "**La Ley Núm. 3**, *supra*, **entra en vigor en poco menos de un mes y, de no proveerse un remedio interlocutorio oportuno, los peticionarios se verán obligados a tomar decisiones drásticas…las repercusiones de estos casos pueden afectar a los peticionarios por el resto de sus días**". Resolución del Tribunal Supremo del 11 de junio de 2013, María del C. Alvarado Pacheco, *et al.* v. E.L.A. CT-2013-05/06/07. Las Juezas Asociadas Rodríguez Rodríguez y Fiol Matta emitieron votos particulares disidentes. El Juez Presidente señor Hernández Denton emitió un voto particular disidente. El Juez Estrella Martínez emitió un voto particular y disintió en que no se expidieran en aquel momento los autos de epígrafe.

Es insostenible que hoy una mayoría de este foro se olvide de todas esas y otras tantas palabras. Cómo mínimo este Tribunal debió proveerles a los demandantes la oportunidad de que presentaran su caso, cumpliendo cada parte con su carga probatoria. Hace poco este Tribunal en Lozada v. J.C.A., 184 D.P.R. 898, (2012) se expresó muy acertadamente respecto a cómo deben decidir los jueces. Allí dijimos:

> En tiempo reciente no hemos vacilado en indicar que a "los jueces no nos puede dominar el temor a decidir". Ahora, tenemos que añadir que la *imparcialidad* debe ser la piedra angular que

CT-2013-08
CT-2013-09
CT-2013-10

guíe nuestros razonamientos, sin importar quiénes sean las partes ni la empatía que sus planteamientos nos provoquen. Eso implica que si bien nuestras ideas y experiencias influyen en nuestro análisis al momento de adjudicar una controversia, debemos analizar los argumentos de las partes involucradas como lo haría la famosa Dama de la Justicia, con la mayor objetividad que nuestra condición humana nos permita. En esta coyuntura, conviene recordar cómo Juan Carlos Mendonca describe el mandamiento judicial de la imparcialidad:

> El litigante lucha por su derecho, en tanto que tú luchas por el derecho; y esto no debes olvidarlo nunca. No te dejes llevar por sus simpatías o antipatías, por conveniencias o compasiones, por temor o misericordia. La imparcialidad implica el coraje de fallar contra el poderoso, pero también el valor, mucho más grande, de fallar contra el débil. (Citas internas omitidas). Id, pág. 926.

IV

Todo lo que hemos enunciado nos lleva a la conclusión de que algunas secciones la Ley 3 son irrazonables, lo que nos sugiere están revestidas de fuertes visos de inconstitucionalidad. Los problemas que se intentan remediar con esa medida no eran desconocidos para el Gobierno de Puerto Rico a través de las décadas en que mantuvo a sus servidores públicos a la expectativa de que tendrían un retiro digno y justo. Tampoco se les compensa con algún tipo de beneficio la severidad del menoscabo en sus expectativas de retiro. Para evaluar esta controversia con más detenimiento y responsabilidad era necesario que emitiéramos el *injunction* preliminar que nos solicitaron los peticionarios para paralizar la aplicación de esa ley.

CT-2013-08
CT-2013-09
CT-2013-10

Según expresé recientemente, "[e]l último foro representativo del Poder Judicial no puede callar mientras se diseña el escenario perfecto para un ardid contra el pueblo de Puerto Rico".[33] Hoy, lamentablemente la mayoría de esta Curia por razones que, en su consciencia llevarán, han desatendido su responsabilidad para con nuestros ciudadanos. A mucho pesar, ciertamente es un día lúgubre para las familias y el pueblo puertorriqueño. Ahora me resta solo esperar que en un futuro aquellos que ocupen posiciones de liderato en el servicio público nunca olviden que la persona no está en función del sistema económico, sino que es el sistema económico el que está en función de la persona.

Hoy el Estado plantea enérgicamente que este Tribunal no debe pasar juicio sobre la sabiduría legislativa que se empleó cuando la Asamblea promulgó la Ley 3, *supra*. Quieren total deferencia. Sin embargo, nos preguntamos si esa misma sabiduría legislativa fue o pudo ser un factor determinante de la crisis que hoy se intenta resolver a costa del empleado público. En esto son pertinentes las palabras que hace más de dos décadas plasmó el entonces Juez Asociado Alonso Alonso en su voto particular en Bayrón Toro v. Serra, *supra*, pág. 624:

> "[e]l Estado no debe justificar cambios al sistema de retiro al alegar que son necesarios y razonables para mantener la solvencia económica

---

[33] Voto particular del Juez Asociado señor Rivera García, María del C. Alvarado Pacheco, *et al.* v. E.L.A. CT-2013-05/06/07.

CT-2013-08
CT-2013-09
CT-2013-10

de éste cuando la debilidad fiscal del mismo se debe al descuido y a la falta de cuidado del Estado propiamente."

En cuanto a esto también es preciso que hagamos constar cierta preocupación de los demandantes, la cual transcribimos según ellos mismos la han expresado:

[t]erminamos indicando que el planteamiento mediático de los demandados de que la responsabilidad del crédito de Puerto Rico está en manos del Tribunal Supremo es absurdo y más aún, un medio de presión del Ejecutivo para obtener su propósito. Es imperioso e indispensable recordar la separación de poderes, que a su vez implica una separación de responsabilidades, de nuestro sistema democrático. El rol de los Tribunales en el sistema judicial no es proveer las alternativas para resolver la crisis fiscal de la Isla ni del Sistema de Retiro. El rol es asegurarse que en el descargue de sus poderes, las demás ramas de gobierno, a quienes sí les corresponde buscar alternativas, no se excedan de las facultades conferidas por ley ni incidan inconstitucionalmente sobre los derechos adquiridos de las personas a quienes gobiernan; más aún de sus propios empleados, con quienes contratan. Petición de certificación Victor A. Rivera et. al. v. E.L.A., et. al., pág. 24.

Como último foro judicial estatal en aras de promover un verdadero acceso a la justicia debemos preguntarnos: ¿conocemos a las comunidades que servimos? Soy del criterio que como consecuencia de esta detrimental medida legislativa, los retos económicos de toda una generación están incrementándose severa y adversamente. Empero, la comunidad de futuros pensionados afectados por la Ley 3, *supra*, ahora parece ser un "obstáculo para el crecimiento financiero" y damos por buenas las acciones del Gobierno sin más preguntas o análisis objetivos. Si hoy cientos de miles de puertorriqueños viven bajo los niveles de

CT-2013-08
CT-2013-09
CT-2013-10

pobreza, sin infraestructura básica, bajo condiciones

ambientales difíciles y viviendas deficientes[34] esta

decisión judicial será el opresor de otros miles más. En

ese sentido, estoy concorde con la siguiente aseveración:

> [W]e must reject abstract neutrality and acquire a different kind of objectivity, assume our role as guardians of procedural fairness, and learn to value the feelings and ideas of others…
>
> Under the Constitution, the primary function of a judge is to guarantee the fundamental constitutional rights of every person. This duty is based on the conviction that judges, as citizens who are aware of the value of these rights in a democratic society, choose their profession knowingly, and they assume responsibility for protecting those rights. They are committed to this end, and part of this commitment is to be aware of the great adversities faced by communities that have limited access to courts, whose members hope to find a helping hand among legal professionals …
>
> Judges as human beings are the sum of their own diverse experiences, ideas, situations, expectations, and realities. Therefore, when a judge neglects to recognize her own subjectivity, her judgments will be inevitably biased. **We must become aware of our own subjectivities, ideologies, and paradigms**. By doing so, we may be able to exercise our judgment more effectively and more closer to a truly impartial assessment of events. Our goal, the, is not neutrality but a reasonable objectivity.[35]

Si hoy los jueces y juezas de este Tribunal no se

hubieran apartado de estas sabias expresiones, estoy

seguro que actuarían como guardianes de nuestra

---

[34] Jueza Asociada, señora Fiol Matta, Knowing the communities we serve, 49 Court Review, 13, 2013. Disponible en: http://aja.ncsc.dni.us/publications/courtrv/cr49-1/CR49-1Matta.pdf. (Última visita 24 de junio de 2013).
[35] Íd., pág. 19.

CT-2013-08
CT-2013-09
CT-2013-10

Constitución. Asimismo, en las páginas de la historia de nuestro Pueblo no se escribiría de la nueva clase de pobreza que hoy están avalando. Espero que los estudiosos de estos temas, puedan responsable y objetivamente escuchar el grito de justicia de estos empleados y no yerren como esta Curia hoy lo hace al ignorar los preceptos que en algún momento juro defender.

No olvidemos que el pueblo espera de los jueces que siempre estemos ávidos a escuchar las posturas que le plantean las partes en un pleito. Asimismo, espera que el juez sea un árbitro que cante las jugadas como las ve, no como otros pretenden que se vean. Que el éxito en las decisiones económicas que se pretenden implantar bajo el palio del bienestar común jamás sea pretexto para atropellar al ser humano y menos aún menospreciar su dignidad. Es oportuno evocar la ilustre frase de Cicerón, *"summum ius summa iniuria"*.

Por todos los fundamentos que anteceden, disiento.


Edgardo Rivera Garcia
Juez Asociado

CT-2013-08
CT-2013-09
CT-2013-10

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Víctor A. Trinidad Hernández y Otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos | CT-2013-008 | |
| María del Carmen Alvarado Pacheco y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos | CT-2013-009<br><br><br>Cons. | Certificación |
| José A. De Jesús Vega y otros<br><br>    Peticionarios<br><br>        v.<br><br>Estado Libre Asociado de Puerto Rico y otros<br><br>    Recurridos | CT-2013-010 | |

Opinión Disidente emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 24 de junio de 2013.

> [e]l derecho a [la] pensión de retiro por años de servicio del empleado público tiene un **respetable contenido ético y moral** y constituye un **seguro de dignidad** para el hombre o la mujer que habiendo dedicado al servicio público sus años fecundos, no debe encontrarse en la etapa final de su vida en el desamparo, o convertido en carga de parientes o del Estado. (Énfasis suplido.) Rosa Resto v. Rodríguez Solís, 111 D.P.R. 89, 92 (1981).

Nuevamente comparecen ante este Tribunal cientos de servidores públicos clamando justicia. Acuden desde los empleados de la Oficina del Contralor que han dedicado sus vidas por más de dos décadas a la lucha en contra de la corrupción; hasta los policías de mayor veteranía que se encuentran al borde de la edad obligatoria de retiro y se enfrentan a un estatuto que elimina la pensión por mérito, reduce drásticamente el importe de la pensión y hasta duplica los años de servicio previo a retirarse.

Hoy todos los trabajadores peticionarios se enfrentan a una ley que menoscaba sustancialmente las obligaciones contraídas por el Estado. Además, se enfrentan a la realidad que revela el antiguo proverbio de que la cuerda triple no se corta fácilmente. En efecto, el hilo del ejecutivo, el hilo del legislativo y el hilo de una mayoría de este Tribunal se han entrelazado para crear una soga que, lejos de cortarse, ha estrangulado los derechos de los empleados públicos del Gobierno de Puerto Rico. Ciertamente, la soga no cortó por los más finos, cortó por los más humildes: los asalariados, los trabajadores, los que subsisten de quincena en quincena. Con ello, queda acreditado que las acciones de los componentes de esa cuerda triple han convertido en chatarra las obligaciones contractuales del Estado con los trabajadores y han degradado las garantías constitucionales del Pueblo.

En consecuencia, disiento por entender que la Ley Núm. 3-2013 está plagada de cambios drásticos al Sistema de Retiro que contravienen la Constitución de Puerto Rico. Veamos.

I

A.

La Sec. 7 del Art. II de la Constitución de Puerto Rico garantiza que en nuestro sistema democrático de gobierno "no se aprueben leyes que menoscaben las obligaciones contractuales". Const. P.R., Art. II, Sec. 7, L.P.R.A., Tomo 1, pág. 296 (2008). En iguales términos, la Sec. 10 del Art. I de la Constitución federal establece una prohibición homóloga en su naturaleza, la cual veda que los Estados de la Unión Americana promulguen estatutos que perjudiquen las relaciones contractuales.[1] Const. EE.UU., Art. I, Sec. 10, L.P.R.A., Tomo 1, pág. 169 (2008).

En términos generales, esta prohibición constitucional impide que los Estados y sus gobiernos locales emitan legislación alguna que pretenda atenuar los compromisos de una parte contratante o dificultar irrazonablemente la ejecución de un contrato. 2 R.D. Rotunda & J.E. Nowak, Treatise on Constitutional Law: Substance and Procedure, 5th ed., Thomson Reuters, Minnesota, § 15.8(b), pág. 879 (2012). A su vez, la referida cláusula persigue incentivar el crédito y el comercio, promoviendo la confianza en la estabilidad de

---

[1]Esta prohibición constituye una de las limitaciones expresas de la Constitución federal al poder de los Estados de la Unión. U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 14 (1977). Esta limitación no vincula al Gobierno federal. E. Chemerinsky, Constitutional Law: Principles and Policies, 4th ed., Wolters Kluwer, Maryland, § 8.3.1, pág. 645 (2011). No obstante, el Gobierno federal queda sujeto a prohibiciones análogas en su naturaleza por virtud de la Quinta Enmienda de la Constitución federal, que garantiza el derecho a un debido proceso de ley. Íd.

las relaciones contractuales. U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 15 (1977).

En consecución con estos fines, los pronunciamientos jurisprudenciales de esta Curia y del Tribunal Supremo federal han reconocido que esta garantía constitucional impide que el gobierno incida adversamente sobre dos tipos de obligaciones contractuales: (1) aquellas sostenidas entre partes privadas; y (2) aquellas en las cuales el gobierno constituya una de las partes contratantes. U.S. Trust Co. of New York v. New Jersey, supra, pág. 17; Domínguez Castro v. E.L.A., 178 D.P.R. 1, 80 (2010). Según lo estableceremos más adelante, esta distinción resulta trascendental al momento de seleccionar el escrutinio constitucional que un Tribunal habrá de emplear ante un reclamo incoado al amparo de la cláusula en contra del menoscabo de relaciones contractuales. Domínguez Castro v. E.L.A., supra, pág. 80. Conscientes de la importancia que conlleva el identificar una relación contractual como privada o pública en su naturaleza, pasemos a elaborar el marco de análisis aplicable ante una interpelación constitucional erguida sobre la palestra de la protección constitucional bajo examen.

Como cuestión de umbral, cuando determinada parte reclame que el Gobierno, mediante la promulgación de legislación a esos efectos, ha menoscabado una relación contractual, un tribunal deberá determinar si la legislación impugnada realmente tuvo el efecto de perjudicar

**sustancialmente** la alegada obligación contractual.[2] General
Motors Corp. v. Romein, 503 U.S. 181, 186 (1992); Energy
Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S.
400, 411 (1983); U.S. Trust Co. of New York v. New Jersey,
*supra*, pág. 17. Ello, independientemente de si la relación
contractual en disputa resulta ser pública o privada en su
naturaleza.

El Más Alto Foro federal ha dividido este primer paso en
tres factores adicionales, a saber: (1) si existe una
relación contractual; (2) si un cambio legislativo ha
menoscabado esa relación contractual; y, (3) si el menoscabo
infligido es sustantivo en su naturaleza. General Motors
Corp. v. Romein, *supra*, pág. 186. Véanse, también: Keystone

---

[2]El Tribunal Supremo federal ha abordado este
requerimiento en las siguientes palabras:

> The severity of the impairment measures the height
> of the hurdle the state legislation must clear.
> Minimal alteration of the contractual obligations
> may end the inquiry at its first stage. Severe
> impairment, on the other hand, will push the
> inquiry to a careful examination of the nature and
> purpose of the state legislation. The severity of
> an impairment of contractual obligations can be
> measured by the factors that reflect the high
> value the Framers placed on the protection of ...
> contracts. Contracts enable individuals to order
> their personal ... affairs according to their
> particular needs and interests. **Once arranged,**
> **those rights and obligations are binding under the**
> **law, and the parties are entitled to rely on them.**
> (Énfasis nuestro.) Allied Structural Steel Co. v.
> Spannaus, 438 U.S. 234, 244-245 (1978).

En Domínguez Castro v. E.L.A., *supra*, pág. 83, una
mayoría de este Tribunal, según estaba compuesto en aquel
entonces, añadió que un menoscabo contractual severo es aquel
que modifica "adversamente los términos o condiciones
esenciales del contrato que principalmente dieron motivo a la
celebración de éste de modo que se frustren las expectativas
de las partes".

Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 504 (1987); Domínguez Castro v. E.L.A, *supra*, págs. 81-82.

Al emplear el análisis señalado, urge tener presente que la prohibición instaurada en la cláusula constitucional en contra del menoscabo de relaciones contractuales no es absoluta en su naturaleza. Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934) ("[T]he prohibition is not ... to be read with literal exactness like a mathematical formula.") Véanse, también: Keystone Bituminous Coal Ass'n v. DeBenedictis, *supra*, pág. 502; Allied Structural Steel Co. v. Spannaus, *supra*, pág. 240; U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 21; City of El Paso v. Simmons, 379 U.S. 497, 508 (1965); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 394 (1973). A esos efectos, la jurisprudencia federal ha establecido que un Estado puede afectar o modificar el remedio provisto por la relación contractual con la cual interviene, **siempre y cuando no menoscabe derechos sustanciales**.[3] City of El Paso v. Simmons, *supra*, pág. 503; Home Bldg. & Loan Ass'n v. Blaisdell, *supra*, pág. 430.

---

[3]El Tribunal Supremo federal ha afirmado lo anterior en los siguientes términos:

> It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, **provided no substantial right secured by the contract is thereby impaired.** No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. **Every case must be determined upon its own circumstances.** (Énfasis suplido.)(Citaciones internas omitidas.) Home Bldg. & Loan Ass'n v. Blaisdell, *supra*, pág. 430.

Es por ello que el Tribunal Supremo federal ha interpretado que la cláusula en contra del menoscabo de obligaciones contractuales debe quedar atemperada de cara al entendimiento de que en todo contrato, el Estado siempre se reserva un residuo de autoridad para poder legislar en consecución de la salud y seguridad pública, al igual que el bienestar general del pueblo. Energy Reserves Group, Inc. v. Kansas Power and Light Co., *supra*, pág. 410; Allied Structural Steel Co. v. Spannaus; *supra*, págs. 240-241 ("[T]he Contract Clause cannot obliterate the police powers of the State"); U.S. Trust Co. of New York v. New Jersey, *supra*, págs. 15-16; City of El Paso v. Simmons, *supra*, pág. 508 ("the reservation of essential attributes of the sovereign power [are] read into contracts as a postulate of the legal order"); Home Bldg. & Loan Ass'n v. Blaisdell, *supra*, págs. 434-440; Warner Lambert Co. v. Tribunal Superior, *supra*, pág. 394. Respecto a la deferencia que un Tribunal viene llamado a otorgarle al ejercicio de ese residuo de poder por parte del Estado, amerita traer a memoria la bifurcación de contratos antes señalada, enfocando nuestra mirada, primeramente, sobre los contractos de naturaleza privada.

Cuando el contrato afectado es **de carácter privado**, los tribunales estamos llamados a otorgarle amplia discreción en torno a lo que la Legislatura entiende que es o no resulta ser necesario para el bienestar general. City of El Paso v. Simmons, *supra*, pág. 508; U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 16. No obstante, esa deferencia no es

irrestricta o carente de fronteras. City of El Paso v. Simmons, *supra*, pág. 509; Warner Lambert Co. v. Tribunal Superior, *supra*, pág. 394. Ante el choque de los intereses del Estado en el ejercicio de su poder inherente como Soberano y los intereses de las partes contratantes en que sus acuerdos no sufran un perjuicio sustancial legislativamente infundido, es función del Tribunal servir como ente reconciliador. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 21.

El Tribunal Supremo federal afirmó lo anterior en los siguientes términos:

> Whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. **This principle precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of the means to enforce them.** (Énfasis suplido.) City of El Paso v. Simmons, *supra*, pág. 509.

Lo anterior se debe a que, de lo contrario, la cláusula en contra del menoscabo de relaciones contractuales sería letra muerta y quedaría desprovista de significado constitucional alguno. Allied Structural Steel Co. v. Spannaus, *supra*, pág. 241 ("[T]he Contract Clause remains part of the Constitution. It is not a dead letter"); U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 16 ("Whether or not the protection of contract rights comports with current views of wise public policy, the Contract Clause remains a part of our written Constitution").

En función de ello, el Tribunal debe tener presente que la garantía constitucional señalada limita ejercicios legítimos de legislación estatal y que la existencia de un interés público importante no siempre será suficiente para contravenir tal limitación. Keystone Bituminous Coal Ass'n v. DeBenedictis, *supra*, pág. 505; Allied Structural Steel Co. v. Spannaus, *supra*, pág. 242 ("If the Contract Clause is to retain any meaning at all, ... it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power"); U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 21 ("private contracts are not subject to unlimited modification under the police power").

A la luz de lo reseñado, **una legislación que pretenda afectar relaciones contractuales existentes, privadas en su naturaleza, debe responder a un interés público legítimo y significante.**[4] Energy Reserves Group, Inc. v. Kansas Power and Light Co., *supra*, págs. 411-412; U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 22; Domínguez Castro v. E.L.A, *supra*, pág. 84. Además, la legislación lesiva a los derechos y las responsabilidades de las partes contratantes **debe ser razonable y necesaria**. Allied Structural Steel Co. v. Spannaus, *supra*, págs. 244 y 247; U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 22; Domínguez Castro v.

---

[4]Se ha reconocido que el intento por remediar un problema social o económico de naturaleza amplia y general puede constituir un interés público importante y significativo. Energy Reserves Group, Inc. v. Kansas Power and Light Co., *supra*, pág. 412.

E.L.A, *supra*, pág. 84. Como norma general, los tribunales le otorgarán deferencia al Estado respecto a la razonabilidad y necesidad de la legislación impugnada. Domínguez Castro v. E.L.A, *supra*, págs. 22-23.

Ahora bien, esta deferencia se limita estrictamente al análisis de **contratos de carácter privado**. Ello, pues, **cuando la relación contractual menoscabada es pública en su naturaleza y el Estado constituye una de las partes contratantes**, existen consideraciones adicionales que exigen un criterio de adjudicación constitucional mucho más oneroso para el Gobierno. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 23; Domínguez Castro v. E.L.A., *supra*, pág. 81. En primer lugar, será imperativo examinar si los derechos contractuales reconocidos por el Estado no representan un ejercicio ilegítimo de sus atributos esenciales como Soberano. Específicamente, habrá que examinar si la legislatura contratante cedió poderes que vinculan indebidamente a las legislaturas futuras y sucesivas. U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 23.

A esos fines, ya se ha determinado que el Estado tiene el poder de incurrir en compromisos financieros futuros con partes privadas. Íd., pág. 24. Una vez se crean estos compromisos financieros, el Estado viene obligado a satisfacerlos. Íd. Aunque ciertamente el Gobierno puede modificar la obligación contractual incurrida mediante la promulgación de legislación, tal menoscabo sobrevivirá un examen constitucional sólo si el mismo es **necesario y razonable**. Íd., págs. 25-26.

**En ese análisis, el Tribunal debe tener presente que el Estado velará por sus propios intereses. Por ello, y distinto al análisis empleado para relaciones contractuales de carácter privado, el Tribunal no puede conferirle deferencia al juicio de la legislatura respecto a qué representa una medida razonable y necesaria.** Keystone Bituminous Coal Ass'n v. DeBenedictis, *supra*, pág. 505; Energy Reserves Group, Inc. v. Kansas Power and Light Co., *supra*, pág. 412 ("**Unless the State itself is a contracting party**, as is customary in reviewing economic and social regulations, courts properly defer to legislative judgments as to the necessity and reasonableness of a particular measure.") (Énfasis suplido.); U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 26. ("[C]omplete deference to a legislative assessment of reasonableness and necessity **is not appropriate because the State's self-interest is at stake**....If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.") (Énfasis suplido.)

Por tanto, en su análisis de aquello que constituye una medida **necesaria**, el Tribunal debe emplear un examen consistente de dos criterios. Primero, una medida **no es necesaria** si imparte una **eliminación total** de la relación contractual menoscabada, cuando existía la posibilidad de instaurar **una modificación menos drástica** en su naturaleza. U.S. Trust Co. of New York v. New Jersey, *supra*, págs. 29-30. En segundo plano, una medida **no es necesaria** si existieron

**medios alternos** para alcanzar el interés público articulado por el Estado.[5] Íd., pág. 30; <u>Domínguez Castro v. E.L.A</u>, *supra*, pág. 84.

En consecuencia, la selección de política pública realizada por el poder legislativo entre las muchas alternativas disponibles, no merece entera deferencia. <u>Domínguez Castro v. E.L.A</u>, *supra*, pág. 84. Como bien lo indicó el Tribunal Supremo federal, **"a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purpose equally well"**. (Énfasis suplido.) <u>U.S. Trust Co. v. New Jersey</u>, *supra*, pág. 31.

Respecto al criterio de **razonabilidad**, el Tribunal deberá valerse de **un examen de previsibilidad a la luz de todas las circunstancias cambiantes**. Véanse: <u>Energy Reserves Group, Inc. v. Kansas Power and Light Co.</u>, *supra*, págs. 415-416; <u>City of El Paso v. Simmons</u>, *supra*, pág. 511. A esos efectos, una legislación que menoscabe relaciones contractuales será razonable **sólo si los efectos que se**

---

[5]El profesor de derecho constitucional, Erwin Chemerinsky, al interpretar la exigencia del Tribunal Supremo federal respecto a que la medida empleada sea *necesaria* y que no existan *alternativas cuyos efectos sean menos drásticos* a la hora de alcanzar el interés público articulado por el Estado, concluyó que el Más Alto Foro federal **equiparó el escrutinio utilizado en casos de menoscabo de relaciones contractuales públicas a un escrutinio estricto.** E. Chemerinsky, <u>Constitutional Law: Principles and Policies</u>, *op cit.*, § 8.3, pág. 655. Ello implica, necesariamente, que la inconstitucionalidad de la legislación impugnada debería presumirse.

**pretenden mitigar no fueron previstos o intencionados por el Estado al momento en el cual contrajo la obligación afectada.** U.S. Trust Co. of New York v. New Jersey, *supra*, pág. 31. Un cambio no previsto será aquél que ocurra en el *tipo* del efecto, **mas no en el *grado* de éste.** Íd., pág. 32. ("subsequent changes ... of degree and not of kind").

Finalmente, amerita añadir que, como parte del análisis concerniente a la razonabilidad y necesidad de una medida, resulta imperativo examinar si son **temporeras** y dirigidas a atender **una situación pública de emergencia, social o económica en su naturaleza.** Domínguez Castro v. E.L.A, *supra*, pág. 85. Si estos criterios adicionales no están presentes, urge inclinar la balanza en favor de la protección de la relación contractual menoscabada. Allied Structural Steel Co. v. Spannaus, *supra*, pág. 250.

Teniendo presente los principios generales aplicables a todo reclamo instado al amparo de la cláusula constitucional en contra del menoscabo de relaciones contractuales, pasemos a particularizar los mismos en el contexto de los planes públicos de retiro.

B.

Por más de dos décadas, esta Curia ha reconocido que las participaciones de un empleado público en el sistema de retiro del gobierno constituyen "**un interés propietario de naturaleza contractual** protegido por la garantía constitucional contra el menoscabo de obligaciones contractuales". Bayrón Toro v. Serra, 119 D.P.R. 605, 607-608 (1987). En concreto, hemos establecido, sin lugar a

ambigüedades, que los planes de retiro son **contratos públicos**, mediante los cuales existe un "acuerdo de voluntades entre el Estado y el empleado, **dirigido a producir un efecto vinculante para las partes**". (Énfasis suplido.) Íd., pág. 618.

Por un lado, la relación contractual acordada beneficia al Estado en su esfuerzo por reclutar y retener personal de alta calidad para el bien común del pueblo puertorriqueño. Bayrón Toro v. Serra, *supra*, pág. 615. Sólo ofreciendo un atractivo plan de retiro, es que el Gobierno logra "atraer personal competente, que de otra forma ofrecería sus servicios a la empresa privada". Íd., pág. 616.

Por otra parte, el empleado público acepta la encomienda de servir a sus conciudadanos a cambio de este beneficio "de **considerable importancia**", el cual "significa una fuente de ingreso futuro, que le permitirá disfrutar de su vejez con razonable seguridad económica". (Énfasis suplido.) Bayrón Toro v. Serra, *supra*, pág. 616. "Es indiscutible que cuando alguien acepta una oferta de empleo toma en consideración **y descansa en la seguridad** que le brinda el sistema de retiro", convirtiéndose los términos y las condiciones de este beneficio **en una "parte esencial de su contrato de empleo"**. (Énfasis suplido.) Íd., págs. 616-617.

Reconociendo esta naturaleza contractual del plan de retiro gubernamental, hemos extirpado de nuestro ordenamiento legal la concepción anacrónica y retrógrada "de que las pensiones son [meras] concesiones o dádivas del Gobierno, y que un empleado participante [que aporta compulsoriamente a

las mismas] no adquiere derecho alguno sobre" ellas. Bayrón Toro v. Serra, *supra*, pág. 610. A raíz de lo anterior, nuestra conceptualización de los planes de retiro en el plano legal, ha venido a descansar sobre el entendimiento certero de que "con el advenimiento de las democracias populares y la desaparición de los regímenes monárquicos, el fundamento jurídico de la pensión no lo constituye un acto de recompensa del soberano, **sino una obligación moral del Estado**". (Énfasis suplido.) Íd., pág. 615, citando a, Rivera v. Rodríguez, 93 D.P.R. 21, 24 (1966).

Tal obligación persigue reconocer el principio indeleble de que **las pensiones constituyen "una retribución final y bien ganada por el empleado público que honrando una vocación de servicio, que en muchas ocasiones conlleva sacrificio y renuncia de bienes materiales, dedica los años fructíferos de su vida al bien común"**. Bayrón v. Serra, *supra*, pág. 615, citando a, Sánchez Nieves v. A.S.R.E.G.J., 116 D.P.R. 372 (1985); Román Mayol v. Tribunal Superior, 101 D.P.R. 807, 811 (1973); Maldonado v. Tribunal Superior, 100 D.P.R. 370 (1972). Cónsono con lo anterior, hemos pautado que "[e]l derecho a [la] pensión de retiro por años de servicio ... tiene un respetable **contenido ético y moral** y constituye un **seguro de dignidad** para el hombre o la mujer que habiendo dedicado al servicio público sus años más fecundos, no debe encontrarse en la etapa final de su vida en el desamparo, o convertido en carga de parientes o del Estado". Bayrón Toro v. Serra, *supra*, pág. 616.

Ante la importancia trascendental de este beneficio contractual de carácter público, en Bayrón Toro v. Serra, fuimos prontos en concluir, categóricamente, que "los participantes [del] Sistema de Retiro del Gobierno **tienen un derecho adquirido de naturaleza contractual que surge con el ingreso del empleado al sistema, independientemente de que la participación sea voluntaria o compulsoria**". (Énfasis suplido.) Íd., pág. 618. A su vez, explícitamente reconocimos dos dimensiones de este derecho adquirido: (1) la dimensión del pensionado ya retirado; y, (2) la dimensión del participante de la pensión, quien aún está pendiente por retirarse.

A la primera de estas dimensiones le conferimos **una protección absoluta** a la luz de la cláusula en contra del menoscabo de obligaciones contractuales. Es por ello que establecimos que "[u]na vez el empleado se ha retirado..., **su pensión no está sujeta a cambios o menoscabos**". Íd., pág. 618. Véanse, también: Rodríguez v. Retiro, 159 D.P.R. 467, 474 y 477 (2003); Calderón Morales v. Adm. de los Sistemas de Retiro, 129 D.P.R. 1020, 1032 (1992) ("La Asamblea Legislativa no tiene facultad para menoscabar ese derecho adquirido de naturaleza contractual"). Respecto a la segunda dimensión del derecho adquirido bajo examen, aseveramos lo siguiente: "antes de que [un participante] pueda acogerse a la jubilación, **los términos del sistema de retiro pueden ser enmendados por el Gobierno siempre que las enmiendas sean razonables y con el fin de adelantar**" un fin importante del Estado. Bayrón Toro v. Serra, *supra*, pág. 618.

De tal manera, nuestras expresiones reconocieron que los términos del sistema de retiro pueden ser enmendados cuando el participante aún no se haya retirado. A esos efectos, también dispusimos que el aumento de la edad mínima para que un participante cualifique para el retiro; la reducción del importe de la pensión que recibirá el participante una vez se retire; y el aumento de la cantidad que un participante deberá aportar al fondo del retiro, constituyen, como mínimo, un menoscabo lo suficientemente severo como para que la cláusula constitucional en contra del perjuicio de obligaciones contractuales quede activada. Bayrón Toro v. Serra, *supra*, págs. 608-609 y 621-622.

A la luz de lo anterior, y adoptando los pronunciamientos del Tribunal Supremo federal en el ámbito de la garantía constitucional indicada, fuimos precisos en indicar que cuando una garantía contractual como ésta quedaba menoscabada severamente por causa de las modificaciones señaladas, tal perjuicio sólo quedaría justificado si el Estado sustentaba que la legislación promulgada a esos fines adelanta **un fin público importante** y que la modificación al plan de retiro resulta ser **razonable** y **necesaria**. Bayrón Toro v. Serra, *supra*, pág. 621. Sostuvimos el requerimiento de que la modificación sea **necesaria**, además de razonable, en el entendimiento de que, cuando se trata de un contrato público en el cual el Gobierno es parte, el escrutinio judicial a emplear "debe ser más cuidadoso para asegurar que la actuación del Estado no sólo sea en beneficio propio". Íd., pág. 620.

No obstante, a pesar de reconocer la exigencia de que el menoscabo de relaciones contractuales **públicas** requiere un escrutinio judicial más oneroso para el Estado, en el cual se evalúe si las modificaciones impuestas a los participantes no-retirados del fondo de retiro público son **necesarias** y **razonables,** guardamos total silencio respecto al significado de aquello que constituye una modificación **necesaria** y **razonable,** según el Más Alto Foro federal ya había definido tales conceptos.

Así, nuestro caso normativo en esta materia omite distinguir lo que ya hemos explicado, a saber: (1) que una modificación a un plan de retiro será **necesaria** sólo si no existen **medidas alternas** para alcanzar el fin público proferido por el Estado; y, (2) que tal medida será **razonable**, sólo si los efectos que se pretenden mitigar **no fueron previstos o intencionados** por el Estado al momento en el cual contrajo con sus empleados públicos los beneficios de retiro afectados.

Ante tal omisión, urge que hoy interpretemos nuestros pronunciamientos en <u>Bayrón Toro v. Serra</u>, *supra*, a la luz de estas consideraciones adicionales, las cuales ya estaban plasmadas en la normativa del Tribunal Supremo de los EE.UU. al momento de emitirse esa Opinión, y que constituyen la protección mínima garantizada por la Constitución federal. Además, en esa faena hermenéutica, está vedado olvidar que "las leyes que crean derechos al disfrute de pensiones se deben interpretar liberalmente a favor del beneficiario[,] a fin de que se cumpla el propósito reparador para las cuales

fueron aprobadas". <u>Calderón Morales v. Adm. de los Sistemas de Retiro</u>, *supra*, pág. 1034.

Habiendo expuesto el marco jurídico aplicable a la controversia que nos atañe, pasemos a repasar las incidencias históricas, económicas y legislativas que han conducido al estado actual del plan de retiro de los empleados públicos del Gobierno de Puerto Rico.

## II

### A.

El Sistema de Retiro de los Empleados del Gobierno de Puerto Rico se creó con el propósito de proveer seguridad económica a sus empleados a través del pago de una pensión vitalicia. Al 30 de junio de 2011, el Sistema de Retiro tenía un total de 135,972 participantes activos. Éstos se distribuyen en 30,057, 50,346 y 55,569 empleados participantes de la Ley Núm. 447 de 15 de mayo de 1951 (Ley Núm. 447), la Ley Núm. 1 de 16 de febrero de 1990 (Ley Núm. 1), y la Ley Núm. 305-1999 (Reforma 2000), respectivamente. Además, existen 79,177 y 4,239 retirados para la Ley Núm. 447 y la Ley Núm. 1, respectivamente. Véase, Valorización Actuarial del Sistema de Retiro al 30 de junio de 2011, Milliman, Wayne, PA.

Mediante el referido sistema, se pretende asegurar el ingreso de los pensionados para que se ajuste a las necesidades y al nivel de vida de cada uno de ellos, a la vez que se promueve la retención de recursos idóneos en el sector público. Con estos propósitos, se creó un fideicomiso conocido como el Sistema de Retiro mediante la Ley Núm. 447,

en el que se estableció como edad promedio de retiro los 55 años de edad con 25 años de servicio. De esta forma, se sustituyeron los fondos de pensiones existentes bajo la Ley Núm. 70 de 3 de mayo de 1931 (Cuerpo de la Policía Insular), la Ley Núm. 23 de 16 de julio de 1935 (funcionarios permanentes del Gobierno de Puerto Rico) y la Ley Núm. 155 de 9 de mayo de 1938 (pensiones a las viudas de los policías que perdían su vida en funciones de su deber). En consecuencia, desde la creación del fideicomiso, el sistema comenzó con un déficit actuarial que el Estado venía obligado a amortizar en un periodo de 30 años. Este compromiso no se cumplió. Así, el Estado sabía de antemano el deber que tenía para asegurar los compromisos contraídos para con sus servidores públicos.[6]

Un déficit actuarial se crea cuando se otorgan beneficios mayores a los activos que posee el sistema de retiro. Por ende, resulta elemental que un déficit actuarial incrementa por ciertas razones principales, a saber: (1) la falta de aportaciones recurrentes al sistema; (2) el aumento de obligaciones, producto de un mayor número de beneficiarios no contemplados en su implementación; y (3) el rendimiento inadecuado de las proyecciones. Ante el panorama de todas estas circunstancias, los actuarios y otros alertaron al Estado sobre la falta de solvencia económica del Sistema de

---

[6]Sistema de Retiro de los Empleados del Gobierno, Origen, Déficit Actuarial y Recomendaciones, Volumen 3, de la Comisión Especial Permanente sobre los Sistemas de Retiro, Enero 2013.

Retiro creado.[7] A su vez, hicieron hincapié en la obligación que tiene el Estado para realizar asignaciones anuales para cumplir con los compromisos contraídos. El Estado no encaró oportunamente los problemas señalados.

Para la década de los ochenta, la divulgación de la información fluyó y creó consternación sobre el futuro del fondo de retiro.  Ello abonó a la incertidumbre respecto a si los empleados públicos contarían con un sistema de retiro que atendiera sus necesidades. Nuevamente, el Estado se mostró indiferente. Mediante sus actuaciones continuó radicando medidas legislativas para aumentar los beneficios, incrementar los beneficiados y procedió con dejadez en el análisis de las necesidades para atender el déficit actuarial anunciado. Como consecuencia, el déficit actuarial ascendió a los $2.8 billones.[8]

La falta de acción provocó el crecimiento acelerado del déficit actuarial. Para una idea de la magnitud de las repercusiones, exponemos que al 30 de junio de 2011, el déficit actuarial ascendía a $23.7 billones para un total de $4.8 billones adicionales al año 2009. No cabe duda que esto representa un problema que requiere ser atendido con extrema

---

[7]Desde el 1957 la Oficina del Contralor, por medio de los distintos informes de auditoría, señaló el déficit actuarial y las recomendaciones a seguir. Mediante el Informe Número DB-58-04 del 30 de septiembre de 1957 se estableció un déficit Actuarial de $23,705,363; el Informe Número DA-83-41 de 30 de junio de 1983 estableció un déficit actuarial de $1.1 billones al 30 de junio de 1975; el Informe DA-89-43 lo estableció en $2.8 billones al 30 de junio de 1984; el Informe DA-96-28 de 14 de mayo de 1996 lo estableció en $4.5 billones al 30 de junio de 1994 y el RF-12-03 del 13 de enero de 2012 lo estableció en $17 billones al 30 de junio de 2009.

[8]Véase el Informe de la Oficina del Contralor DA-89-43.

prontitud. Sin embargo, conforme a la propia Administración de los Sistemas de Retiro, el déficit actuarial surge desde el origen de la creación del fideicomiso, pero éste no impediría la operación del sistema siempre que se pueda alcanzar un equilibrio actuarial. De esta forma, la Administración de los Sistemas de Retiro manifiesta que para lograr el equilibrio actuarial es necesario que el flujo de fondos provenientes de las aportaciones más el rendimiento de los activos sea adecuado para cubrir las obligaciones contraídas por el sistema. Bajo esa condición, el déficit actuarial no constituye un problema inmediato, ya que éste únicamente se activa en caso de que se liquide el Sistema de Retiro. Véase, Informe Final del 29 de junio de 2012 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 283, 7ma. Sesión Ordinaria, 16ta Asamblea Legislativa, págs. 2-4.

La Administración de los Sistemas de Retiro sugiere concentrarse en un problema principal del Sistema de Retiro constituido por la falta de flujo de efectivo. Esta falta de dinero en caja afecta directa y recurrentemente el pago de las obligaciones contraídas por el Estado para con sus empleados públicos y pensionados. Claro está, el enfoque exclusivo de atender la necesidad del flujo de efectivo, sin un plan en que se capitalicen los activos del sistema, resultaría en la crónica de una muerte anunciada.

El déficit de flujo de efectivo del Sistema de Retiro de los Empleados de Gobierno ascendió del 2008 al 2009 a $380

millones cuando del 2007 al 2008 era de $240 millones. De otra parte, el Banco Gubernamental de Fomento estima que el déficit del Sistema de Retiro tendrá un impacto en el Fondo General de aproximadamente $900 millones anuales por los próximos 25 años.[9] El flujo negativo de caja agotará los activos del Sistema de Retiro para el 2014.[10]

El déficit en el flujo de efectivo responde, en gran medida, a que las aportaciones individuales y patronales son insuficientes para mantener los beneficios concedidos y a las gracias adicionales otorgadas sin la debida identificación de fondos para sufragarlas. Básicamente, el Sistema de Retiro se nutre de estas aportaciones. Igualmente, era de esperarse un crecimiento significativo del déficit en caja, según

---

[9]Véanse, Ponencia del Departamento de Hacienda sobre el P. de la C. 888 del 12 de marzo de 2013, pág. 3; Informe Positivo de 12 de junio de 2013 de la Comisión de Hacienda y Finanzas Públicas del Senado de Puerto Rico con relación al P. de la C. 1055, 1ra Sesión Ordinaria, 17ma Asamblea Legislativa. En la actualidad, el Sistema de Retiro desembolsa cerca de $1.55 billones anualmente y recibe $750 millones, por lo que el 52% de sus obligaciones no están cubiertas. De estos se espera que para el 2014 el Estado desembolse el 1.4% del Fondo General. Véase, Puerto Rico adopts major pension reform and proposes sales tax expansion for fiscal 2014 budget, May 15, 2013, Moody's Investors Service, en http://www.gdb-pur.com/documents/PensionReformIssuerComment-5-15-13.pdf.

[10]Véanse, además, Employee's Retirement System of the Government of the Commonwealth of Puerto Rico, Estados financieros para el año término del 30 de junio de 2011 realizados por Deloitte & Touch, LLP y la Valorización Actuarial al 30 de junio de 2011, Milliam, Wayne, PA. Para este periodo los beneficios se entienden que procederán de dinero prestado.

incrementaran los beneficiarios bajo la Ley Núm. 447 y la Ley Núm. 1.[11]

A pesar de la insuficiencia de efectivo para cumplir con las obligaciones contraídas, el Estado procedió a inyectar sumas no recurrentes para tratar de aminorar el impacto. Entre estas medidas, el Estado procedió a la venta de acciones de la Puerto Rico Telephone Company, la venta de activos del Sistema de Retiro, la adquisición de préstamos millonarios y la emisión desmedida de bonos. En este último caso, lejos de actuar con prudencia, el Estado emitió bonos de $3,000 millones que ocasionaron pérdidas al Sistema de Retiro. Por medio de esta emisión se crearon unas expectativas de rendimiento de 11%, las cuales resultaron únicamente en un ínfimo rendimiento real de 4.4% para cumplir con la obligación generada para con los bonistas de 6.6%. En el 2008 la emisión de bonos alcanzó los $937 millones, los cuales para el 2009 se habían convertido en tan sólo $837 millones. No tan sólo el rendimiento de estas emisiones de bonos fue muy por debajo de lo esperado, sino que el Estado prestó como colateral al pago de la deuda las aportaciones patronales, previamente comprometidas para el pago a nuestros pensionados. El resultado obtenido agravó aún más el Sistema de Retiro. Véanse: Primer Informe Parcial del 30 de junio de 2011 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 417, 5ta Sesión Ordinaria, 16ta Asamblea

---

[11]Refiérase a las Valorizaciones Actuariales al 30 de junio de 2011 y al 30 de junio de 2007, Milliman, Wayne, PA.

Legislativa; Segundo Informe Parcial del 7 de octubre de 2011 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 417, 6ta Sesión Ordinaria, 16ta Asamblea Legislativa; Tercer Informe de 30 de junio de 2012 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre la R. de la C. 417, 7ma. Sesión Ordinaria, 16ta Asamblea Legislativa.

La vorágine se acrecienta con las acciones y omisiones exclusivas del Estado, las cuales contribuyen a un mayor déficit que afecta a los miles de empleados públicos obligados a depender de este sistema para poder vivir dignamente luego de una jornada de arduo trabajo. Para señalar sólo algunas de las irrazonables actuaciones realizadas por el Estado, identificamos las siguientes: (1) el pago no subsidiado de leyes especiales;[12] (2) la extensión de beneficios a los cónyuges e hijos de los participantes;[13] (3) el aumento de aportaciones a los gastos fúnebres;[14] (4)

---

[12] Véanse, Ley Núm. 95 de 29 de junio de 1963 (aportación a planes de salud); Ley Núm. 98 de 4 de junio de 1980 (Aguinaldo de Navidad); Ley Núm. 14 de 24 de abril de 1987 (Aguinaldo de Navidad); Ley Núm. 109-1997 (aumentó el Aguinaldo de Navidad); Ley Núm. 37-2001 (Bono de Verano); Ley Núm. 155-2003 (Bono de Medicinas); Ley Núm. 159-2003 (aumentó el Aguinaldo de Navidad); Ley Núm. 433-2004 (aumentó el Aguinaldo de Navidad); Ley Núm.144-2005 (aumentó el Aguinaldo de Navidad).

[13] Véanse, Ley Núm. 169 de 30 de junio de 1968; Ley Núm. 105 de 28 de junio de 1969; Ley Núm. 4 de 7 de abril de 1985; Ley Núm. 13-1992; Ley Núm. 156-2003 (aumentó en un 50% la pensión al cónyuge).

[14] Véanse, Ley Núm. 11 de 13 de abril de 1986; Ley Núm. 316-2000 (aumentó en $250 pago mínimo por defunción); Ley Núm. 524-2004 (aumentó en $250 pago mínimo por defunción).

la cantidad de préstamos concedidos a los miembros del sistema, que en el 2011 era de $1,275 millones, equivalente a un 37% del portfolio de inversiones;[15] (5) la falta y dejadez en el cobro de aportaciones patronales a los patronos morosos y a los municipios;[16] (6) la falta de cobro de deudas por el pago de leyes especiales y otros beneficios legislados a sufragarse por los municipios y las corporaciones públicas; (7) la falta de cobro de intereses;[17] (8) la falta de aumento en el pago de las aportaciones patronales e individuales; (9) el aumento de pensionados (incluye las ventanas de retiro);[18]

---

[15]Véanse, Informe de Auditoría RF-13-10 de 8 de mayo de 2013 de Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura para el período del 1 de julio de 2003 al 30 de junio de 2012; Employee's Retirement System of the Government of the Commonwealth of Puerto Rico, Estados financieros para el año término del 30 de junio de 2011 realizados por Deloitte & Touch, LLP; Ley Núm. 72 de 20 de junio de 1956.

[16]El Informe de Patronos Morosos al 13 de mayo de 2013, refleja que las corporaciones públicas y los municipios adeudan al sistema $58,618,412.18 y $26,772,919.33, respectivamente, por concepto de leyes especiales, tales como: bonos de navidad, bonos de medicamentos, pagos de préstamos, remesas y programas de retiro temprano, entre otros. Además, se estima que la Autoridad de Acueductos y Alcantarillados adeuda al Sistema de Retiro $833,219,000 y el Fondo del Seguro del Estado $984,943,000 por falta de cumplimiento con el Art. 2-116 de la Ley Núm. 447, 3 L.P.R.A. sec. 781.

[17]A modo de ejemplo: Ley Núm. 110 de 1973 (promovió un préstamo de $100 millones al presupuesto general sin el pago de intereses); Ley Núm. 97-2002; Ley Núm. 168-2005 (concedió un plan de pago a aquellos empleados que retiraron sus aportaciones del Sistema de Retiro).

[18]Véanse, Ley Núm. 127 de 27 de junio de 1958 (concedió beneficios a participantes de alto riesgo); Ley Núm. 2 de 26 de marzo de 1965 (anualidad vitalicia a exgobernadores antes de 1992 y $10,000 a la viuda); Ley Núm. 80 de 13 de julio de 1988 (acreditó los servicios militares prestados con anterioridad y posterioridad a la Ley Núm. 447); Ley Núm. 71 de 17 de agosto de 1989 (acreditó el tiempo que un dirigente obrero sirvió a una unión); Ley Núm. 116-1993 (acreditó los

_____

servicios prestados por los empleados de la Oficina Legal de Santurce, Inc.); Ley Núm. 24-1994 (Retiro Temprano a los empleados de la Autoridad de Teléfonos de Puerto Rico y sus subsidiarias); Ley Núm. 90-1994 (Retiro Temprano a los empleados de la Corporación de Crédito y Desarrollo Comercial y Agrícola de PR); Ley Núm. 149-1994 (acreditó los servicios prestados a la Asociación de Pensionados del Gobierno de Puerto Rico, Inc.); Ley Núm. 54-1995 (Retiro Temprano a los empleados del Banco Gubernamental de Fomento); Ley Núm. 255-1995 (eliminó el impedimento por edad para entrar al Sistema de Retiro y la acreditación por años de servicio); Ley Núm. 3-1996 (incluyó compulsoriamente a los empleados y funcionarios municipales); Ley Núm. 49-1996 (incluyó como servicios acreditables los prestados por los empleados de la Asociación de Alcaldes de Puerto Rico, la Federación de Municipios de Puerto Rico y los Consorcios Municipales); Ley Núm. 57-1996 (incluyó a los alcaldes como funcionarios que pueden acogerse al Sistema de Retiro); Ley Núm. 204-1997 (Retiro Temprano a Compañía de Fomento Industrial); Ley Núm. 182-1996 (Retiro Temprano a empleados de las Ramas Ejecutiva, Legislativa y Judicial); Ley Núm. 217-1998 (acreditó el tiempo trabajado a los empleados de la Administración del Derecho al Trabajo); Ley Núm. 370-1999 (Retiro Temprano a empleados del Municipio de San Juan); Ley Núm. 112-2000 (Retiro Temprano a empleados del Banco Gubernamental de Fomento); Ley Núm. 119-2000 (Retiro Temprano a empleados de la Corporación del Fondo del Seguro del Estado); Ley Núm. 174-2000 (Retiro Temprano a empleados de las Ramas Ejecutiva, Legislativa y Judicial); Ley Núm. 193-2000 (acreditó el servicio prestado por empleados de San Juan Legal Services Incorporated); Ley Núm. 218-2000 (acreditó el servicio prestado por empleados de Agencias del Gobierno de los Estados Unidos de Norte América); Ley Núm. 339-2000 (Retiro Temprano a los empleados del Departamento de Salud); Ley Núm. 464-2000 (Retiro Temprano a los empleados del Banco Gubernamental de Fomento para Puerto Rico, la Autoridad para el Financiamiento de las Facilidades Industriales, Turísticas, Educativas, Médicas y Control Ambiental y de la Corporación para el Financiamiento de la Vivienda de Puerto Rico); Ley Núm. 360-2004 (Retiro Temprano a los empleados de la Compañía de Comercio y Exportación de Puerto Rico); Ley Núm. 143-2005 (Retiro Temprano empleados de la Compañía de Fomento Industrial); Ley Núm. 273-2006 (Retiro Temprano a los Empleados de la Compañía de Turismo); Ley Núm. 33-2007 (eliminó el requisito mínimo por tiempo servido al legislador municipal); Ley Núm.66-2007 (Retiro Temprano a los empleados de la Compañía de Comercio y Exportación de Puerto Rico); Ley Núm. 188-2007 (Retiro Temprano a los empleados del Banco Gubernamental de Fomento); Ley Núm. 59-2008 (Retiro Temprano a los empleados de la Autoridad de Tierras de Puerto Rico); Ley Núm. 136-2008 (Retiro Temprano a los empleados del Departamento del Trabajo y Recursos Humanos); Ley Núm. 244-2008 (Retiro Temprano a los empleados de la Junta de Calidad Ambiental); Ley Núm. 275-2008 (Retiro Temprano a los

(10) el incremento porcentual en las pensiones sin identificar la procedencia de fondos para su pago;[19] (11) el aumento de los salarios de los empleados antes del retiro; (12) el pago de pensiones sin revisar si éstas proceden porque los beneficiarios hayan fallecido;[20] (13) la alta incidencia de participantes que se acogieron al sistema por incapacidad; (14) el cambio de expectativa de vida de los participantes del sistema sin que se tomaran previsiones a tales efectos; (15) las pensiones por mérito;[21] y (16) las inversiones mal estructuradas en la emisión de bonos, entre otras.[22]

---

empleados de la Administración del Derecho al Trabajo); Ley Núm. 70-2010. Según cifras presentadas por la Oficina del Contralor en su Ponencia del 14 de marzo de 2013 sobre el P. del C. 888, pág. 3, el costo de los empleados que se acogieron al retiro temprano ronda en los $739,894,544.

[19]Véanse, Ley Núm. 124 de 8 de junio de 1973; Ley Núm. 23 de 23 de septiembre de 1983 (la mitad del aumento de ciertas pensiones); Ley Núm. 221-1998 (aumentó en un 3% las anualidades pagadas por la Ley Núm. 447); Ley Núm. 22-2005 (fijó la edad de retiro obligatorio de los miembros de la Policía de Puerto Rico y el Cuerpo de Bomberos a los 58 años de edad); Ley Núm. 35-2007 (concedió otro aumento de 3% a las anualidades pagadas para ciertas pensiones y aumentó la pensión mínima por $100 mensuales); Ley Núm. 15 de 24 de abril de 1987; Ley Núm. 207-1995; Ley Núm. 134-1996 (aumento C.O.L.A. a pensionados de alto riesgo); Ley Núm. 221-1998; Ley Núm. 208-2000(aumento de $200 a pensión de ciertos beneficiarios); Ley Núm. 40-2001 (aumento adicional de 3%); Ley Núm. 156-2003; Ley Núm. 157-2003; Ley Núm. 35-2007.

[20]Conforme al Informe Final de 28 de septiembre de 2012 de la Comisión de los Sistemas de Retiro del Servicio Público de la Cámara de Representantes con relación a la R. de la C. 477, 7ma Sesión Ordinaria, 16ta Asamblea Legislativa, existen 4,027 pensionados y beneficiarios mayores a los 90 años de edad. Éstos reciben una pensión mensual con leyes especiales de alrededor de $1,895,000.

[21]Véanse, Ley Núm. 216-2008; Ley Núm. 234-2008.

[22]Sobre este particular refiérase a las siguientes Ponencias presentadas durante la discusión del P. de la C.

Todas estas razones eran conocidas por el Estado. Tan es así que sirvieron de base para la Exposición de Motivos de la Ley Núm. 3-2013. Expresamente, el Estado señala que el Sistema de Retiro se afectó por las aportaciones inadecuadas que no estaban pareadas con los beneficios que se recibirían y la falta de proyección de los cambios económicos o actuariales que afectan a éstos. Asimismo, el propio Estado destaca que una serie de leyes aprobadas entre el 1960 y el presente debilitaron las finanzas, al aumentar los beneficios sin contar con aportaciones adicionales y sin que el propio gobierno hiciera la aportación recomendada por los actuarios para cubrir los beneficios del retiro. De igual forma, el Estado reconoce el impacto de las leyes especiales –bonos de verano, para medicamentos, aguinaldo de navidad, aportaciones a planes médicos, pensiones mínimas, beneficios por muerte o incapacidad y ajustes por el costo de vida- que fueron concedidos sin que los responsables por tal pago –el mismo

_____

888 que se convirtió en la Ley Núm. 3-2013: (1) Memorial Explicativo de 20 de marzo de 2003 sobre el P. de la C. 888, presentado por los Servidores Públicos Unidos de Puerto Rico Concilio 95/AFSCME, págs. 4-5; (2) Ponencia del 8 de marzo de 2013 del Lcdo. Héctor Mayol Kauffmann, Administrador de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura sobre el P. del C. 888, pág. 3.; (3) Ponencia del 12 de marzo de 2013 del Banco Gubernamental de Fomento sobre el P. de la C. 888, págs. 2-3; (4) Ponencia del 12 de marzo de 2013 del Departamento de Hacienda sobre el P. de la C. 888, pág. 4; (5) Ponencia de la Federación de Pensionados y Jubilados de Puerto Rico sobre el P. de la C. 888, págs. 2-4, 6-7; (6) Ponencia del 12 de marzo de 2013 de la Federación del Trabajo de PR-AFL-CIO, la Central Puertorriqueña de Trabajadores, la Central Alianza Laboral y la Asociación de Maestros de Puerto Rico sobre el P. de la C. 888, págs.7-13; (7) Ponencia de 11 de marzo de 2013 de la Oficina de Gerencia y Presupuesto sobre el P. de la C. 888, pág. 2; (8) Ponencia del 14 de marzo de 2013 del Grupo de Funcionarios y Empleados de la Oficina del Contralor de Puerto Rico sobre el P. de la C. 888, págs.2-3.

gobierno, las corporaciones públicas y los municipios-remitieran el correspondiente pago.

El propio Estado admite que los programas de retiro temprano para reducir la plantilla laboral tuvieron el efecto de reducir los ingresos al Sistema de Retiro. Todo ello, unido a los cambios en la expectativa de vida de los participantes y los programas de préstamos personales, hipotecarios y de viajes culturales conferidos a los beneficiados, tuvieron un efecto de quebranto en la salud del Sistema de Retiro. En cuanto a la emisión de bonos, el Estado reconoce que no fue realizada conforme al patrón seguido por otras jurisdicciones, que asignaron una fuente de pago externa para pagar el servicio de la deuda. Por el contrario, y para agravar la situación del fideicomiso, en Puerto Rico la emisión se estructuró como una deuda del mismo Sistema, en donde las aportaciones patronales sirvieron como fuente de repago de los bonos. Como consecuencia de la referida emisión, el Sistema de Retiro está obligado a pagar alrededor de $6,000 millones en intereses, más el principal de $3,000 millones con las aportaciones al fondo de retiro, que son la única fuente de ingreso para el pago de los beneficios a los pensionados. Véase, Exposición de Motivos de la Ley Núm. 3-2013, págs. 5-8.

Por otra parte, en un intento incompleto por atender la crisis, el Estado aprobó legislaciones dirigidas a aumentar la capacidad de inversión del Sistema de Retiro.[23] Además,

---

[23] Ley Núm. 42 de 19 de junio de 1987; Ley Núm. 46 de 29 de junio de 1988.

para responder con el pago de pensiones futuras y mantener la solvencia del Sistema de Retiro, el Estado realizó cambios a la estructura del referido fideicomiso mediante la aprobación de la Ley Núm. 1 de 26 de febrero de 1990 y la Ley Núm. 305-1999 (Reforma 2000).

Mediante la Ley Núm. 1, se aumentaron las aportaciones patronales (9.275%) e individuales (8.275%) para aquellos empleados que ingresaron posterior al 1 de abril de 1990. No obstante, y advertido de ello, el Estado declinó aumentar las aportaciones a los servidores públicos cobijados por la Ley Núm. 447. De igual forma, se estableció que: (1) la retribución promedio sería a base de los últimos cinco años de servicios; (2) la edad normal de retiro aumentó a los 65 años de edad; (3) las aportaciones patronales e individuales se remitirían dentro de un término determinado y (4) se requirió la realización de estudios actuariales antes de adoptarse cualquier medida que liberalizara fondos.

Luego, y ante la insuficiencia de las medidas, se aprobó la Reforma 2000 para cerrar el Sistema de Retiro y crear un Plan de Ahorros para el Retiro que beneficiara a los empleados que ingresen al gobierno a partir del 1 de enero de 2000. Mediante la Reforma 2000, los empleados públicos no recibían beneficios definidos, sino el rendimiento de sus ahorros en el sistema a los 60 años de edad. Además, la aportación patronal que se hiciera para los participantes de la Reforma 2000 se utilizaría para sanear el déficit actuarial del antiguo sistema. A su vez, se eliminó el beneficio por incapacidad, no se garantizaron los beneficios

al final de la jornada y el empleado quedo obligado a pagar un 25% de sus ganancias al Sistema para la administración de sus fondos.

Posteriormente, en el 2001 se presentaron varios proyectos con el fin de atemperar el quebranto del Sistema de Retiro. A pesar de ello, el Estado desatendió muchas de las medidas y declinó otras. Con sus acciones, aventajó los ingresos al Fondo General sobre los ingresos necesitados por el Sistema de Retiro. A modo de ejemplo, el 17 de abril de 2001, se presentó el P. de la C. 966 en el que se propuso destinar bianualmente 1% del monto total de las rentas anuales del Estado Libre Asociado al Sistema de Retiro para que fuera invertido y su rédito distribuido en los beneficiarios del Sistema. Este proyecto no fue aprobado por el impacto en el fondo general.

Más tarde, en el 2005 se presentó el P. del S. 476 con el fin de autorizar una emisión de bonos para financiar $2,000 millones para el Sistema de Retiro. Además, proponía un aumento en las aportaciones patronales e individuales. A pesar de que el P. del S. 476 contó con un informe positivo de la Comisión de Hacienda de la Cámara de Representantes, nunca fue llevado a votación en el pleno de la Cámara. Durante el 2009 hubo un nuevo intento de aumentar las aportaciones patronales —en específico las del Sistema de Retiro para Maestros— que tampoco fue evaluado. También quedó pendiente en el 2010 un plan de reorganización para integrar los sistemas de retiro y crear una Junta de Síndicos. Otro intento en el 2012 para ingresar fondos al sistema lo fue el

P. de la C. 4059, en el que se propuso requerir que las contribuciones sobre ingresos pagadas, en torno a las pensiones recibidas del Sistema de Retiro de Empleados del Gobierno de Puerto Rico, sean depositados en el fondo de retiro, a fin de allegarle fondos adicionales al sistema. La medida también quedó engavetada.

Más tarde en el 2012 se presentó el P. del S. 2509 a los fines de crear la "Pega Dominical" como un sorteo para reforzar las finanzas del Sistema de Retiro y crear un fondo especial para cubrir el déficit actuarial. El proyecto tampoco fue evaluado por la Comisión. Lo mismo ocurrió con el P. de la C. 3918, presentado en el 2012 a los fines de proveer un sistema de sorteo electrónico desde la computadora personal y asignar esos fondos al Sistema de Retiro. Sin embargo, el Estado acaba de duplicar determinados sorteos de juegos de azar, cuyos ingresos no están destinados al Sistema de Retiro.

Independiente a ello, el Estado promulgó la Ley Núm. 96-2011 para inyectar $162 millones en bonos con la esperanza de recibir $1,200 millones en un periodo no mayor de 40 años. Por otro lado, la Ley Núm. 114-2011 aumentó la aportación patronal para el fondo del sistema de retiro de maestros. También, la Ley Núm. 116-2011 validó una nueva enmienda al Sistema de Retiro. La pieza legislativa original contemplaba las siguientes propuestas de cambio, las cuales no fueron adoptadas: (1) que se aumentaran a los alcaldes los requisitos para ser acreedores del sistema; (2) el aumento de aportaciones individuales y la revisión periódica de éstas;

(3) la limitación del gravamen para la adquisición del empréstito y (4) un término para el recobro de las deudas acumuladas por aportaciones al Sistema de Retiro. Ninguna de estas propuestas fue avalada. Solamente, se validaron en dicha ley las siguientes modificaciones parciales: (1) el incluir como miembros de la matrícula a los empleados transitorios; (2) aumentar las aportaciones patronales; (3) acoger la aprobación mediante certificación de deuda por parte del Sistema de Retiro al Centro de Recaudaciones sobre Impuestos Municipales o el Departamento de Hacienda y (4) la imposición de criterios rígidos para conceder activos en garantías. A su vez, mediante la Ley Núm. 156-2011 y la Ley Núm. 196-2011, se modificó la cartera de préstamos del sistema y el ingreso de las cooperativas en este programa. A pesar de ello, las medidas aprobadas en el 2011 no tendrán un impacto significativo en las finanzas del sistema. Véase, Sistema de Retiro de los Empleados del Gobierno, Origen, Déficit Actuarial y Recomendaciones, Volumen 3, de la Comisión Especial Permanente sobre los Sistemas de Retiro, Enero 2013.

Ante este cuadro, desoyendo el reclamo de varios sectores y carente de información actuarial para valorizar las modificaciones, el Estado aprueba a la ligera la Ley Núm. 3-2013.[24]

---

[24]Al momento de su aprobación, varios sectores reclamaron y denunciaron la falta de información actuarial para valorizar las propuestas aprobadas. Entre estos sectores, se encontraron los siguientes: los Servidores Públicos Unidos de Puerto Rico Concilio 95/AFSCME, la AARP, la Federación del Trabajo de PR-AFL-CIO, la Central

B.

Ante ello, es nuestro deber identificar el abanico de propuestas y recomendaciones que el Estado tiene ante sí, previo a recurrir e imponer sobre los servidores públicos todos los cambios drásticos incorporados con la aprobación de la Ley Núm. 3-2013. Veamos las alternativas disponibles que son menos drásticas y razonables.

En cuanto a las propuestas presentadas por los miembros de la Cámara de Representantes y del Senado, destacamos aquellas que facilitan fondos recurrentes al Sistema de Retiro.[25] Revisemos.

Entre las opciones que tiene el Estado se encuentran un sinnúmero de proyectos presentados por la Cámara de Representantes con el fin de atender el problema del Sistema de Retiro. Realzamos los siguientes: (1) el P. de la C. 786, que pretende crear la "Ley de Justicia Tarifaria y Rescate del Sistema de Retiro de Puerto Rico", mediante la cual se propone la distribución al Sistema de Retiro del exceso de recaudos de $1,800 millones de la imposición fija del

_____

Puertorriqueña de Trabajadores, la Central Alianza Laboral y la Asociación de Maestros de Puerto Rico, la Local 2396, representante exclusiva de los empleados de Comedores Escolares, la Local 1850, representante exclusiva de los empleados de la Asociación de Empleados del Gobierno de Puerto Rico, y el Sr. José Melara, representante internacional y "Organizing Coordinator" de la UAW.

[25]Debido al gran número de propuestas, se propuso que se hiciera un solo proyecto para recoger las mismas, denominado *Ley de Recaudos para Salvar las Pensiones de los Participantes y Empleados Públicos del Gobierno Central.* Véase, Ponencia de la Asociación de Empleados de Comedores Escolares de Puerto Rico UAW Local 2396 ante la Comisión de Asuntos Laborales y Sistemas de Retiro del Servicio Público de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 888.

arbitrio especial a las entidades foráneas; (2) el P. de la C. 868, que propone la "Ley de Juegos al Azar" con el fin de transferir fondos de los ingresos brutos generados por las máquinas tragamonedas; (3) el P. de la C. 917, que promueve transferir de la Contribución Mínima Tentativa un porcentaje determinado al Sistema de Retiro; se estima que esta iniciativa podría redundar en $150 millones anuales; (4) el P. de la C. 922, que procura disponer que el 1% del arbitrio a la adquisición de cierta propiedad mueble y servicios se destine al Sistema de Retiro; (5) el P. de la C. 925, que propone un aumento en la aportación patronal al Sistema de Retiro y aumenta el tiempo de servicio y la edad de retiro para que los alcaldes puedan beneficiarse del programa; (6) el P. de la C. 926, que persigue eliminar la exención contributiva a los espíritus destilados u otras bebidas alcohólicas para asignar ese recaudo al Sistema de Retiro; se estima que la medida recaudaría $180,000,000; (7) el P. de la C. 981, que enmendaría la Ley de la Lotería de Puerto Rico y asignaría $10,000,000 al Sistema de Retiro; (8) el P. de la C. 997, que establece una contribución especial a las cooperativas de ahorro y crédito, subsidiarias y afiliadas para el fondo del retiro de los maestros, y (9) el P. de la C. 1045, que provee para descontar las deudas de ciertas remesas al Sistema de Retiro, lo cual resultaría en una inyección inmediata de $60,542,036.

De otra parte, los proyectos presentados por el Senado como opciones para atender la referida crisis son los siguientes: (1) el P. del S. 23, que persigue crear la "Pega

Dominical", cuyos fondos serían destinados a reforzar las finanzas del sistema; (2) el P. del S. 219, que propone enmendar la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor", a los fines de disponer que $4 de la prima pagada por el seguro obligatorio fuera destinada al Sistema de Retiro; se estima que existen 3,045,000 vehículos de motor, por lo que la medida podría aportar fondos en $12,180,000 anuales; (3) el P. del S. 428, que enmendaría la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor" con el fin de incluir 84 centavos mensuales a la prima universal inicial del seguro de responsabilidad obligatorio y destinarla al Sistema de Retiro; la cual redundaría en $2,557,000 anuales; (4) el P. del S. 429, que crearía la "Ley del Fondo de Ayuda al Sistema de Retiro del Estado Libre Asociado de Puerto Rico", que establecería que toda corporación multinacional que venda más de un billón de dólares por año estará obligada a dejar en la banca local un 25% de ese dinero en Puerto Rico, por un término de diez años y de ese dinero se le traspasará un 5% al referido fondo con el propósito de reducir el déficit actuarial; (5) el P. del S. 430, que autorizaría al Sistema de Retiro a tomar dinero prestado de la Asociación Conjunta del Seguro de Responsabilidad Obligatorio; (6) el P. del S. 431, que crearía la "Ley de Justicia al Pensionado del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico", mediante la cual se cedería un 2% del dinero retenido por toda entidad bancaria o financiera en

nuestra jurisdicción, como parte del dinero en circulación[26] de los depósitos de nómina de pensionados del Sistema de Retiro y de la nómina de empleados públicos; (7) el P. del S. 474, que destinaría al Sistema de Retiro el exceso de $6,500,000 de los fondos transferidos por la Asociación de Suscripción Conjunta, provenientes de la partida de "Fondos Retenidos por el Asegurador Pertenecientes a Otros", luego de que éstos se convierten en propiedad del Gobierno de Puerto Rico y pasen al Fondo General del Tesoro Estatal; y (8) el P. del S. 493, un proyecto similar al P. del S. 474, dirigido a crear una nueva asignación anual para nutrir el déficit actuarial del Sistema de Retiro.

Además, durante el proceso de la aprobación de la Ley Núm. 3-2013 participaron distintos sectores en representación de los grupos obreros y otros. Éstos expusieron claramente las repercusiones que la medida conllevaría en los servidores públicos. En ese proceso no tan sólo presentaron sus opiniones, sino que emitieron recomendaciones al Estado. Muchas de las recomendaciones razonables y acciones necesarias que el Estado pudo implantar son las siguientes: (1) cobrar las deudas que mantiene el Sistema de Retiro y no condonar las mismas; (2) requerir que se cumpla con el envío de las aportaciones individuales y patronales retenidas y que se impongan multas y penalidades por tal incumplimiento; (3) aumentar la captación del Impuesto a la Venta y Uso; (4)

---

[26]Se refiere al dinero depositado pero no acreditado a la cuenta de su destinatario. Ese dinero devenga intereses para las entidades bancarias mientras se finaliza ese proceso.

atender la evasión contributiva; (5) evaluar aumentar razonablemente las aportaciones de los empleados; (6) reducir los contratos de servicios profesionales, consultivos y de publicidad; (7) solicitar informes sobre el impacto de aprobaciones de leyes que permitieron acogerse al retiro a ciertos empleados para evaluar si recibieron aumentos de sueldo con el propósito de gozar de mayores beneficios al momento de la jubilación; (8) establecer un "grandfather clause" para aplicarse a servidores públicos de más de 50 años para que puedan retener su derecho a retirarse por mérito; (9) investigar el desembolso de beneficios a favor de personas fallecidas; y (10) solicitar información certificada sobre: (a) las deudas patronales, planes de pago y cumplimiento de éstos; y (b) las deudas condonadas a patronos y las razones para ello. Véanse, Ponencia del 14 de marzo de 2013 del Grupo de Funcionarios y Empleados de la Oficina del Contralor de Puerto Rico, págs. 8 y 9; Ponencia de 20 de marzo de 2013 de Servidores Públicos Unidos de Puerto Rico, Concilio 95/AFSCME con relación al P. de la C. 888, págs. 15-17.

Queda evidenciado que el Estado tuvo y tiene a su alcance varias recomendaciones y alternativas viables para reducir la brecha del flujo de efectivo del Sistema de Retiro, el cual amenaza con afectar la solvencia del fideicomiso. A pesar de ello, el Estado procedió a aprobar la Ley Núm. 3-2013. Expongamos las consecuencias adversas y los cambios drásticos contenidos en la legislación que nos ocupa.

III

Como hemos expuesto, el Sistema de Retiro está enmarcado en tres legislaciones diferentes, a saber: la Ley Núm. 447, la Ley Núm. 1 y la Reforma 2000. La Ley Núm. 3-2013 propone cambios radicales, entre los que se destacan los siguientes: (1) crear un programa híbrido de contribución definida; (2) eliminar la pensión por mérito (edad más años de servicio); (3) modificar las estructuras de las leyes que cobijan a los empleados públicos en el Sistema de Retiro; (4) alterar y requerir más años de servicio a los servidores públicos para gozar de los beneficios de una jubilación; (5) reducir beneficios especiales; (6) aumentar la aportación individual del empleado público; y (7) aumentar el desembolso del empleado público al obligarle a adquirir un seguro por incapacidad e imponerle los gastos de la administración del sistema.

En términos generales, los beneficiarios de la Ley Núm. 447 y la Ley Núm. 1, hasta la aprobación de la Ley Núm. 3-2013, gozaban de un plan de beneficio definido y una pensión por mérito bajo ciertas condiciones. Por su parte, la Reforma 2000 no contemplaba un beneficio definido, ya que ésta funcionaba como un plan de ahorro el cual repartía la aportación del empleado más el rendimiento que ésta pudiera generar, por lo que no existía un beneficio mínimo estipulado.

Las anualidades de retiro de los participantes de la Ley Núm. 447 eran calculados a base del 1.5% del salario promedio multiplicado por los primeros 20 años de servicio, más un 2%

del salario promedio multiplicado por los años de servicio restantes.[27] En todo caso, la anualidad no podía exceder de un 75% de su salario promedio. Además, al amparo de la Ley Núm. 447, los empleados tenían la opción de recibir una pensión por mérito equivalente al 75% de su salario promedio, siempre y cuando contaran con 30 años de servicio y 55 años de edad. No obstante, por virtud de la Ley Núm. 3-2013 la pensión por mérito ha quedado eliminada, excepto para todo empleado que entre el 1 de julio de 2013 y el 30 de diciembre de 2013, cumpla con las condiciones indicadas. Ahora bien, de estos empleados ejercer su derecho, su pensión quedará reducida hasta un 15%. Véase, Informe de la Reforma del Sistema de Retiro, Ley Núm. 3-2013. http:// www.retiro.pr.gov/ wp-content /uploads/2013/04/ Presentacion-Ley-3-17-de-abril-de-2013.pdf.

Por otra parte, al aprobarse la Ley Núm. 1 la anualidad de retiro de todo empleado que entrara al servicio público entre el 1 de abril de 1990 y el 31 de diciembre de 1999, equivaldría al 1.5% por ciento de su salario promedio multiplicado por sus años de servicio.[28] Ambas legislaciones contemplaban un beneficio mínimo.

La Ley Núm. 3-2013 alteró el pilar de estos sistemas al cambiar la fórmula de beneficio a partir del 30 de junio de 2013; eliminó la pensión por mérito, y exigió a los

---

[27]El salario promedio es calculado a base de los salarios más altos durante cualesquiera 36 meses.

[28]El salario promedio es calculado a base de los últimos 5 años de servicio.

servidores públicos laborar por más tiempo, requiriéndoles, a su vez, mayores aportaciones y eliminando beneficios.

Básicamente, a partir del 30 de junio de 2013 los integrantes de la Ley Núm. 447 y la Ley Núm. 1 tendrán que trabajar más tiempo y luego de esa fecha sus beneficios para jubilación equivaldrían a un plan de ahorro.[29] En cuanto a los empleados bajo la Reforma 2000, éstos no podrán contar con el rembolso en una suma global de lo que aportaron para luego poder invertir el mismo, sino que, por el contrario, dependerán de una anualidad vitalicia. Ante la incertidumbre de cuánto realmente será el rendimiento de su dinero, los empleados públicos tendrán mayores dificultades para planificar su retiro. A su vez, nadie les garantiza que el nuevo sistema de retiro goce de suficiente liquidez para cumplir con el pago de estas anualidades una vez estos empleados se retiren.

Con relación a la edad de retiro, debemos señalar que, en términos generales, bajo la Ley Núm. 447 un empleado podía retirarse a los 55 años de edad con 25 años de servicio, o 58 años de edad con 10 años de servicio. De igual forma, la Ley Núm. 447 proveía para que un empleado se pudiera acoger a una pensión diferida.[30] Por el contrario, con las modificaciones

---

[29]La Ley Núm. 3-2013 contempla que la rentabilidad de las aportaciones nunca será menor del 80% del rendimiento neto de la cartera de inversión por semestre de rentabilidad. La anualidad se hará a base de un factor a determinarse por el actuario del Sistema de Retiro y la expectativa de vida actuarial con la tasa fija garantizada.

[30]Específicamente, la Ley Núm. 447 proveía para que un empleado público con menos de 58 años de edad y con 10 a 25 años de servicios pudiera recibir una pensión diferida una

introducidas por la Ley Núm. 3-2013, los participantes bajo la Ley Núm. 447 que tengan, al 30 de junio de 2013, 55 años de edad o menos, podrán retirarse a los 61 años de edad, por lo que tendrán que laborar y aportar, como mínimo, por 3 años adicionales a los que se comprometieron al comenzar su faena de servicio. **El examen de cada uno de los restantes grupos escalonados demuestra que los cambios efectuados, relacionados con la edad para acogerse a los beneficios, tienen el efecto de, como mínimo, duplicar los años que le faltaba a un empleado para retirarse bajo la Ley Núm. 447.**[31]

Por su parte, la gran mayoría de los empleados cobijados por la estructura creada por la Ley Núm. 1 podrán retirarse a los 65 años de edad, pero no contarán con el beneficio de un retiro temprano y del ajuste actuarial que ello conllevaba. Recordemos que mediante la opción del retiro temprano existente, antes de entrar en vigor la Ley Núm. 3-2013, un empleado cobijado por la Ley Núm. 1, podía jubilarse una vez cumplía un mínimo de 25 años de servicio y alcanzaba la edad de 55 años. Ahora, **estos empleados tendrán que esperar a la edad mínima de 65 años para recibir los beneficios.** Un

---

vez alcanzara los 58 años de edad. Asimismo, este beneficio de pensión diferida también estaba disponible para aquellos servidores públicos que se hubiesen retirado con 25 años de servicio, pero con menos de 55 años de edad.

[31]Ello surge de que hoy día los funcionarios bajo la Ley Núm. 447, que al 30 de junio de 2013 no cumplan con las condiciones antes descritas, podrán retirarse escalonadamente de la siguiente manera: si el empleado tiene 57 años de edad, el retiro será cuando el empleado alcance los 59 años de edad; si el empleado tiene 56 años de edad, podrá retirarse a los 60 años de edad; si el empleado tiene 55 años de edad o menos, será elegible para el retiro cuando alcance 61 años de edad. Véase, Sección 17 de la Ley Núm.3-2013.

ejemplo basta para conceptualizar el alcance nefasto de esta situación. Un empleado público que a sus 21 años de edad comenzó a laborar para el servicio público el 1ro de abril de 1990, hubiera podido optar por el retiro temprano de cumplir con 25 años de servicio y 55 años de edad. Por tanto, este empleado, al 30 de junio de 2013, le faltaban sólo 2 años de servicios y tendría que haber esperado, únicamente, 11 años para cumplir con el requisito de edad y recibir su pensión por retiro temprano. No obstante, con los cambios impuestos por la Ley Núm. 3-2013, ahora tendrá que trabajar por los próximos 21 años hasta alcanzar los 65 años de edad, lo que equivale a 10 años adicionales de servicio a los que contempló originalmente al firmar su contrato de empleo.

Los empleados cubiertos por lo que era la Reforma 2000 podían retirarse a los 60 años de edad. Sin embargo, con las nuevas enmiendas introducidas por la Ley Núm. 3-2013, si éstos no tienen la edad de 60 años al 30 de junio de 2013, **se les duplica el tiempo que les resta por aportar al sistema**, al igual que los beneficiados de la Ley Núm. 447.[32] De ahora en adelante, bajo la Ley Núm. 3-2013, todo empleado que ingrese al Sistema de Retiro podrá recibir los beneficios de

---

[32]Ello se desprende de que la edad de retiro para los participantes de la Reforma 2000 era, en su mayoría, de 60 años de edad. Ahora, con la nueva ley, si al 30 de junio de 2013 el empleado tiene 59 años de edad, el retiro será opcional a los 61 años de edad; si tiene 58 años de edad, podrá retirarse a los 62 años de edad; si tiene 57 años de edad, será elegible para el retiro a los 63 años de edad; si tiene 56 años de edad, podrá jubilarse a los 64 años de edad y si tiene 55 años o menos, será elegible a los 65 años de edad. Véase, Sección 17 de la Ley Núm.3-2013.

jubilación a los 67 años de edad, o a los 55 años de edad, si es considerado un empleado de alto riesgo.

Con relación a la situación particular de los empleados de alto riesgo (policías y bomberos), éstos bajo la Ley Núm. 447, podían retirarse al cumplir 50 años de edad y completar 25 años de servicio. Asimismo, estos servidores podían retirarse antes de cumplir los 50 años de edad si habían prestado entre 10 a 25 años de servicio. No obstante, esta segunda alternativa implicaba una anualidad diferida hasta la fecha en la cual cumplieran los 50 años de edad. En ambos casos, la anualidad sería equivalente a los demás empleados cobijados por la Ley Núm. 447. De igual forma, el retiro de los policías y bomberos era obligatorio a partir de los 62 años.

En el caso de los servidores públicos de alto riesgo cobijados por la Ley Núm. 1, éstos podían retirarse a la edad de 55 años, siempre y cuando hubieran completado 30 años de servicio. En estos casos, distinto a otros empleados, se gozaba del derecho a un 75% de su retribución promedio. Si el empleado de alto riesgo se retiraba antes de los 55 años de edad con 30 años de servicio, se reducía su pensión a un 65% de su retribución promedio.

Con la Reforma 2000, para los empleados de alto riesgo el legislador mantuvo la edad de retiro en los 55 años. A su vez, eliminó la edad de retiro obligatoria para estos funcionarios. Respecto a la aportación individual de estos empleados, la ley mantuvo el 8.275% de su retribución mensual. Sin embargo, el empleado de alto riesgo que

comenzara a laborar a partir del 1 de enero de 2000, vería limitado el importe de su pensión al total de ahorros generados por tales aportaciones a lo largo de su carrera, más el rendimiento alcanzado por la inversión de éstas.

Con el advenimiento de la Ley Núm. 3-2013, se catalogó como empleados de alto riesgo a los policías, bomberos estatales y municipales y a los oficiales de custodia, excluyendo de esta clasificación a los alguaciles. De igual forma, la Ley Núm. 3-2013 ubicó al personal de alto riesgo en un programa híbrido de contribución definida. Como consecuencia, aquellos empleados de alto riesgo cobijados por la Ley Núm. 447, tendrán que esperar hasta tener 55 años de edad y 30 años de servicio para retirarse, por lo que les aumentó en 5 años la edad de retiro y el tiempo de servicio. Igualmente, aquellos servidores de alto riesgo acogidos a la Ley Núm. 1 tendrán que esperar a los 55 años de edad y 30 años de servicio para jubilarse. Por tanto, de igual forma se incrementó por 5 años su tiempo de servicio. La situación de estos funcionarios se recrudece aún más al considerar que tienen que retirarse por obligación a los 58 años de edad y 30 años de servicio.

Por otra parte, mediante esta nueva pieza legislativa, se aumentan los desembolsos que los servidores públicos deben hacer. Así, su aportación se establece en un mínimo de 10% de su retribución. Como si ello no fuera poco, al eliminarse la pensión por incapacidad ocupacional o no ocupacional, se obliga a estos servidores a desembolsar para la adquisición de un seguro por incapacidad. Ese costo, aunque no debe

exceder de un cuarto por ciento de la retribución del participante, aún no ha sido establecido por el Administrador del Sistema de Retiro.[33]

Por otra parte, la Ley Núm. 3-2013 elimina varios beneficios para los futuros retirados y reduce otros para los futuros pensionados: el bono de navidad, la aportación patronal al plan médico, y el bono de medicamentos. De otra parte, esta ley elimina los reconocimientos de servicios no cotizados, la facultad de devolver y transferir aportaciones, y modifica los beneficios por defunción.

Con el marco antes expuesto, pasemos a aplicar el derecho discutido a la controversia ante nuestra consideración.

IV

En las peticiones de certificación ante nuestra consideración, cientos de empleados públicos alegan que la Ley Núm. 3-2013 es inconstitucional por menoscabar sustancialmente los beneficios de retiro contractualmente acordados entre ellos y el Estado. Distinto al criterio errado de una mayoría de esta Curia, los peticionarios están asistidos por la justicia y la razón. Veamos.[34]

_____

[33]Véase, Sección 19 y 26 de la Ley Núm. 3-2013.

[34]Recordemos que las peticiones de certificación ante nuestra consideración impugnan una desestimación conferida por el Tribunal de Primera Instancia. Ante ello, tomamos como ciertos todos los hechos bien alegados en las demandas de los peticionarios. Epifanio Vidal v. Suro, 103 D.P.R. 793 (1975). Una desestimación sólo procederá si, luego de resolver toda duda a favor de los peticionarios-demandantes, encontramos que éstos no exponen una reclamación que justifique la concesión de un remedio. Ramos Lozada v. Orientalist Rattan Furniture, 130 D.P.R. 712 (1992). A su vez, tomamos

Según lo discutido en nuestra exposición del Derecho, en nuestra jurisdicción no existe duda alguna de que las participaciones de un empleado público en el sistema de retiro del Gobierno de Puerto Rico constituyen un interés propietario de naturaleza contractual que activa la garantía constitucional en contra del menoscabo de relaciones contractuales. La Ley Núm. 3-2013, al aumentar considerablemente la edad de retiro y los años de servicio que un servidor público deberá satisfacer antes de acogerse al retiro; al reducir significativamente el importe de la anualidad que recibirán los empleados públicos una vez se jubilen; al eliminar la acumulación de beneficios conferidos por las Leyes Núm. 447 y 1, en aras de establecer un nuevo programa de contribución definida; al aumentar la aportación de los peticionarios al fondo de retiro; al eliminar o reducir los beneficios otorgados a los servidores públicos por virtud de ciertas leyes especiales, y al imponer el pago de un seguro de incapacidad, **ha menoscabado sustancialmente las expectativas de retiro y el contrato de empleo de los servidores públicos, en el cual se les reconoció un derecho adquirido a sus participaciones en el fondo de pensión del Estado**, según los términos y las condiciones dispuestas en la Ley Núm. 447, la Ley Núm. 1 y la Reforma 2000.

Un menoscabo contractual tan severo como éste, sólo puede sobrevivir las exigencias de nuestra Constitución si el Estado logra articular que la Ley Núm. 3-2013 es **necesaria** y

_____
conocimiento judicial de todas las ponencias y los proyectos de ley presentados ante la Asamblea Legislativa con relación al sistema de retiro de los empleados públicos.

**razonable** para alcanzar **un fin público importante**. Al considerar estos factores, no debe haber duda de que, por ser el sistema de retiro **un contrato público** en el cual el Estado es una de las partes contratantes, no hay cabida para otorgarle a la Asamblea Legislativa una deferencia ciega respecto a si las modificaciones instauradas por la Ley Núm. 3-2013 representaban la vía más **necesaria** y **razonable** para el fin público perseguido. Emplear el escrutinio constitucional bajo examen de tal manera, equivale a una renuncia tácita e ilegítima de nuestro poder constitucional para examinar la validez de las leyes a la luz del significado de nuestra Ley Suprema, según tal significado ha sido demarcado por esta Curia y el Tribunal Supremo de los EE.UU. Aclarado lo anterior, examinemos estos factores de cara al contexto específico de la Ley Núm. 3-2013.

La Exposición de Motivos de la Ley Núm. 3-2013, nos ilustra que el fin público perseguido por el Estado, al aprobar la disposición legal indicada, lo constituía atender la erosión total de los activos del sistema de retiro público y evitar la degradación del crédito de Puerto Rico al llamado nivel "chatarra". Véase, Exposición de Motivos, Ley Núm. 3-2013. Para que la Ley Núm. 3-2013 sea válida constitucionalmente, las modificaciones instauradas por su texto para alcanzar ese fin público, debían ser las alternativas **necesarias** y **razonables**.

Como bien indicamos anteriormente, una medida legislativa que menoscaba relaciones contractuales será **necesaria** si no existían medidas legislativas alternas que

lograran la obtención del fin público perseguido de manera menos drástica. En el caso particular ante nuestra consideración, encontramos que existían medidas alternas menos drásticas para inyectarle fondos al sistema de retiro público y evitar la erogación de sus activos.

Según expusimos detalladamente en la Parte II. B. de esta Opinión, al momento de aprobarse la Ley Núm. 3-2013, los miembros de la Cámara y el Senado, y las entidades y los sectores de nuestra sociedad que representaban a los empleados públicos afectados, presentaron una miríada de alternativas razonables y menos drásticas a la Ley Núm. 3-2013, las cuales prometían allegar una cantidad significativa de fondos recurrentes al sistema de retiro público.

Estas numerosas alternativas hubiesen resuelto el problema de flujo de caja del sistema de retiro, evitando así la necesidad de imponer sobre los hombros frágiles de los empleados públicos, la carga onerosa de los déficits creados negligentemente por el Estado. Ante la disponibilidad abrumadora de medidas alternas que hubiesen evitado el menoscabo contractual aquí impugnado, resulta forzoso concluir que la Ley Núm. 3-2013 no era **necesaria**.

En iguales términos, la disposición bajo examen tampoco es **razonable** en su naturaleza. Según lo discutimos anteriormente, una medida legislativa es **razonable** sólo si los efectos que se pretenden mitigar con su promulgación no eran **previsibles** o **intencionados** por el Estado al momento en el cual contrajo la obligación menoscabada. Cuando analizamos la Ley Núm. 3-2013 a la luz de este crisol, encontramos que

los efectos que pretende mitigar fueron previstos desde la fecha en que se creó el sistema de retiro público. Peor aún, las acciones y omisiones del Estado por los pasados 62 años han sido esfuerzos que han agravado la crisis que hoy pretende remediar, a costas del bienestar de miles de empleados públicos inocentes.

Concretamente, desde el 15 de mayo de 1951, fecha en la cual se creó el sistema de retiro que hoy analizamos, el Estado conocía que el mismo sufría de un déficit actuarial millonario que debía atajar con prontitud. Desde el 1957 hasta el presente, la Oficina del Contralor y otras entidades financieras públicas y privadas, pronosticaron el crecimiento desbocado de este déficit y aconsejaron al Estado respecto a la necesidad de atender la crisis financiera del retiro oportuna y adecuadamente.

A su vez, el Gobierno conocía que, por virtud del número significativo de participantes del sistema de retiro prontos a retirarse, el déficit actuarial quedaría agravado por un déficit en el flujo de efectivo, el cual incidiría sobre la liquidez del sistema y la fuente de pago de los beneficios de los empleados. A pesar de estas exhortaciones e indicios de peligro, el Estado se cruzó de brazos y permitió que los déficits trogloditas crecieran desmedidamente.

Peor aún, el Estado se convirtió en agente activo de la crisis que veía venir, tomando acciones en detrimento de la liquidez del fondo de retiro. Según lo expuesto anteriormente, el Estado: (1) aprobó un número significativo de leyes especiales que concedieron unos beneficios

adicionales a la anualidad de retiro; (2) mantuvo en un nivel insostenible el porcentaje mínimo de las aportaciones patronales y de los empleados; (3) emitió bonos garantizados por las aportaciones patronales requeridas para el pago de beneficios de retiro, y (4) otorgó un sinnúmero de préstamos que comprometieron la liquidez del sistema. Por causa de estas acciones, desde el 1954 al presente, los déficits indicados continuaron su ascenso a niveles insostenibles.

Mientras tanto, el Estado se hizo el desentendido y se convirtió en el principal responsable de lo que hoy, en aras de evadir responsabilidad, pretende catalogar como una "acción inevitable". Nada más lejos de la verdad. Todo lo reseñado apunta a que esta crisis **era previsible** desde el momento en el cual se creó el sistema de retiro que hoy se encuentra al borde del abismo. Asimismo, las acciones y omisiones del Estado han sellado el fracaso del sistema, en aras de atender otros intereses de menor importe social. Ante tal proceder, la Ley Núm. 3-2013 no cumple con el criterio de razonabilidad.

**En resumidas cuentas, las cargas impuestas a los trabajadores puertorriqueños por virtud de la Ley Núm. 3-2013 no eran necesarias ni razonables. Consecuentemente, no quedaba otra alternativa que reconocer los vicios de inconstitucionalidad presentes en la ley impugnada.**[35]

---

[35]En iguales términos, recordemos que toda legislación que procure menoscabar relaciones contractuales debe ser **temporera** en su naturaleza. Aquí, los cambios impugnados no tienen un ámbito de aplicabilidad limitado. Al contrario, éstos son de carácter permanente. Ello abona a su inconstitucionalidad.

Sin embargo, la decisión de una mayoría de este Tribunal opta por vindicar la Ley Núm. 3-2013, la cual sólo puede interpretarse como la opción más drástica disponible en el arsenal legislativo del Estado, que conlleva la nefasta realidad de: (1) acelerar la decisión de jubilación o renuncia de los servidores públicos, ocasionando la erogación de fondos no previstos; (2) aumentar de manera dramática e irrazonable los años de servicio requeridos a un empleado para jubilarse; (3) reducir los beneficios de jubilación acordados cuando fue nombrado; (4) agravar la crisis económica y social que atraviesa Puerto Rico, al impedir que los empleados públicos puedan cumplir cabalmente con sus deudas contraídas, ya que al momento de jubilarse no contarán con los ingresos esperados y planificados para su jubilación; (5) limitar las opciones de los servidores públicos, quienes no gozan de alternativas con relación al disfrute de las aportaciones que realizaron; (6) promover la inestabilidad emocional, afectando así la salud y el bienestar de los servidores públicos, quienes desconocen el  monto con el que podrán contar al momento de retirarse; e (7) impedir que el empleado público pueda ahorrar debido a que se gravan sus fondos al aumentar sus aportaciones y requerírsele que adquieran un seguro de incapacidad y que aporten al pago de la administración del sistema.[36]

Hoy, una mayoría de esta Curia obvia esta realidad. Como situación agravante, compran "el argumento *ad terrorem*

---

[36] Véase, Ponencia de 14 de marzo de 2008 del Grupo de Funcionarios y Empleados de la Oficina del Contralor de Puerto Rico sobre el P. de la C. 888, págs. 7-8.

de que la legislación [bajo examen] es intocable judicialmente debido a que la anulación causaría una posible degradación del crédito del país".[37] De tal manera, permiten que el Estado cancele "unilateralmente su compromiso laboral con los servidores públicos..., pretendiendo amordazar al Poder Judicial" en el proceso.[38] En efecto, dos hilos se han entrelazado armoniosamente con un hilo de la mayoría de este Tribunal y el resultado irremediable es que la cuerda triple amordazó a la justicia.

Al así obrar, la Opinión mayoritaria le da la espalda al trabajador puertorriqueño, permitiendo que el Estado le imponga la carga de sus errores a los servidores públicos que confiaron en él. De este modo, olvidan las palabras acertadas del Juez Asociado, señor Alonso Alonso, quien, en una coyuntura similar a la que hoy examinamos, afirmó lo siguiente:

> El Estado y las entidades que tienen responsabilidad sobre la administración y buena marcha de los sistemas de retiro tienen sobre sus hombros una gran responsabilidad de mantener la solvencia de los sistemas de retiro y de administrarlos con debido cuidado y prudencia. **El Estado no debe justificar cambios al sistema de retiro al alegar que son necesarios y razonables para mantener la solvencia económica de éste cuando la debilidad fiscal del mismo se debe al descuido y a la falta de cuidado del Estado propiamente.** (Énfasis suplido.) Bayrón Toro v. Serra, *supra*, pág. 625. (Voto Particular del Juez Asociado, señor Alonso Alonso.)

Ciertamente, el mal que hoy se le impone a los trabajadores es producto del descuido administrativo que, por

---

[37]A. S. Negrón García, Tribunal Supremo y sistema de retiro, El Nuevo Día, 18 de junio de 2013.

[38]Íd.

décadas, el Estado ha venido arrastrando y postergando. Sin embargo, una mayoría de este Foro ha castigado al más inocente –al empleado– y ha premiado la irresponsabilidad del más culpable –el Gobierno. Con ello, ha consentido a que el Estado apunte su lanza en contra de los servidores públicos, para así poder sembrar terror, acusarlos y repartirles las responsabilidades que declinó ejercer. Ante tal proceder, no me queda otra opción que disentir.

V

Por los fundamentos antes expuestos, resulta irremediable reconocer que la Ley Núm. 3-2013 adolece de patentes vicios constitucionales. En consecuencia, procedía revocar al Tribunal de Primera Instancia.

Luis F. Estrella Martínez
Juez Asociado